**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-3025


HIGH COUNTRY CONSERVATION ADVOCATES,
WILDEARTH GUARDIANS,
CENTER FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB, and
WILDERNESS WORKSHOP,


Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
U.S. DEPARTMENT OF AGRICULTURE,
DANIEL JIRÓN, in his official capacity as Acting Under Secretary of Agriculture for Natural
Resources and Environment, U.S. Department of Agriculture,
SCOTT ARMENTROUT, in his official capacity as Supervisor of the Grand Mesa,
Uncompahgre, and Gunnison National Forests,
UNITED STATES DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT, and
KATHARINE MACGREGOR, in her official capacity as Deputy Assistant Secretary, Land and
Minerals Management, U.S. Department of the Interior,


Defendants.

_____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND
PETITION FOR REVIEW OF AGENCY ACTION**
_____

## INTRODUCTION

1.      The Sunset Roadless Area is a 5,800 acre forested landscape which hugs the west flank of 12,700-foot Mount Gunnison and the West Elk Wilderness in northwestern Gunnison County, Colorado.  The area's undisturbed lands are characterized by wide swaths of aspen groves and mixed conifer forest; wildflowers, meadows, streams, and beaver ponds are also found here.  These habitats support numerous different wildlife species, from black bear and the imperiled Canada lynx, to chorus frogs and snakes.  The area is treasured by hunters and hikers alike for its remoteness and beauty.  Visitors may delight in stunning views of Mount Lamborn and the Ragged Mountains while enjoying a quiet hike in the pristine forest.

2.      For years, this intact forest has been on the chopping block, threatened by a proposed expansion of the West Elk Mine, owned by the nation's second largest coal company, Arch Coal.  Arch has been seeking to expand the mine's underground operations beneath the Sunset Roadless Area since 2009.  Operating the mine below ground requires the construction within the roadless area of a spiderweb network of bulldozed roads and the flattening and clearcutting of forest for drilling pads and methane drainage wells that will release methane, a potent greenhouse gas.  In 2012 and 2013, the Forest Service and Bureau of Land Management (BLM) issued a suite of decisions approving an expansion that would have led to the construction of more than 6 miles of roads and nearly 50 drilling pads within a 1,700-acre area at the heart of the Sunset Roadless Area.

3.      This Court, however, stopped this threatened destruction in 2014 by vacating the federal agencies' decisions.  The Court held that the Forest Service and BLM violated the National Environmental Policy Act (NEPA) in their environmental review by turning a blind eye

1

to the project's huge climate costs while carefully accounting for the alleged economic benefits of the expansion, an approach that subverted the law's mandate that agencies take a "hard look" at environmental impacts. <u>High Country Conservation Advocates v. U.S. Forest Serv.</u>, 52 F. Supp. 3d 1174 (D. Colo. 2014).

4.     The threat to the Sunset Roadless area did not end there, however, as Arch renewed its efforts to expand the mine. The Forest Service and BLM conducted new NEPA analysis on the proposed expansion over the last two years. But despite having the benefit of a second opportunity to fully account for the mine expansions' harms, the agencies have, among other errors, again underestimated or obscured the climate pollution impacts of the expansion while improperly boosting the purported economic benefits.

5.     Based on this skewed analysis, the Forest Service and the Department of the Interior recently issued three decisions which set the stage for Arch to move forward with the expansion. First, effective April 17, 2017, the Forest Service reinstated an exception to the Colorado Roadless Rule, which generally prohibits road construction in Forest Service roadless areas. This "exception" (or loophole) allows road construction for coal mining within the 19,700-acre "North Fork Coal Mining Area," which encompasses the Sunset Roadless Area as well as nearby Pilot Knob and Flatirons Roadless Areas.

6.     Second, on December 11, 2017, the Forest Service consented to the modification of two coal leases, paving the way for the mine to expand into 1,700 acres of the Sunset Roadless Area, and access approximately 17.6 million tons of coal.

7.      Third, today, December 15, 2017, the Department of the Interior approved of the lease modifications.  As a result of these three decisions, Arch may imminently begin bulldozing up to 6 miles of road and scrape 10 drilling pads into the roadless area.

8.      The roads and drilling pads for both the exploration plan and mining the Lease Modifications will clearcut forest, destroy and fragment habitat, displace wildlife, alter hydrology, and transform a natural forest into a developed area.  The scars of construction will persist for decades, long after the mine has removed its coal and moved on.  Further, West Elk was the state's single largest industrial polluter of methane over the past six years.  The mine expansion will guarantee years more methane pollution.  Combustion of the 17 million tons of coal Arch hopes to mine will release up to 45 million tons of carbon dioxide, further accelerate the damaging impacts of climate change.

9.      The decision to reinstate the North Fork Coal Mining Area exception to the Colorado Roadless Rule must be set aside because the Forest Service violated NEPA in three significant ways.  First, the agency failed to consider an alternative that would have protected the Pilot Knob Roadless Area from coal mining.  Pilot Knob contains distinct habitat compared to the other roadless areas subject to the exception; protecting Pilot Knob would preserve winter range for deer and bald eagles and severe winter range for elk.  Second, the Forest Service failed disclose or analyze the water, wildlife, vegetation or other resources across the 19,700-acre exception area, making it impossible for the agency to fairly compare alternative courses of action.  Third, the Forest Service failed to acknowledge and account for the environmental impacts of the increased demand for coal which will be induced by its decision.  The Forest Service's decision to open up more lands to roads and mining will add more coal to the market,

3

causing the price of coal-fired electricity to fall, and inducing demand for more coal-fired electricity and causing more climate impacts.  By failing to consider this reasonably foreseeable effect, the Forest Service underestimated the climate pollution – and the climate impacts – attributable to the exception.

10.     The Forest Service's consent to, and the Interior Department's approval of, the Lease Modifications for the West Elk Mine must also be set aside because it also violates NEPA, for five reasons.  First, the Forest Service and Department of the Interior (the Agencies) failed to take a "hard look" at the Lease Modifications' climate impacts in a manner that directly contradicts this Court's decision in High Country Conservation Advocates, 52 F. Supp. 3d at 1190-93.  In that case, this Court held that an agency must disclose the climate impacts of its decision by using a scientifically valid and available tools (the social cost of carbon protocol) or provide a rational explanation for why that approach is not appropriate.  Here, the Agencies did neither.  Second, compounding this error, the Agencies failed to take a "hard look" at the socioeconomic impacts of the Lease Modifications by overstating the economic benefits of extending the mine's life.  The Agencies thus simultaneously ignored the mine expansion's climate costs while inflating its benefits.  Third, instead of addressing this skewed analysis, the Agencies failed to respond to an expert report submitted by Plaintiffs identifying clear errors in its socio-economic analysis.  Fourth, the Agencies failed to consider a reasonable alternative aimed at mitigating the methane pollution associated with the Lease Modifications, despite an expert report demonstrating the feasibility of flaring vented methane.  Fifth, the Agencies' NEPA analysis failed to disclose how criss-crossing the area with roads and pads will effectively fragment what is now intact wildlife habitat.

11.     The Forest Service's approval of the North Fork Coal Mining Area exception and consent to the Lease Modifications, as well as the Department of the Interior's approval of the Lease Modifications, violate federal law.   The Agencies' decisions must be set aside, and any construction of roads or well pads allowed by those decisions must be enjoined.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 5 U.S.C. §§ 701-706 (Administrative Procedure Act's judicial review provisions).  The Court may order relief pursuant to 28 U.S.C. § 2201 (declaratory judgments).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred within this judicial district, the Forest Service has an office in this district, the public lands and resources in question are located in this district, and the agency actions will cause impacts in this district.

## PARTIES

14.     Plaintiff High Country Conservation Advocates (HCCA) is a non-profit conservation organization headquartered in Crested Butte, Colorado.  Founded in 1977 as High Country Citizens' Alliance to keep Mount Emmons molybdenum mine-free, the group's work now addresses other issues that affect Gunnison County's clean air, clean water, public lands, and healthy wildlife.  HCCA has about 900 members who live, recreate, and enjoy the rural and wild character of Gunnison County and its public lands.  HCCA is an active participant in public lands management in Gunnison County, including the lands at issue in this case.

15.     Plaintiff WildEarth Guardians is an American West-based non-profit environmental advocacy organization dedicated to protecting and restoring the wildlife, wild

places, and wild rivers throughout the American West.  WildEarth Guardians is headquartered in

Santa Fe, New Mexico, and has offices in Denver, Colorado and throughout the western U.S.

WildEarth Guardians has over 100,000 members.  Through its Climate and Energy Program,

WildEarth Guardians aims to combat global climate change to protect the American West's

wildlife, wild places, and wild rivers.  WildEarth Guardians works for clean energy solutions that

can help our society shift away from the use of fossil fuels in order to safeguard our climate, our

clean air, and our communities.

16.     Plaintiff The Center for Biological Diversity is a non-profit environmental

organization with over 61,000 members, many of whom live and recreate in western Colorado.

The Center is headquartered in Tucson, Arizona, with offices in a number of states and Mexico.

The Center uses science, policy, and law to advocate for the conservation and recovery of

species on the brink of extinction and the habitats they need to survive.  The Center has and

continues to actively advocate for increased protections for species and their habitats in

Colorado.

17.     Plaintiff Wilderness Workshop is a non-profit organization engaged in research,

education, legal advocacy and grassroots organizing to protect the ecological integrity of local

public lands.  Wilderness Workshop is based in Carbondale, Colorado and has approximately

800 members.  Wilderness Workshop not only defends pristine public lands from new threats,

but also strives to restore the functional wildness of landscapes fragmented by human activity.

Wilderness Workshop works to protect and preserve existing wilderness areas, advocate for

expanding wilderness, defend roadless areas from development that would destroy their

wilderness character, and safeguard the ecological integrity of all federal public lands in the vicinity of the White River National Forest, including the lands at issue in this case.

18.     Plaintiff Sierra Club is America's largest grassroots environmental organization, with more than 830,000 members nationwide, including more than 24,000 members in Colorado. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

19.     Plaintiffs High Country Conservation Advocates, WildEarth Guardians, The Center for Biological Diversity, Wilderness Workshop, and the Sierra Club and/or their members have commented and been involved in every stage of the Agencies' decisionmaking process.

20.     Members and staff of the Plaintiffs' organizations regularly use and enjoy the lands impacted within the Lease Modifications and within the area of the Exploration Plan, as well as adjacent lands, for a variety of purposes, including wildlife and wildflower viewing, photography, recreation, and aesthetic appreciation of the area's natural, wild values.  The Plaintiffs' members and staff are also concerned with protecting the wildlife, scenery, air quality, and other natural values of the North Fork Coal Mining Area.  The Forest Service's and U.S. Department of Agriculture's removal of protections for the North Fork Coal Mining Area irreparably harms Plaintiffs' interests and the interests of their members because it will result in the bulldozing of miles of road and construction of drilling pads within the Sunset Roadless Area.  Road construction will destroy wildlife habitat and vegetation, and degrade Plaintiffs' members' enjoyment of wildlife, photography, recreation, and the natural and wild character of

the Sunset Roadless Area.  Plaintiffs' members plan to return to the Sunset Roadless Area and

the lands within the Lease Modifications and within the area of the Exploration Plan this year

and every year for the foreseeable future.  Because Arch Coal intends to begin road and pad

construction for exploration as soon as this month within the Sunset Roadless Area, harm to

Plaintiffs' members' interests is imminent.

21.     The Agencies' failure to comply with NEPA harms the Plaintiffs' members and

staff by denying them the right to informed decisionmaking and full disclosure under NEPA, as

well as the right to meaningfully participate in the decisionmaking process.

22.     Defendant United States Forest Service is a federal agency under the U.S.

Department of Agriculture.  The Forest Service is responsible for managing the Grand Mesa,

Uncompahgre, and Gunnison National Forests (GMUG) and for "consenting" to the Lease

Modifications.  The Forest Service is also responsible for "concurring" in the BLM's approval of

the Exploration Plan.  The Forest Service is responsible for adopting and ensuring the agency

complies with its rules, including the Colorado Roadless Rule, which was altered by the decision

to adopt the North Fork Coal Mining Area exception.  Officials of the Forest Service, acting in

their official capacity, consented to the Lease Modifications and concurred in an exploration plan

for the area.

23.     Defendant U.S. Department of Agriculture is charged with the administration of

the U.S. Forest Service.  The U.S. Department of Agriculture has the authority to adopt rules and

regulations concerning the management of Forest Service lands, including the Colorado Roadless

Rule North Fork Coal Mining Area exception.

24.     Dan Jirón is the acting Under Secretary of Agriculture for Natural Resources and Environment.  Mr. Jirón's predecessor, Robert Bonnie, signed the Record of Decision adopting the North Fork Coal Mining Area exception on December 19, 2016, which became effective on April 17, 2017.  81 Fed. Reg. 91811 (Dec. 19, 2016); 82 Fed. Reg. 9973 (Feb. 9, 2017) (effective date).  Mr. Jirón is sued in his official capacity.

25.     Defendant Scott Armentrout is the Supervisor of the GMUG National Forest.  Mr. Armentrout signed the Record of Decision consenting to the West Elk Mine's Lease Modifications on December 11, 2017.  Mr. Armentrout is sued in his official capacity.

26.     Defendant U.S. Department of the Interior is charged with carrying out the Mineral Leasing Act of 1920, as amended, and the Federal Policy and Land Management Act of 1976.  Pursuant to its obligations under those laws, the Department of the Interior has authority to make mineral leasing decisions on federal lands, including lands administered by the U.S. Forest Service.  The U.S. Department of the Interior also has the authority to adopt rules and regulations concerning the management of the BLM.

27.     Defendant Bureau of Land Management is a federal agency under the U.S. Department of the Interior.  Through the BLM, the Department of the Interior exercises the federal government's authority to make mineral leasing decisions on federal lands, including lands administered by the U.S. Forest Service.

28.     Defendant Katharine MacGregor serves as Deputy Assistant Secretary, Land and Minerals Management.  Exercising the authority of the Assistant Secretary, Land and Minerals Management, Ms. MacGregor signed the Record of Decision relying on the Lease Modifications

SFEIS and approving of the Lease Modifications and Exploration Plan on December 15, 2017.

Ms. MacGregor is sued in her official capacity.

## LEGAL FRAMEWORK

### I.      THE ADMINISTRATIVE PROCEDURE ACT

29.     Because NEPA does not include a citizen suit provision, this case is brought

pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706, 1305, 3105,

3344, 4301, 5362, and 7521.

30.     The APA allows persons and organizations to challenge final agency actions in

the federal courts.  Id. §§ 702, 704.  The APA declares that a court shall hold unlawful and set

aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.  Id. § 706(2)(A).

### II.     THE NATIONAL ENVIRONMENTAL POLICY ACT

31.     Congress enacted NEPA, 42 U.S.C. §§ 4321-4370h, to, among other things,

"encourage productive and enjoyable harmony between man and his environment" and to

promote government efforts "that will prevent or eliminate damage to the environment."  Id.

§ 4321.  As a general matter, NEPA requires that federal agencies analyze and disclose to the

public the environmental impacts of their actions.  Id. § 4332(2)(C).

32.     To this end, the Council on Environmental Quality (CEQ) has promulgated

regulations implementing NEPA.  Among other things, the rules are intended to "tell federal

agencies what they must do to comply with the procedures and achieve the goal of [NEPA]," to

"insure that environmental information is made available to public officials and decisions are

made and before actions are taken," and to ensure "better decisions" and "foster excellent action." 40 C.F.R. § 1500.1(a)-(c).

33.     To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The agency should describe "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii). Overall, an EIS must "provide [a] full and fair discussion of significant impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

34.     NEPA requires federal agencies to analyze "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). NEPA also requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). CEQ regulations implementing NEPA identify the alternatives analysis as the "heart" of a NEPA document. 40 C.F.R. § 1502.14. NEPA's implementing regulations emphasize an agency's duty to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.16.

35.     An EIS must also identify the direct, indirect, and cumulative impacts of each reasonable alternative, including a project's ecological, aesthetic, economic, social, and health effects. Id. §§ 1502.15, 1508.8. Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." Id. § 1508.8. Indirect impacts are "caused by the

action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. § 1508.7.

36.     NEPA further requires that agencies disclose, discuss, and respond to "any responsible opposing view," and provide a rationale for choosing one approach over the other. 40 C.F.R. § 1502.9(b).

37.     In approving an action analyzed in an EIS, federal agencies must issue a Record of Decision (ROD). 40 C.F.R. § 1505.2. At a minimum, an ROD must state what the decision was, identify all alternatives considered by the agency in reaching its decision, and state "whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." Id. § 1505.2(a)-(c).

## III.   THE MINERAL LEASING ACT

38.     The Mineral Leasing Act, 30 U.S.C. §§ 181-287, grants BLM the authority to lease federally-owned coal. BLM's coal-leasing authority extends to federally-owned coal on lands controlled by other federal or state agencies, including the Forest Service, and on split-estate lands where private landowners control the surface estate. Id. §§ 181, 182.

39.     Under the Mineral Leasing Act, coal leases on Forest Service land "may be issued only upon consent" of the Forest Service and "only ... upon such conditions as [the Forest

Service] may prescribe with respect to the use and protection of the nonmineral interests in those lands." Id. § 201(a)(3)(A)(iii).

40.     Regulations issued pursuant to the Mineral Leasing Act and the Federal Land Policy and Management Act (FLPMA) govern the exploration of federally-owned coal. Exploration plans concerning federal coal are regulated under three separate regimes.  First, where the exploration will take place on lands not subject to a federal coal lease, the entity seeking to explore must receive an exploration license.  43 C.F.R. Part 3410 (Exploration Licenses).  These regulations require the publication of a notice of the company's exploration plans in the Federal Register, and a requirement that other companies have the chance to share in the costs and the data retrieved from such exploration.  43 C.F.R. § 3410.2-1(c).  Second, where the exploration will occur on lands leased to the entity seeking to explore, but not within an approved mine permit boundary, BLM reviews the exploration plan pursuant to the requirements of 43 C.F.R. Part 3480.  These regulations do not require posting notice of the exploration proposal in the Federal Register.  Finally, where an entity seeks to explore lands within the boundary of its mine permit boundary, exploration activities are permit[ted] through the Office of Surface Mining, via the Colorado Division of Reclamation, Mining, and Safety (DRMS).

41.     Where an entity seeks to explore on federal lands under lease but not currently within a mine permit boundary, the company may not begin exploration operations unless the company has first "obtain[ed] approval from the authorized [BLM] officer."  43 C.F.R. § 3482.1(a)(1).  BLM has discretion to disapprove any exploration plan within a lease, or it may require an applicant to modify the plan.  43 C.F.R. § 3480.0-6(d)(1) (authorized officer at BLM

has duty to "[a]pprove, disapprove, approve upon condition(s), or require modification to exploration plans for Federal coal."). See also id. §§ 3482.1(a)(1); 3482.2(a)(1).

42.     Where other federal agencies, such as the Forest Service, manage surface resources, BLM is required to engage in "consultation" with the surface managing agency. 43 C.F.R. § 3482.2(a). To this end, an exploration plan cannot be approved until the surface managing agency reviews the adequacy of the reclamation bond and concurs "with the approval terms" of the exploration plan. 43 C.F.R. § 3482.2(a).

## IV.     THE 2001 ROADLESS AREA CONSERVATION RULE

43.     The Forest Service's 2001 Roadless Area Conservation Rule (hereinafter the "National Roadless Rule") prohibits road construction and reconstruction in Inventoried Roadless Areas and prohibits the cutting, sale, or removal of timber from Inventoried Roadless Areas, subject to limited exceptions. 66 Fed. Reg. 3244, 3272–73 (Jan. 12, 2001) (to be codified at 36 C.F.R. §§ 294.10-.14); see also Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209 (10th Cir. 2011) (upholding the 2001 Roadless Area Conservation Rule).

## V.     THE COLORADO ROADLESS RULE

44.     On July 3, 2012, the Forest Service approved and adopted the Colorado Roadless Rule, which applies to National Forest roadless areas in this state. 77 Fed. Reg. 39,576, 39,576 (July 3, 2012). While the National Roadless Rule prohibits road construction for coal mining in inventoried roadless areas, the 2012 Colorado Roadless Rule contained an exception allowing construction of temporary roads for "coal exploration and/or coal-related surface activities" in the North Fork Coal Mining Area, which is identified on maps included in the Colorado Roadless Rule final EIS. Id. at 39,578. 36 C.F.R. § 294.43(c)(1)(ix).

45.     In 2014, the U.S. District Court for the District of Colorado set aside and vacated

the Forest Service's decision to adopt the North Fork Coal Mining Area exception.  High

Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174 (D. Colo. 2014).

46.     After completing additional NEPA analysis in 2015 and 2016, the Forest Service

reinstated the exception permitting road construction for coal mining in the North Fork Coal

Mining Area, effective April 17, 2017.

## FACTUAL BACKGROUND

## I.     THE WEST ELK MINE AND PROPOSED LEASE MODIFICATIONS

47.     The West Elk Coal Mine is located near Paonia, Colorado, in the North Fork

Valley of Gunnison County.  The Mine opened in 1982 and is an underground coal mine that

employs the longwall mining method.  The Mine is owned and operated by Mountain Coal

Company LLC (MCC), a subsidiary of the nation's second largest coal producer, Arch Coal.

The Mine largely underlies lands managed by the U.S. Forest Service as the GMUG National

Forest.  The West Elk Mine has an annual production capacity of 7 million tons of coal.

48.     The geologic formations in and adjacent to the coal seams mined at West Elk

contain significant amounts of methane.  Methane is released as a result of mining.  Because it is

combustible, methane can pose a safety hazard in mines.  To protect miners, the federal Mine

Safety and Health Administration requires MCC to remove excess methane, which the Mine has

chosen to do in part by venting methane directly into the atmosphere through methane drainage

wells.  These methane drainage wells are located every 750 to 1,000 feet on the land surface

above the longwall panel.  The Forest Service and BLM have alleged that methane drainage

wells are essential for the West Elk Mine's operations.

49.     On January 16, 2009, two subsidiaries of Arch Coal (MCC and Ark Land Company) submitted an application to BLM for two Lease Modifications that would add approximately 10.1 million tons of federal coal to two of the West Elk Mine's existing leases, COC-1362 and COC-67232.

50.     These Lease Modifications would allow MCC to access and mine additional coal on adjacent Forest Service and private lands.  This adjacent Forest Service and private land coal could not be mined without MCC obtaining the right to mine the Lease Modifications area because of the geometric alignment of underground coal "panels" (areas to be mined) on the existing leases.  In 2017, the Forest Service stated that the Lease Modifications would permit MCC to access an additional 7.5 million tons of coal from private lands and from existing federal leases that would otherwise not be mined, raising to 17.6 million tons the total volume of coal that MCC could produce due to the Lease Modifications.

## II.     THE WEST ELK MINE'S SURFACE IMPACTS

51.     The drilling of exploration holes and methane drainage wells required to mine coal at the West Elk Mine cause damaging surface impacts to the land above and adjacent to the Mine.  Each methane drainage well requires bulldozing an area about one acre in size to clear the well pad; exploration pads cause similar damage.  In addition, each exploration pad and methane drainage well requires the construction of roads to transport the drill rig and construction and maintenance equipment that must access the drill site.  Because the terrain in the area is rough and hilly, roads and pads often carve areas out of hillsides where cut and fill is required to level the pad and road bed.  Waste pits are dug at each drilling site.  Water used in drilling operations is often sucked from a nearby creek; long hoses or pipes snake through adjacent woods to deliver

16

water to the pad. Where roads are constructed across streams, the streams are channelized through a metal culvert. The pads and roads needed for methane drainage wells and exploration pads eliminate vegetation, fragment wildlife habitat, can pollute surface waters, and degrade many other resources.

### III. THE SUNSET ROADLESS AREA

52. The Lease Modifications add 1,721 acres to the West Elk Mine's existing federal coal leases. The vast majority of the Mine's expansion would occur in the Sunset Roadless Area. More than 1,700 acres of the land covered by the Lease Modifications – 99% of the Lease Modifications' acreage – are located in the Sunset Roadless Area.

53. The Sunset Roadless Area is a 5,800-acre expanse of undeveloped and unroaded aspen and giant spruce forests located nine miles east of Paonia, Colorado, and directly adjacent to the West Elk Wilderness Area. The Sunset Roadless Area is home to elk, mule deer, black bear, wild turkey, beaver, chorus frog, goshawk, and mountain lion. The Sunset Roadless Area also contains habitat for the threatened Canada lynx. Because the Sunset Roadless Area contains high-quality, undeveloped Forest Service lands, in 2005 the Forest Service found nearly 3,000 acres of the Sunset Roadless Area "capable" of wilderness protection.

54. If the coal in the Lease Modifications is mined, the Forest Service has estimated that 1,701 acres of the 5,800-acre Sunset Roadless Area would be pock-marked by methane drainage wells and associated well pads and criss-crossed with roads needed to access them. Because 99% of the Lease Modifications' acreage lies in the Sunset Roadless area, nearly all of the 48 methane drainage wells identified under the Lease Modifications' "Reasonably Foreseeable Mine Plan" will likely be located within the Sunset Roadless Area. Expansion of

17

the West Elk Mine into the Sunset Roadless Area would fragment wildlife habitat, destroy plant and wildlife communities, cause increased air and climate pollution, diminish solitude, and significantly harm other resources in the Roadless Area.  Aspen and spruce trees a century old or older will be logged; the U.S. Fish and Wildlife Service concluded that habitat may not recover its "functionality" for some wildlife species for 30-40 years after the roads and well pads are decommissioned.  The area's capability for addition to the preservation as wilderness would also likely be compromised due to the construction of roads, well pads, and clearcutting, some of which will occur within the lands identified as wilderness capable by the Forest Service in 2005.

## IV.   THE WEST ELK MINE'S CLIMATE POLLUTION

55.   In addition to requiring methane drainage wells and roads that scar the surface above and adjacent to the West Elk Mine, the Mine's high concentrations of methane cause and contribute to air pollution and climate change when vented into the atmosphere.  The Mine emits methane in low concentrations through its ventilation system, and in much higher concentrations through the Mine's methane drainage wells.  According to data the Mine itself submits to the U.S. Environmental Protection Agency (EPA), the West Elk Mine emitted more than 4.4 million tons of carbon dioxide-equivalent of methane pollution over the period 2011 through 2016, making it the single largest industrial methane polluter in the State of Colorado during that period.

56.   Methane is a potent greenhouse gas with both short-term and long-term climate impacts.  The warming influence of greenhouse gasses are frequently measured and compared using a "global warming potential" (GWP), which compares the warming influence of one ton of a specified greenhouse gas to that of one ton of carbon dioxide.  The Agencies acknowledges

18

that methane has a GWP of between 28 (gas alone) and 36 (with climate feedbacks) when measured over a 100-year period.  Methane's short term climate impacts are far higher: measured over a 20-year period, methane has a GWP of 84 to 87, according to EPA.

57.    The additional 17.6 million tons of coal that the 2017 Lease Modifications would make available could result in up to 45 million additional tons of carbon dioxide pollution. Methane emissions due to continuing mining amount to as much as 977,000 tons of CO2e per year.

58.    When the impacts of methane pollution and coal combustion are combined, the West Elk Mine could be responsible for as much as 47.6 million tons of CO2ein greenhouse gas pollution over the 2.7 years it is predicted to take MCC to mine the coal made available by the Lease Modifications.

59.    The U.S. Supreme Court long ago acknowledged that climate change poses "serious and well recognized" impacts to the human environment.  <u>Massachusetts v. EPA</u>, 549 U.S. 497, 521 (2007).  Among the long list of public health and environmental harms caused by climate change are increased average temperatures, more frequent extreme temperatures, more frequent extreme weather events, increased sea-level rise, changes in precipitation patterns, increased species extinctions, and increased public health harms.  The Forest Service and BLM state that in Colorado average temperatures have increased by 2 degrees Fahrenheit over the past 30 years and 2.5 degrees Fahrenheit over the last 50 years.  Warming trends have contributed to an earlier snowmelt in the state and a peak runoff time in the spring by approximately one to four weeks.  Wildfire season in Colorado is weeks longer than it was just a few decades ago.

60.     In November 2017, the U.S. Global Change Research Program released its Fourth National Climate Assessment, and the findings are unequivocal.  The report "is designed to be an authoritative assessment of the science of climate change, with a focus on the United States, to serve as the foundation for efforts to assess climate-related risks and inform decision-making about responses."  The report confirms that global temperatures are rising at an alarming rate. Sixteen of the last seventeen years have been the hottest on record.  Since the last National Climate Assessment was published, 2014 became the hottest year in recorded history, until it was surpassed by 2015, which was then surpassed by 2016.

61.     The Fourth National Climate Assessment indicates that "stronger evidence has emerged for continuing, rapid, human-caused warming of the global atmosphere and ocean" since 2014, when the prior climate assessment report was released.  According to this Climate Assessment, man-made greenhouse gas emissions "are the dominant cause of the observed warming;" simply stated, "there is no convincing alternative explanation."

62.     The Climate Assessment further indicates that decisions made today will determine whether climate impacts are catastrophic or merely incredibly costly.  The report states that "[c]hoices made today will determine the magnitude of climate change risks beyond the next few decades" and that "[w]ithout major reductions in emissions, the increase in annual average global temperature relative to preindustrial times could read 9° F (5° C) or more by the end of this century."

63.     The multitude of severe environmental and public health harms caused by climate change is projected to result in significant economic costs.  For example, climate change will cause increased expenditures for disaster relief, flood insurance, and drought-related crop losses.

The U.S. Government Accountability Office (GAO) has noted that in the past decade, extreme weather-related events have cost the United States tens of billions of dollars in damages.  The GAO report highlighted that in 2012 the federal government requested $60.4 billion for Superstorm Sandy recovery efforts; and New York City recently announced a $20 billion climate adaptation plan aimed at avoiding a repeat of the destruction wrought by Superstorm Sandy from future storms.  In addition, a National Research Council study commissioned in part by the Central Intelligence Agency reported the United States military and intelligence agencies will face increased threats and expenditures in future years from decreased world stability, water and food shortages, and energy supply chain disruptions caused by climate change.

64.     Given the multi-billion dollar costs of climate change, federal agencies developed a metric called the "social cost of carbon" that estimates the socio-economic costs of each ton of greenhouse gas pollution.  EPA explains that the social cost of carbon "is meant to be a comprehensive estimate of climate change damages and includes changes in net agricultural productivity, human health, and property damages from increased flood risks."  However, EPA makes clear that the social cost of carbon "does not include all important damages" and it "very likely" underestimates the true economic costs of greenhouse gas pollution.  In 2010, the federal Interagency Working Group on the Social Cost of Carbon, which included the Department of Agriculture, estimated that the social cost of carbon was $26 per ton of carbon dioxide emitted in 2020 (in 2007 dollars).  In 2015, the Interagency Working Group revised the social cost of carbon upward to $43 per ton of carbon dioxide emitted in the year 2020 (in 2007 dollars).

65.     Although the Trump administration disbanded the Interagency Working Group in 2017, the social cost of carbon protocol the Group developed continues to represent the most

state-of-the-art approach based on the best available, peer-reviewed literature, because it relies

on multiple peer-reviewed models.  The Government Accountability Office in 2014 supported

the methodology used to develop the social cost of carbon.  A federal appellate court has upheld

agency use of the social cost of carbon; and a district court recently held that an agency analysis

of a coal mining plan violated NEPA where the agency failed to disclose climate impacts via the

social cost of carbon.  See Zero Zone, Inc. v. U.S. Dept. of Energy, 832 F. 3d 654, 677-78 (7th

Cir. 2016); Montana Environmental Information Center v. U.S. Office of Surface Mining, --- F.

Supp. 3d ----, 2017 WL 3480262 at *15 (D. Mont. Aug. 14, 2017).

## V.     FEDERAL AGENCIES' FIRST, FAILED ATTEMPT TO PERMIT MINE EXPANSION

66.     In 2012 and 2013, Federal agencies made a number of decisions to approve the

MCC's 2009 application for Lease Modifications and its 2013 exploration plan.  First, in 2012,

the Forest Service adopted the Colorado Roadless Rule which included the North Fork Coal

Mining Area exception permitting road construction for coal mining in the Sunset Roadless Area

and additional roadless lands.  77 Fed. Reg. 39,576, 39,576 (July 3, 2012).  Second, the Forest

Service officially consented to the Lease Modifications in late 2012, paving the way for BLM to

approve lease modifications on March 27, 2013.  Third, BLM approved a coal exploration plan

in late June 2013, with the purpose of allowing about six miles of road and 10 drilling pads to be

constructed within the Sunset Roadless Area.

67.     Citizen conservation groups, including High Country Conservation Advocates,

WildEarth Guardians, and Sierra Club promptly sued the Forest Service and BLM in July 2013,

alleging that the agencies' decisions approving the coal mining exception to the Colorado

Roadless Rule, the Lease Modifications, and the exploration plan violated NEPA and other statutes.

68.    In June 2014, the U.S. District Court for the District of Colorado ruled that each of the three decisions by the federal agencies violated NEPA, and enjoined on-the-ground activities related to the exploration plan.  See High Country Conservation Advocates, 52 F.Supp.3d 1174.  In September 2014, the Court issued an additional remedy order, vacating the Lease Modifications and the coal mine exception to the Colorado Roadless Rule.  High Country Conservation Advocates v. U.S. Forest Service, 67 F.Supp.3d 1262 (D. Colo. 2014).

69.    In its June 2014 decision, this Court held that the Forest Service and BLM's EISs violated NEPA's "hard look" mandate in approving the Colorado Roadless Rule coal mine exception.  The Court ruled that environmental impact statement failed to disclose the greenhouse gas emission (including methane emissions) from the mining of more than 300 million tons of coal that the agency concluded would be made available by adopting the exception, although the agency carefully tallied the economic benefits of mining the coal.  High Country Conservation Advocates, 52 F.Supp.3d at 1194-96.  The Court also held that the agencies similarly failed to disclose the greenhouse gas emissions from combustion of the coal that likely would be mined as a result of the coal mine exception, and improperly ignored an expert report concluding that those emissions could be significant.  Id. at 1196-99.

70.    This Court's June 2014 decision also concluded that the agencies' environmental analysis for the Lease Modifications violated NEPA's "hard look" mandate because that analysis failed to adequately disclose the climate change impacts of mining and burning the Lease Modifications' coal.  The Court noted that a tool for disclosing such impacts "is and was

available: the social cost of carbon protocol." Id. at 1190.  This Court dismissed all of the

agencies' proffered explanations for refusing to disclose climate impacts using the social cost of

carbon and ruled:

> the agencies might have justifiable reasons for not using (or assigning minimal
> weight to) the social cost of carbon protocol to quantify the cost of GHG
> emissions from the Lease Modifications.  Unfortunately, they did not provide
> those reasons in the FEIS, and their post-hoc attempts to justify their actions, even
> if the Court were permitted to consider them, are unpersuasive.  Therefore I find
> that the FEIS's proffered explanation for omitting the protocol was arbitrary and
> capricious in violation of NEPA.

Id. at 1193.  This Court noted that the failure to use the social cost of carbon was arbitrary in part

because the agencies carefully tallied the economic benefits of the Lease Modifications while

omitting the most obvious costs, those associated with climate change:  "it was … arbitrary and

capricious to quantify the *benefits* of the lease modifications and then explain that a similar

analysis of the *costs* was impossible when such an analysis was in fact possible and was included

in an earlier draft EIS."  Id. at 1190-91 (emphasis in original).

71.     This Court did not remand the decision with instructions, but instead vacated the

Lease Modification, Colorado Roadless Rule North Fork Coal Mining Area exception, and

exploration plan, leaving the agency free to decide whether or not to attempt to approve Arch

Coal's lease application.

## V.     THE FOREST SERVICE'S 2016 APPROVAL OF THE COLORADO ROADLESS
## RULE COAL MINE EXCEPTION

72.     In 2015, the Forest Service announced its intent to consider re-imposing the coal

mine exception to the Colorado Roadless Rule, and to prepare supplemental environmental

analysis discussing the impacts of that proposal.  80 Fed. Reg. 18,598 (Apr. 7, 2015).  The Forest

Service stated that the purpose and need for the proposal was to "to provide management

direction for conserving roadless characteristics within the area while addressing the State

interest in not foreclosing exploration and development of the coal resources in the North Fork

Coal Mining Area." 80 Fed. Reg. at 18,599.  Plaintiff groups submitted comments on this notice

of proposed rulemaking, and further provided comment on the Supplemental Draft

Environmental Impact Statement (SDEIS), released in November 2015, that the Forest Service

prepared to analyze the impacts of the coal mine exception.

　　　　73.　　The coal mine exception SDEIS contained an attempt to analyze the greenhouse

gas pollution and the social cost of carbon related to those emissions.  The SDEIS concluded the

net social cost of opening to mining the 172 million tons of coal within the North Fork Coal area

could <u>be more than $12 billion</u>.  Even that high figure likely underestimated the project's climate

costs because the agency arbitrarily omitted the social cost of climate pollution from methane

venting, and failed to address the likely increase in climate pollution caused by the increase in

electricity consumption resulting from putting on the market millions of tons per year of cheap

coal.  Plaintiff groups provided expert comments to the agency explaining why the Forest

Service's social cost analysis was flawed and how to correct it.

　　　　74.　　The Forest Service issued a Supplemental Final Environmental Impact Statement

(SFEIS) on the coal mine exception on November 17, 2016.  The SFEIS failed to cure the

SDEIS's deficiencies.  While the SFEIS did contain a modified analysis of the volume of

greenhouse gas emissions likely to result from coal mining, that analysis, like the SDEIS, failed

to account for increased electrical demand induced by increased coal supplies from the North

Fork Area, and the resultant increase in climate pollution.  Plaintiff groups submitted an expert

report to the Forest Service in December 2016 raising these and other issues, to which the Forest

Service and Department of Agriculture did not respond before adopting the North Fork Coal

Mining Area exception.  In addition, the coal mine exception SFEIS made a number of new

assumptions – including the arbitrary assumption that the Clean Power Plan would be in effect –

that erroneously lowered mining's estimated social costs.  By mid-November 2016, the Clean

Power Plan had been stayed by litigation, and then-President-elect Trump had vowed to repeal it.

75.     The coal mine exception SFEIS failed to consider a range of reasonable

alternatives, ignoring an alternative that would bar road construction for mining in the Pilot

Knob Roadless Area, which contains distinct vegetation and wildlife habitat when compared to

other roadless lands that would be open to road construction.  The SFEIS also failed to disclose

the wildlife, ecosystem, recreation, and other values of the lands to be opened to coal mine

bulldozing, thus rendering it impossible to compare alternatives.

76.     On December 19, 2016, the Department of Agriculture issued a notice that it was

"reinstating the North Fork Coal Mining Area exception to the Colorado Roadless Rule."  81

Fed. Reg. 91811 (Dec. 19, 2016).  That exception did not take effect until April 2017.  82 Fed.

Reg. 9973 (Feb. 9, 2017) (setting April 17, 2017 effective date).

## VI.     THE FOREST SERVICE'S 2017 CONSENT TO THE LEASE MODIFICATIONS

77.     Following the vacatur of the Lease Modifications by this Court in 2014, MCC

submitted a written request that BLM and the Forest Service again consider its application for

the Lease Modifications.  In response, the Forest Service in February 2016 issued a "scoping"

notice announcing that it would prepare a supplemental environmental impact statement of the

Lease Modifications.  The Bureau of Land Management was a "cooperating agency" in

preparing the environmental analysis.  Plaintiff groups submitted comments on scoping.

78.     In May 2017, following the Forest Service's adoption of the North Fork Coal

Mining Area exception, without which the Lease Modifications could not be approved, the

Forest Service (with BLM as a cooperator) issued a new supplemental analysis (a SDEIS) on the

Lease Modifications.  The Forest Service, while incorporating a number of prior NEPA analyses

by reference, prepared an entirely new EIS to address the Lease Modifications and a number of

changed circumstances relevant to that proposal, including, among other things: modified

stipulations; a changed scope to include the impacts of a modified exploration plan; and new

information concerning the accessibility of the coal reserves, including a geographic fault that

would limit MCC's access to some coal outside the Lease Modifications.

79.     The new SDEIS, however, failed to contain an analysis of the climate impacts of

the proposed Lease Modifications.  The SDEIS, in a contradictory manner, provided a number of

inconsistent bases for failing to address the social cost of carbon (a number of which this Court

had specifically rejected in High Country Conservation Advocates, 52 F.Supp.3d at 1190-93),

while also stating that the climate impacts of the Lease Modifications would be a fraction of

those disclosed in the 2016 Colorado Roadless Rule coal mine exception SFEIS.

80.     While ignoring (again) the Lease Modifications' climate costs, the SDEIS inflated

the Lease Modifications' economic benefits.  In comments on the Lease Modifications SDEIS,

Plaintiff groups submitted a report from economic expert Dr. Tom Power demonstrating that the

SDEIS's analysis of socio-economic impacts overstated the impacts of the mine on employment,

income and other factors by drawing an improperly large boundary concerning where those

impacts would likely occur.

81.     The Lease Modifications SDEIS also failed to consider a reasonable alternative which would have reduced or offset methane pollution associated with the lease modifications. Although Plaintiffs provided evidence that flaring methane emitted from ventilation wells is a reasonable way to mitigate the mine's climate impacts, the Forest Service declined to analyze such an alternative in detail.

82.     The Lease Modifications SDEIS also failed to disclose that exploration and development of the Lease Modifications – which will result in the bulldozing of six miles of road and 48 drilling pads – will do more than just eradicate habitat on a certain number of acres; it will fragment habitat over the broad 1,700-acre area.  The Lease Modifications SDEIS failed to address the impacts of noise, carved-up habitat, or vehicle traffic on numerous wildlife species, and/or the overall impact on the entire Lease Modifications area.

83.     The Forest Service (with BLM as a cooperator) issued its SFEIS on the Lease Modifications and a draft Record of Decision (ROD) on September 7, 2017.  The SFEIS failed to cure the agency's failure to take a hard look at climate pollution impacts and wildlife fragmentation, and failed to analyze an alternative that addressed flaring.

84.     Pursuant to 36 C.F.R. § 218.8, Plaintiffs filed official "objections" with the Forest Service's Rocky Mountain Region on October 23, 2017, alleging that approving the Lease Modifications would violate NEPA and other statutes.  Plaintiffs' objections included two expert reports.  The first, a report from economist Dr. Tom Power, et al., demonstrated that the SFEIS had abandoned assumptions concerning the Lease Modifications' impacts on jobs, income and other factors that the agency had used in prior analyses, and adopted new and unfounded assumptions concerning job creation and miner pay.  These new assumptions resulted in a

dramatic and erroneous increase in the Lease Modifications alleged economic impacts and benefits.  The second, from Raven Ridge LLC, demonstrated that flaring of vented methane – an action MCC has long refused to adopt, and that federal agencies have long refused to analyze in detail – was a practical and cost effective alternative.

85.     The Forest Service's Deputy Regional Forester for the Rocky Mountain Region rejected all objections, including Plaintiffs', on December 7, 2017.

86.     On December 11, 2017, GMUG National Forest Supervisor Scott Armentrout signed a Record of Decision (ROD) consenting to the Lease Modifications.

## VI.     APPROVAL OF THE LEASE MODIFICATIONS AND THE EXPLORATION PLAN

87.     On December 11, 2017, an official of the Forest Service's Rocky Mountain Region concurred in the exploration plan for the Lease Modifications area.

88.     On December 15, 2017, the day of this filing, Katharine MacGregor, the Department of the Interior Deputy Assistant Secretary for Land and Minerals Management issued a Record of Decision approving the Lease Modifications and the exploration plan on behalf of the Bureau of Land Management.  This decision formally relies upon the Lease Modifications SFEIS to satisfy the Department's NEPA obligations.

89.     As a result of this approval, Arch may imminently begin bulldozing in the Sunset Roadless Area pursuant to its exploration plan.  In fact, the company appears to have plans to begin doing so within days.  Arch Coal represented to State regulators in November 2017 that it may begin exploration of the Lease Modification areas in December.  On December 13, 2017, visitors traveled the site of one of the proposed exploration roads that Arch's notice to regulators indicated could be bulldozed this month.  They found trees within the Lease Modifications area

29

recently flagged with new surveyor's tape, presumably to guide construction crews in their work.

Harm to Plaintiffs' members' interests in protecting the Sunset Roadless Area is therefore

imminent as a result of the agencies' decisions.

## FIRST CAUSE OF ACTION
(NEPA Violation:  Failure to Consider a Range of Reasonable Alternatives in the Forest
Service's Analysis of the Colorado Roadless Rule Coal Mine Exception)

90.     The allegations in paragraphs 1 to 89 are incorporated herein by reference.

91.     NEPA requires federal agencies, including the Forest Service and BLM, to

analyze a range or reasonable alternatives in EISs.  42 U.S.C. § 4332(2)(C), (E); 40 C.F.R.

§§ 1502.14.

92.     The Forest Service failed to analyze a reasonable alternative in its EIS for the

Colorado Roadless Rule North Fork Coal Mining Area exception.  Specifically, the Forest

Service failed to analyze in detail an alternative which would have protected the Pilot Knob

Roadless Area from road construction and mining, despite the fact that this alternative

represented a reasonable middle-ground approach and would have protected unique resources in

the area.

93.     The Forest Service's failure to analyze a range of reasonable alternatives in the

agency's analysis of the impacts of Colorado Roadless Rule North Fork Coal Mining Area

exception violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.  5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
(NEPA Violation:  Failure to Provide Baseline Data Against Which the Impacts of the
Alternatives Could Be Compared in the Forest Service's Analysis of the Colorado Roadless Rule
Coal Mine Exception)

94.     The allegations in paragraphs 1 to 93 are incorporated herein by reference.

95.     NEPA requires federal agencies, including the Forest Service, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions.  42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).  NEPA also requires agencies to "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration."  40 C.F.R. § 1502.15.

96.     The Council on Environmental Quality has stated in guidance that "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."  Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act 41 (1997).

97.     The Forest Service failed to assess important values and resources present in the North Fork Coal Mining Area, which is the epicenter of impacts from the proposed action and its alternatives.  The area impacted by the alternatives for reinstating the North Fork Coal Mining Area exception is narrowly focused on 19,700 acres, yet the Forest Service's NEPA analysis fails to succinctly describe the environmental values – wildlife habitat, water resources, vegetation, and others – which would be affected by road constructions for coal mining in this discrete area.

98.     The Forest Service's failure to comply with NEPA in providing a baseline against which environmental impacts can be measured and evaluated violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION
(NEPA Violation:  Failure to Adequately Analyze the Climate Impacts of Adopting the of the Colorado Roadless Rule Coal Mine Exception)

99.     The allegations in paragraphs 1 to 98 are incorporated herein by reference.

31

100.    NEPA requires federal agencies, including the Forest Service and BLM, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions.  42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).

101.    The Forest Service failed to take a hard look at climate pollution impacts in its EIS for the Colorado Roadless Rule North Fork Coal Mining Area exception.  Specifically, in its analysis of climate pollution, the Forest Service's EIS fails to address the fact that making additional coal available from the North Fork Coal Mining Area will reduce the price of coal-fired electricity, inducing greater demand for that electricity, and thus greater climate pollution.  By failing to account for this impact, the Forest Service failed to take the required hard look at the nature and extent of these impacts.

102.    The Forest Service's failure to take the required "hard look" at the climate pollution impacts of the Colorado Roadless Rule North Fork Coal Mining Area exception violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**FOURTH CAUSE OF ACTION**
(NEPA Violation:  Failure to Take a "Hard Look" at the Climate Impacts of the Lease Modifications)

103.    The allegations in paragraphs 1 to 102 are incorporated herein by reference.

104.    NEPA requires federal agencies, including the Forest Service, BLM and the Department of the Interior, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions.  42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).  NEPA defines impacts or effects to include economic and social impacts of a proposed action.  40 C.F.R. § 1508.8; see also High Country Conservation Advocates, 52 F. Supp. 3d at 1190.

Agencies are required under NEPA to disclose climate impacts.  See WildEarth Guardians v. BLM, 870 F.3d 1222 (10th Cir. 2017).

105.    The Lease Modifications SFEIS fails to disclose adequately the impacts and costs of the greenhouse gas pollution from coal mining that will foreseeably occur as a result of the Lease Modifications.  Specifically, the SFEIS failed to disclose the social cost of climate pollution or provide a reasonable basis for not using the social cost protocol.  The Lease Modifications SFEIS thus failed to take a "hard look" at the analysis of the Lease Modifications' climate and socioeconomic impacts, in violation of NEPA.

106.    The failure of the Forest Service, BLM and the Department of the Interior to take the required "hard look" at the climate pollution impacts of the Lease Modifications violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**FIFTH CAUSE OF ACTION**
(NEPA Violation:  Failure to Take a "Hard Look" at the Socioeconomic Impacts of the Lease Modifications)

107.    The allegations in paragraphs 1 to 106 are incorporated herein by reference.

108.    NEPA requires federal agencies, including the Forest Service, BLM and the Department of the Interior, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions.  42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).  NEPA defines impacts or effects to include economic and social impacts of a proposed action.  40 C.F.R. § 1508.8; see also High Country Conservation Advocates, 52 F. Supp. 3d at 1190.

109.    In its socioeconomic analysis, the Lease Modifications SFEIS inexplicably diverges from earlier analysis of economic impacts and dramatically overstates the economic impacts and benefits associated with the Lease Modifications.

110.    The failure of the Forest Service, BLM and the Department of the Interior to take the required "hard look" at the climate pollution impacts of the Lease Modifications violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**SIXTH CAUSE OF ACTION**
(NEPA Violation:  Failure to Take a Respond to Responsible Opposing Views of Experts on Socioeconomic Impacts of the Lease Modifications)

111.    The allegations in paragraphs 1 to 110 are incorporated herein by reference.

112.    NEPA requires agencies to disclose, discuss, and respond to "any responsible opposing view," and provide their rationale for choosing one approach over the other.  40 C.F.R. § 1502.9(b).

113.    The Forest Service, BLM and the Department of the Interior failed to respond to the opposing views contained in the October 2017 expert report of Dr. Thomas Power et al. and submitted to the Forest Service with Plaintiffs' "objections" to agency's proposal to consent to the Lease Modifications.  Plaintiffs also provided the report to BLM.  Dr. Power demonstrated that the SFEIS's analysis of impacts to labor, employment and the economy contradicted prior agency conclusions concerning the impacts of the Lease Modifications and the Colorado Roadless Rule, and in doing so likely significantly overstated the Lease Modifications' economic impacts and alleged benefits.

114.    The failure of the Forest Service, BLM and the Department of the Interior to respond to Dr. Power's expert analysis is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## SEVENTH CAUSE OF ACTION
(NEPA Violation:  Failure to Analyze Alternatives to Reduce Methane Pollution in the Forest Service's Lease Modifications Analysis)

115.    The allegations in paragraphs 1 to 114 are incorporated herein by reference.

116.    NEPA requires federal agencies, including the Forest Service, BLM and the Department of the Interior, to analyze a range or reasonable alternatives in EISs.  42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. §§ 1502.14.

117.    NEPA requires federal agencies, including the Forest Service, to analyze mitigation measures in EISs.  40 C.F.R. §§ 1502.14(f), 1502.16(h), 1505.2(c).

118.    The Forest Service, BLM and the Department of the Interior failed to analyze a reasonable alternative in the Lease Modifications SFEIS that would require mitigation to reduce the methane pollution as a condition of the agencies' approval of the Lease Modifications.

119.    The failure of the Forest Service, BLM and the Department of the Interior to analyze a range of reasonable alternatives and mitigation measures in the agency's analysis of the impacts of Lease Modifications violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## EIGHTH CAUSE OF ACTION
(NEPA Violation:  Failure to Take a "Hard Look" at the Lease Modifications' Impacts to Wildlife Due to Habitat Fragmentation)

120.    The allegations in paragraphs 1 to 119 are incorporated herein by reference.

121.     NEPA requires federal agencies, including the Forest Service, BLM and the Department of the Interior, to take a "hard look" at the direct, indirect, and cumulative impacts of proposed major federal actions.  42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).

122.     The Lease Modifications SFEIS fails to take a "hard look" at the foreseeable impacts of the Lease Modifications on wildlife due to habitat fragmentation caused by road and drill pad construction for coal mine and the Exploration Plan

123.     The failure of Forest Service, BLM and the Department of the Interior to take the required "hard look" at the Lease Modifications' impacts to wildlife habitat violates NEPA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and provide the following relief:

1.     Declare that Defendants U.S. Department of Agriculture, U.S. Forest Service, and Under Secretary Jirón violated NEPA, regulations implementing NEPA, and the APA in promulgating the North Fork Coal Mining Area exception to the Colorado Roadless Rule;

2.     Declare unlawful and issue an injunction setting aside Defendants U.S. Department of Agriculture's, U.S. Forest Service's, and Under Secretary Jirón's decision in promulgating the North Fork Coal Mining Area exception to the Colorado Roadless Rule;

3.     Declare that Defendants U.S. Forest Service and Supervisor Armentrout violated NEPA, regulations implementing NEPA, and the APA in consenting to Lease Modifications COC-1362 and COC-67232, and in concurring to the exploration plan thereon;

4.      Declare unlawful and issue an injunction setting aside Defendants U.S. Forest Service's and Supervisor Armentrout's consent to Lease Modifications COC-1362 and COC-67232 and concurrence to the exploration plan thereon;

5.      Declare that Defendants U.S. Department of the Interior, Bureau of Land Management, and Deputy Assistant Secretary MacGregor violated NEPA, regulations implementing NEPA, and the APA in approving of Lease Modifications COC-1362 and COC-67232 and the exploration plan thereon;

6.      Declare unlawful and issue an injunction setting aside Defendants U.S. Department of the Interior, Bureau of Land Management, and Deputy Assistant Secretary MacGregor's approval of Lease Modifications COC-1362 and COC-67232 and the exploration plan thereon;

7.      Issue an injunction ordering Defendants to not approve, consent to, or otherwise take action pursuant to Lease Modifications COC-1362 and COC-67232 unless and until the Defendants comply with NEPA, and regulations implementing these laws;

8.      Issue an injunction ordering Defendants to not approve, concur with, or otherwise take action pursuant to any exploration plan for the Lease Modifications area, unless and until Defendants comply with NEPA and implementing regulations;

9.      Grant Plaintiffs such temporary restraining orders or preliminary injunctions as they may request;

10.     Award Plaintiffs costs and reasonable attorney's fees as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d) and any other statute;

11.     Retain jurisdiction of this action to ensure compliance with its decree; and

12.    Provide such other declaratory and injunctive relief as the Court deems just and

proper.


Respectfully submitted December 15, 2017,

/s/ *Edward B. Zukoski*
Edward B. Zukoski
Earthjustice
633 16th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
Fax: (303) 623-8083
tzukoski@earthjustice.org

Mary Emily Splitek
Earthjustice
633 16th Street, Suite 1600
Denver, CO 80202
(303) 966-9613
Fax: (303) 623-8083
esplitek@earthjustice.org


*Attorneys for Plaintiffs High Country Conservation Advocates,*
*WildEarth Guardians, Center For Biological Diversity, Sierra Club, and*
*Wilderness Workshop*