**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-3025-WYD

HIGH COUNTRY CONSERVATION ADVOCATES, <u>et al.</u>,

Plaintiffs,

v.

UNITED STATES FOREST SERVICE, <u>et al</u>.,

Defendants.

---

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

High Country Conservation Advocates, <u>et al.</u> (collectively "Plaintiffs"), hereby move this

Court for a temporary restraining (TRO) and preliminary injunction pursuant to Rule 65 to enjoin

the U.S Department of the Interior, the Bureau of Land Management (BLM) and the U.S. Forest

Service (collectively "Federal Defendants") from permitting Arch Coal, Inc. and its subsidiaries

(Arch) from bulldozing roads and scraping drilling pads within the Sunset Roadless Area on

National Forest lands in western Colorado. Such bulldozing could begin as soon as this Friday,

December 22.

Unless this Court issues an order maintaining the status quo on the ground, Arch has

indicated that on Friday evening at 5 PM, or very soon thereafter, the company may begin to

bulldoze two miles of new road up to 30 feet wide and scrape three half-acre drilling pads to

explore for coal for the West Elk Mine.  This construction will require the toppling of scores of

100-foot-tall aspen trees, and the leveling of rough and hilly terrain, which will degrade the scenic beauty, wildlife habitat, and current natural, undeveloped nature of this roadless area that Plaintiffs have long worked to protect and that their members enjoy.  This harm will be irreparable.  Once cut down, the trees cannot be put back; the roadless area cannot be "undeveloped."  These damaging actions may soon occur because Federal Defendants made unlawful decisions that allow Arch's exploration.

In addition to demonstrating irreparable harm, Plaintiffs establish the remaining factors warranting preliminary relief.  The balance of harms tips heavily in Plaintiffs' favor because any harm to Federal Defendants and Arch is speculative, short-term, and not irreparable.  Arch's own schedule submitted to state regulators gave the company two years to complete exploration, a schedule Arch will likely be able to meet even if a preliminary injunction is in place until late spring.  In addition, there is a strong public interest in protecting the environment and ensuring compliance with environmental laws.

Finally, Plaintiffs are likely to prevail on the merits of their claims.  Plaintiffs will show that the Federal Defendants violated the National Environmental Policy Act (NEPA) by, among other things, ignoring the climate impacts of mining the challenged coal Lease Modification, while simultaneously inflating the mine's alleged economic benefits.  By arbitrarily skewing their analysis, Federal Defendants make virtually the same errors they made in attempting to approve an earlier version of the Lease Modifications and related decisions, mistakes that led this Court to vacate those decisions in High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174 (D. Colo. 2014) (Jackson, J.) ("High Country").

This Court should therefore issue a temporary restraining order and/or preliminary injunction to maintain the status quo on the ground until the Court can fully review and rule on Plaintiffs' request for injunction or adjudicate the merits of Plaintiffs' claims.  This Court should also waive the requirement that Plaintiffs post a bond, or require a nominal bond, because Plaintiffs are non-profits seeking to protect the public interest and the environment and in ensuring that their government obeys the law.

## LEGAL BACKGROUND

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment."  Id. § 4321.  As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions.  Id. § 4332(2)(C); see also 40 C.F.R. § 1500.1 (Council on Environmental Quality (CEQ) regulations implementing NEPA for all agencies).

To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  The agency should describe "any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C. § 4332(2)(C)(ii).  Overall, an EIS must "provide [a] full and fair discussion of significant environmental impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  NEPA mandates that an agency takes a "hard look" at the impacts of a proposed action.  Citizens'

<u>Comm. To Save Our Canyons v. Utah Environmental Congress</u>, 513 F.3d 1169, 1179 (10th Cir. 2008).

## FACTUAL BACKGROUND

The Sunset Roadless Area is a 5,800 acre forested landscape which hugs the west flank of 12,700-foot Mount Gunnison and the West Elk Wilderness in northwestern Gunnison County, Colorado.  The area's undisturbed lands, managed by the U.S. Forest Service, are characterized by wide swaths of aspen groves and mixed conifer forest; wildflowers, meadows, streams, and beaver ponds are also found here.  Declaration of Jeremy Nichols (Nichols Dec.) (Ex. 1) at ¶ 11; Declaration of Allison Melton (Melton Dec.) (Ex. 2) at ¶¶ 15, 19, 21, 22, 26-27, 29-30; Declaration of Matt Reed (Reed Dec.) (Ex. 3) at ¶¶ 5-9; Declaration of Peter Hart (Hart Dec.) (Ex. 4) at ¶ 7-8, 10, 12.  These habitats support numerous different wildlife species, from black bear and the imperiled Canada lynx, to chorus frogs and snakes.  Nichols Dec. (Ex. 1)  at ¶ 11; Melton Dec. (Ex. 2) at ¶¶ 26, 38; Reed Dec. (Ex. 3) at ¶ 4; Hart Dec. (Ex. 4) at ¶ 12.  The area is treasured by hunters and hikers alike for its remoteness and beauty.  Melton Dec. (Ex. 2) at ¶¶ 15, 16, 10, 27; Reed Dec. (Ex. 3) at ¶¶ 6, 8, 10; Hart Dec. (Ex. 4) at ¶¶ 11, 13.  Visitors may delight in stunning views of Mount Gunnison, Mount Lamborn, and the Ragged Mountains while enjoying a quiet hike in the pristine forest.  Nichols Dec. (Ex. 1) at ¶ 6; Melton Dec. (Ex. 2) at ¶¶ 13, 24; Reed Dec. (Ex. 3) at ¶ 4; Hart Dec. (Ex. 4) at ¶¶ 6-7, 9.

For years, this intact forest has been threatened by a proposed expansion of the West Elk Mine, owned by the nation's second largest coal company, Arch Coal.  Arch has been seeking to expand the mine's underground operations beneath the Sunset Roadless Area since 2009.  Operating the mine below ground requires the construction within the roadless area of a

spiderweb network of bulldozed roads and the flattening and clearcutting of forest for drilling

pads and methane drainage wells to release methane, a potent greenhouse gas, to ensure safe

conditions in the mine.

In 2012 and 2013, the Forest Service BLM issued a suite of decisions that would have led

to the construction of more than 6 miles of roads and nearly 50 drilling pads within a 1,700-acre

area at the heart of the Sunset Roadless Area.  First, the Forest Service approved the Colorado

Roadless Rule in 2012, which generally prohibited road construction across four million acres of

roadless National Forest lands in the state.  That rule, however, contained a proviso, the North

Fork Coal Mining Area exception, permitting road construction on 19,000 acres of roadless

forest, including the Sunset Roadless Area.  See High Country, 52 F. Supp. 3d at 1184.  Second,

in 2013, and with the Forest Service's consent, BLM approved two coal Lease Modifications

granting Arch the right to mine coal under 1,700 acres of the Sunset Roadless Area.  Id.  Third,

that same year, and with Forest Service concurrence, BLM approved an exploration plan within

the Sunset Roadless Area.  Id. at 1185.

This Court, however, stopped the threatened destruction of the roadless area in 2014 by

finding unlawful and vacating each of the three federal agencies' decisions.  High Country, 52 F.

Supp. 3d at 1189-1200 (finding federal agencies violated NEPA); High Country Conservation

Advocates v. U.S. Forest Serv., 67 F. Supp. 3d 1262 (D. Colo. 2014) (vacating agency

decisions).  The Court held that the Forest Service and BLM violated NEPA in their

environmental review by, among other things, turning a blind eye to the huge climate costs of

coal mining in the North Fork Coal Mining Area while carefully accounting for the alleged

economic benefits of mining, an approach that subverted the law's mandate that agencies take a

"hard look" at environmental impacts.  High Country, 52 F. Supp. 3d at 1194-98.  This Court

also ruled that the Federal Defendants' failed to disclose the climate-related impacts of mining

the Lease Modifications using a proven tool for disclosing such costs – the social cost of carbon

protocol – or providing valid reasons for not using the protocol.  Id. at 1189-93.

The Court's decision did not end the threat to the Sunset Roadless area, however, as Arch

renewed its efforts to expand the mine.  Following vacatur of the agency decisions, the Forest

Service and BLM conducted new NEPA analyses the on proposed expansion over the last two

years, attempting to address the inadequacies identified in the High Country decision.  First, the

Forest Service completed a draft and final supplement EIS on reinstating the Colorado Roadless

Rule North Fork Coal Mining Area exception.  Following that review, and effective April 17,

2017, the Forest Service reinstated the exception to the Colorado Roadless Rule, reopening the

Sunset Roadless Area and other lands to coal leasing.  See 81 Fed. Reg. 91811 (Dec. 19, 2016);

82 Fed. Reg. 9973 (Feb. 9, 2017).

Second, in 2017, the Forest Service prepared a supplemental draft EIS (SDEIS) on

Arch's renewed application to lease 1,700 acres of coal within the Sunset Roadless Area.

Plaintiffs commented on SDEIS, and upon issuance of the Supplemental Final EIS (SFEIS)[1] on

the Lease Modifications, filed official "objections"[2] to the Forest Service's proposed Record of

Decision (ROD) pursuant to 36 C.F.R. § 218.8.  On December 7, 2017, the Forest Service

---

[1] U.S. Dept. of Agriculture Forest Service, Supplemental Final Environmental Impact Statement: Federal Coal Lease Modifications COC-1362 & COC-67232, Aug. 2017 (excerpts attached as Ex. 5) (hereinafter "Lease Modifications SFEIS").

[2] High Country Conservation Advocates, et al.'s Objections to Federal Coal Lease Modifications COC-1362 & COC-67232, Oct. 23, 2017 (Ex. 6).

rejected Plaintiffs' objections,[3] and on December 11 issued the agency's final ROD consenting to the Lease Modifications.[4]  The Interior Department approved the Lease Modifications on December 15,[5] paving the way for the mine to expand into the Sunset Roadless Area, and to access approximately 17.6 million tons of coal.  The Forest Service predicted mining coal within the Lease Modifications could ultimately result in the bulldozing of new roads and the flattening of forest and hillsides to build 48 well pads and 6.5 miles of new roads, disturbing about 72 acres of roadless lands.  Lease Modifications SFEIS (Ex. 5) at 90, 261.  This construction will allow the Mine to vent methane, a combustible gas and greenhouse pollutant.  Id. at 96.

Third, also on December 15, 2017, the Department of the Interior approved a coal exploration plan that permits Arch Coal to bulldoze up to 6 miles of road and scrape 10 drilling pads into the roadless forest.  Id.  The Exploration Plan is divided into two phases.  Phase I, which Arch intends to undertake starting this month and complete by June 2018, involves bulldozing three segments of road, about two miles in length total, to location where the company will scrape three half-acre drill pads.[6]  Phase II, which Arch proposes to start in June

---

[3] Letter from Maribeth Gustafson to Edward Zukoski, December 7, 2017 (Ex. 7).

[4] U.S. Dept. of Agriculture Forest Service, Final Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232, Dec. 11, 2017 (Ex. 8) (hereinafter "Forest Service ROD").

[5] Dept. of the Interior Bureau of Land Management, Record of Decision, DOI-BLM-CO-S050-2015-0042-EIS, December 15, 2017 (Ex. 9).

[6] Mountain Coal Company, Notice of Intent to Explore (updated Nov. 8, 2017) ("Sunset Trail Area Exploration Plan") (excerpts attached as Ex. 10) at 7 (Phase I involves constructing roads and three drill pads for drill holes SST-2, SST-4, and SST-7); Lease Modifications SFEIS (Ex. 5) at 41-42 (identifying road lengths and acreage disturbance for exploration road and pads); id. at 3 (mapping exploration road and pad locations); K. Welt, Notice Of Intent To Explore Involving Removal Of 250 Tons Or Less Of Coal (Nov. 8, 2017) (Ex. 11) at 2 (showing "Period of Intended Exploration" for Phase I to be between Dec. 2017 and June 2018).

2018 and complete by October 2020 if Phase I yields promising results, involves constructing another four miles of road and another seven drill pads.[7]  In total, the Exploration Plan will require flattening an area (nearly 23 acres) the size of more than 17 football fields.[8]  The full effect of this construction, moreover, is not fully captured by the number of acres directly disturbed.  The plan will result in a web of roads crisscrossing 2.5 square miles (1,700 acres) of habitat at the heart of the 5,800-acre Sunset Roadless Area.

Arch can only implement the Exploration Plan if the decisions re-instating the Colorado Roadless Rule North Fork Coal Mining Area exception and the Lease Modifications are in effect.  See 43 C.F.R. § 3482.1 (requiring BLM approval of exploration plans on federal leases but outside mine permit boundaries).  If either is invalidated, Arch may not undertake the Exploration Plan.

Despite having the benefit of a second opportunity to fully account for the mine expansions' impacts, Federal Defendants have made the same type of mistakes in their new decisions that this Court held violated NEPA in High Country.  The Federal Defendants have again failed to take a hard look at the impacts of the Lease Modifications on climate change and provide no valid basis for refusing to utilize the social cost of carbon protocol.  At the same time, the agencies improperly boosted the purported economic benefits of the Lease Modifications,

---

[7] Mountain Coal Company, Notice of Intent to Explore (updated Nov. 8, 2017) ("Sunset Trail Area Exploration Plan") (excerpts attached as Ex. 10) at 7 (describing Phase 2); K. Welt, Notice Of Intent To Explore Involving Removal Of 250 Tons Or Less Of Coal (Nov. 8, 2017) (Ex. 11) at 2 (showing "Period of Intended Exploration" for subsequent exploration drilling to be complete by October 2020).

[8] Lease Modifications SFEIS (Ex. 5) at 41-42.

leading to an arbitrarily skewed analysis.  The agencies' uninformed (or misinformed) decisions to approve the Lease Modifications violate NEPA.

## ARGUMENT

To obtain a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Gen. Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007).

Plaintiffs satisfy each part of the four-part standard.[9]

---

[9] Plaintiffs have standing to bring the claims pressed here.  Article III standing requires "1) 'an injury in fact' that is 2) fairly traceable to the challenged action and 3) likely to be redressed by judicial intervention." Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1264-65 (10th Cir. 2002) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  High Country Advocates et al. meet each part of this test.  The attached declarations of Mr. Nichols, Mr. Reed, Ms. Melton, and Mr. Hart (Exs. 1-4) demonstrate that each plaintiff group has members: who use and enjoy the lands within the Lease Modifications area impacted by the Exploration Plan; who assert that their recreational, aesthetic, and health interests will be harmed by bulldozing for road and pad clearing; and who intend to return to the area.  The stated harm is a direct result of the inadequate agency analyses challenged here which, together, authorize construction within roadless national forest and prolong the mine's life by nearly three years.  See Comm. to Save Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996) ("Under [NEPA], an injury results not from the agency's decision, but from the agency's uninformed decisionmaking.").  A favorable decision will set aside agency decisions authorizing such damaging actions until the agencies appropriately evaluate environmental impacts.  That is sufficient to satisfy the redressability requirement.  See, e.g., Sierra Club, 287 F.3d at 1265-66.  The Tenth Circuit and this Court have found many of these same organizations had standing to raise similar claims challenging coal leases based on similar allegations of injury.  High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174, 1186-88 (D. Colo. 2014); WildEarth Guardians v. U.S. Bureau of Land Management, 870 F.3d 1222, 1230-32 (10th Cir. 2017).

I.     **PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IF A STAY IS NOT GRANTED.**

A movant satisfies the irreparable harm requirement where there is a "significant risk" of irreparable injury.  Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (movant must show irreparable harm is "likely").  The Supreme Court has held that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."  Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987); Catron Cty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv., 75 F.3d 1429, 1440 (10th Cir. 1996) ("An environmental injury usually is of an enduring or permanent nature, seldom remedied by money damages and generally considered irreparable.").  Environmental harm "is irreparable in the sense that it cannot adequately be remedied by" monetary damages.  Davis v. Mineta, 302 F.3d 1104, 1116 (10th Cir. 2002), overruled on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276 (10th Cir. 2016).

Plaintiffs demonstrate at least two types of irreparable harm if a stay is not granted.  First, absent a stay, bulldozers could begin road construction and begin leveling drilling pads through the forests of the Sunset Roadless Area any time after this Friday, December 22 at 5 PM.  The bulldozing of roads in the natural, roadless forest will irreparably harm Plaintiffs; no monetary remedy can repair the trees or the area's wild nature.  Second, if this construction occurs in the absence of the environmental review required by NEPA, the statute's purpose of requiring agencies to "look before they leap" will be undermined, and a "bureaucratic steamroller" will be unleashed, making it difficult for Plaintiffs to obtain any meaningful relief without a stay.

**A.      Bulldozing Roads for the Exploration Plan Will Irreparably Damage the Forest Values and the Interests of the Plaintiffs and Their Members.**

Courts have found irreparable harm from road construction in forests, and irreparable harm to public lands from mineral exploration—the very type of harm threatened by the exploration plan here.  In <u>Colo. Wild, Inc. v. U.S. Forest Service</u>, this Court held that construction of even one 250-foot long access road through forest lands would cause irreparable harm to the environment.  523 F. Supp. 2d 1213, 1220-21 & n.4 (D. Colo. 2007) (<u>Colo. Wild II</u>).  Destruction of wildlife habitat has also been held to cause irreparable harm.  <u>See</u>, <u>e.g.</u>, <u>Nat'l Wildlife Fed'n v. Burford</u>, 835 F.2d 305, 323 (D.C. Cir. 1987) (upholding district court's grant of preliminary injunction, which "stressed that any mining or leasing could cause irreparable injury by permanently destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values").  The Tenth Circuit has further recognized that irreparable injury can result when a proposed action harms recreational users by "disrupt[ing] the natural setting and feeling" of the affected area.  <u>Davis</u>, 302 F.3d at 1115-16 (quotation omitted).

Here, Plaintiffs face all of these types of harm.  Phase I of the Exploration Plan will construct two miles of road and level terrain for three drilling pads within the Sunset Roadless Area.  Lease Modifications SFEIS (Ex. 5) at 41-43.  These ground-disturbing activities will particularly damage mature aspen stands.  Lease Modifications SFEIS (Ex. 5) at 176.  These trees will take decades to grow back, and the Forest Service admits that this disturbance will be "long-term." <u>Id.</u>[10]  The fact that the forest ecosystem eventually may regrow after reclamation

---

[10] <u>See also</u> FWS Concurrence letter (June 16, 2010) (Ex. 12) at 3 (concluding that vegetation eliminated for road and pad construction within the Lease Modifications area would take 30-40 years to return to serving as functional habitat for lynx).

does not eliminate the likelihood of irreparable harm.  See San Luis Valley Ecosystem Council v. U.S. Fish and Wildlife Serv., 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009).

Arch's planned exploration activities will be highly disruptive to the Sunset Roadless Area and the forest and habitat it supports.  That exploration will involve road and well-pad construction throughout the Sunset Roadless Area.  Lease Modifications SFEIS (Ex. 5) at 67. Arch will blade, fill, and level two miles of new roads, including the installation of culverts for any stream crossings. "Drill sites will be leveled by grading," meaning that terrain will be leveled, and the existing contour will be altered, as hillsides may be gouged out.  Id.  Arch will construct large slurry pits, drill, and remove and stockpile topsoil for these exploration pads.  Id. at 41-47.  Construction will result in noise from traffic consisting of a drilling rig, fuel trucks, water trucks, a pipe truck, flatbed trailer, air compressors and/or boosters, a supply trailer, and four-wheel-drive pick-up trucks.  Id. at 45.  If water is not trucked in, it will be sucked from nearby streams in winter, when stream levels are at their lowest, or from ponds used by wildlife and livestock, then placed in pipes that will run along roads or through the forest.  Id. at 45.

This damage is imminent.  In discussions with Plaintiffs' counsel, Arch has categorically rejected requests to defer implementation of its Phase I exploration activities beyond Friday at 5 PM, including a request to delay ground disturbance until January 15, 2018 to permit more orderly briefing and court consideration.  The path of proposed bulldozing and chainsawing has been recently surveyed and flagged, indicating construction is imminent.  See Nichols Dec. (Ex. 1) at pp. 18, 23-24.  The damage this project will cause to pristine roadless areas would be swift, long-lasting, and irreparable.

The Exploration Plan will also have immediate and long-term impacts on wildlife. Federal Defendants acknowledge that the construction of "roads and well pads" such as those bulldozed for exploration "will result in a complete loss of habitat within the footprint [of these wells and pads] … for the life of the project." Id. at 175, 190, 198, 1003 (noting that the wildlife analysis sections of the supplemental draft EIS "recognized that roads and well pads would result in complete loss of habitat within the footprint for many of the species analyzed"). Federal Defendants recognize this as a "long-term change" to the forest. Id. at 1003. Construction will destroy habitat for birds, including northern goshawk and purple martin, both of whom use mature aspen forests that will be bulldozed for pads and roads. Id. at 202-03, 213-14. It will also change suitable habitat for the threatened lynx into unsuitable habitat. Id. at 190 (recognizing that "[l]ong-term direct effects" would result from "changes in vegetation, which provides denning and foraging habitat"). The Federal Defendants admit that these impacts to habitat will be "irretrievable," and that the destroyed areas would not recover to their pre-disturbance character for "several decades." Id. at 289.

Arch's planned destruction will also harm those who seek out a remote, natural recreation experience. Construction, vegetation eradication and habitat destruction, and landscape and scenery alteration caused by implementing the Exploration Plan will occur within what the Forest Service has identified for over thirty years as a roadless area—that is, an undisturbed area free of roads, free of development, and largely natural in appearance. Id. at 244. The Forest Service has repeatedly recognized the continuing roadless nature of the Sunset area since the

Forest Service's initial inventory in 1979.[11]  The proposed exploration activities would permanently alter this undisturbed landscape.  Federal Defendants acknowledge that road and pad construction "could diminish natural-appearing landscapes," an impact that could persist for up to a quarter-century.  Id. at 253; see also id. at 254 (roads and pads "could diminish the recreational opportunities for some users").  Roads and pad construction for coal mining would degrade the existing "semi-primitive recreational experience … across the entire 1,700 acre lease modification area until roads are rehabilitated."  Id. at 256.  Exploration would have many of these same impacts.  A man who has hunted in the Sunset Roadless Area for 45 years reinforced these conclusions:

> We have watched drilling pad after drilling pad go up and roads scarred across the landscape [near the Sunset Roadless Area] ….
>
> Once you start moving machinery in there and cutting trees and building roads, there is no going back.  It would never be the same.  I beg of you to keep it roadless and preserve what it is for my kids and grandkids.[12]

Plaintiffs' members attest to the irreparable harm that will occur to their recreational interests as a result of the Exploration Plan moving forward, including diminished enjoyment of the naturalness and undeveloped character of the area, diminished enjoyment of hiking, camping, and other recreational endeavors, and diminished enjoyment of the views of the area, both within and outside of the Sunset Roadless Area.  Nichols Dec. (Ex. 1) at ¶¶ 18-19, 27-30; Melton Dec. (Ex. 2) at ¶¶ 24-25, 29-32, 37, 39-41; Reed Dec. (Ex. 3) at ¶¶ 9-10; Hart Dec. (Ex. 4) at ¶¶ 12-13.

---

[11] In a 2005 Forest-wide inventory for wilderness lands, the Forest Service reconfirmed that the 5,880-acre Sunset area was roadless, see Lease Modifications SFEIS (Ex. 5) at 553-54.  The fact that these lands remain identified as lands managed pursuant to the Colorado Roadless Rule reaffirms their roadless nature.

[12] Letter of M. Stilley (July 24, 2017), comment on the Lease Modifications SDEIS (Ex. 13).

As the Tenth Circuit has recognized, this type of harm cannot be rectified with money.  Davis, 302 F.3d at 1115-16 (finding irreparable injury when the proposed action would "disrupt the natural setting and feeling" of the affected area); see also San Luis Valley, 657 F. Supp. at 1240.

The law is clear that Arch's plans will result in irreparable harm to lands, wildlife, and the recreational experience.  See San Luis Valley, 697 F. Supp. at 1240 (finding that plaintiffs established a likelihood of irreparable where they demonstrated that the disturbance associated with drilling would impact, inter alia, wildlife habitat, and a "large expanse of undeveloped land with a significant 'sense of place' and quiet," and where plaintiffs had "interests in the water, wildlife, air, solitude and quiet, and natural beauty [the area] provides"); see also Anglers of the Au Sable v. U.S. Forest Serv., 402 F. Supp. 2d 826, 829-30, 834, 837-38 (E.D. Mich. 2005) (issuing a stay of site preparation that would have included "clearing of a 3.5-acre well site, logging and clearing of the land, and widening the road . . . about 200 feet from [a] semi-primitive, non-motorized area" due to:  destruction of the peace and quiet of the tract; harm to old-growth forests; wildlife disturbance; damage to "the cleared area and surrounding forest," "disruption of natural regeneration systems," changes in scenery; and impacts to recreation").  Id. at 829, 837-38.  The harms Plaintiffs face cannot be remedied absent an injunction preserving the status quo and the Sunset Roadless Area.  See, e.g., Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1382 (9th Cir. 1998).[13]

---

[13] See also Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 472 F.3d 1097, 1100 (9th Cir. 2006) (finding irreparable harm where inundating lands for a proposed mine "will adversely affect the environment by destroying trees and other vegetation").

**B.      Implementation of the Exploration Plan Absent NEPA Compliance Threatens Irreparable Harm.**

Plaintiffs also face irreparable harm if the Exploration Plan goes forward absent compliance with NEPA.  NEPA is a procedural statute that requires agencies to undertake a comprehensive analysis of environmental impacts <u>before</u> taking action that may impact the environment.  By requiring federal agencies to consider the impacts of their actions <u>prior</u> to taking them, <u>see</u> 42 U.S.C. §§ 4321, 4332, that is, to look before they leap, NEPA procedures "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989); <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 371 (1989) (requiring NEPA compliance beforehand, so agency does not "regret its decision after it is too late to correct").  Agencies must therefore comply with NEPA at earliest possible time, "before an irretrievable commitment of resources is made."  <u>N.M. ex rel. Richardson v. BLM</u>, 565 F.3d 683, 718 (10th Cir. 2009) (quotation omitted); <u>see id.</u> at 703 ("NEPA requires federal agencies to pause before committing resources to a project.").

As a result, courts find irreparable harm can result from agency actions going forward where courts have before them credible claims of NEPA violations.  Agency action prior to NEPA compliance unleashes "a bureaucratic steam roller," making it difficult to alter the outcome of analyses retroactively.  <u>Colo. Wild II</u>, 523 F. Supp. 2d at 1221 (quotations omitted); <u>see also</u> <u>San Luis Valley</u>, 657 F. Supp. 2d at 1241-42 ("[t]he Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the exploratory drilling] were permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking.").  Unless NEPA compliance occurs before

implementation, the public "will have been deprived of the opportunity to participate in [the] NEPA process at a time when such participation … is calculated to matter." <u>Save Strawberry Canyon v. Dep't of Energy</u>, 613 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009).

If Plaintiffs ultimately prevail on the merits, NEPA compliance <u>after</u> bulldozing for road and drill pad construction will make an unbiased environmental analysis of the decisions leading to the Exploration Plan virtually impossible due to the bureaucratic momentum for a project already underway.  Plaintiffs' members attest to the irreparable harm that they and their organizations will suffer as a result of the Exploration Plan moving forward absent the thorough environmental analysis required by NEPA.  <u>See</u>, <u>e.g.</u>, Melton Dec. (Ex. 2) at ¶¶20, 29, 31-35, 41; Nichols Dec. (Ex. 1) at ¶¶ 30, 32-35.  Plaintiffs thus face irreparable harm from the inability to participate effectively in agency environmental evaluations—as well as irreparable environmental harm—if this Court allows the Exploration Plan to go forward while the Court reviews this preliminary injunction motion and/or evaluates the merits of Plaintiffs' allegations of NEPA violations.

## II.   THE BALANCE OF HARMS WEIGHS IN FAVOR OF GRANTING AN INJUNCTION.

Because Plaintiffs face significant environmental harm, and Federal Defendants and Arch Coal face, at worst, some minor delay and speculative financial harm, the balance of harms weighs heavily in Plaintiffs' favor.

The Supreme Court has explained that:

Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., is irreparable.  If such injury is sufficiently likely, therefore, <u>the balance of the harms will usually favor the issuance of an injunction to protect the environment</u>.

Amoco Prod. Co., 480 U.S. at 545 (emphasis added).  Moreover, where harm to a project developer is speculative because the developer "may suffer financial harm, but if an injunction does not issue, unlawful disruption to [fragile habitat] is likely irreparable," the balance of hardships tips in favor of the environmental plaintiff.  Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1125 (9th Cir. 2004) (emphasis added) (internal quotations omitted).[14]

Here, the speculative nature of Arch Coal's financial harm demonstrates that the balance of harms tips decidedly in Plaintiffs' favor.  The very premise of the Exploration Plan is that Arch does not yet know whether the Lease Modifications area contains economically viable coal reserves, or that, if found, they could be successfully mined.  The Exploration Plan itself anticipates that the company could terminate exploration after studying results from the first three exploration wells, depending on the results of the data.[15]  A decision of the Interior Board of Land Appeals (IBLA) – the appellate review body within the office of the Secretary of the Interior – concerning Arch's 2013 attempt to begin exploration with the Lease Modifications, concluded that harm to Arch from a brief delay in exploration was speculative.  The IBLA labelled as "speculative" Arch Coal's claimed harm from a potential for a one month delay in exploration.[16]

> [T]he effect of not immediately implementing the Exploration Plan is a short delay in confirming the characteristics of the coal reserves, which might contain

---

[14] This is not a case where Arch Coal has already started work.  An injunction will simply preserve the status quo on the ground.  The fact that Plaintiffs do not seek to halt a project already begun means there are no "equities in favor of completion of a partially-completed project."  Davis, 302 F.3d at 1116.

[15] Mountain Coal Company, Notice of Intent to Explore (updated Nov. 8, 2017) ("Sunset Trail Area Exploration Plan") (excerpts attached as Ex. 10) at 7.

[16] Order, In re West Elk Exploration Plan, IBLA-2013-170 (July 10, 2013) ("IBLA Order Denying Full Force And Effect Petition") (Ex. 14) at 3.

> commercially recoverable quantities of coal.  If such quantities exist, and if after
> the delay there is insufficient time left in the exploration season to complete the
> characterization drilling and analysis, as Arch [Coal] fears, then the delay might
> cause Arch [Coal] eventually to bypass the coal ....[17]

The IBLA held that it was not in the public interest to eliminate the Board's normal 30-day stay

in order to permit immediate exploration because, inter alia, "there is no certainty that

economically recoverable coal resources would be discovered, or that Arch Entities would

eventually be able to successfully extract such resources even if they are discovered."[18]  Thus,

Defendant Interior Department's appeals board in 2013 concluded that any alleged harm from

losing access to the Lease Modifications' coal was fundamentally speculative.  That same

conclusion applies with equal force to the instant Exploration Plan.

In fact, Arch's own Exploration Plan further reinforces the conclusion that a reasonable

stay of surface disturbance will cause the company little harm because it will not interfere with

the company's apparent exploration schedule.  The company's schedule assumes that exploration

could take two years,[19] and that exploration can occur "on a year-round basis, if ground

conditions [and surface land-owners] allow."[20]  Work on each one of the 10 exploration holes

will take about a month or less.[21]  It is therefore very unlikely that even a few-months delay

---

[17] Order, In re West Elk Exploration Plan, IBLA-2013-170 (July 10, 2013) ("IBLA Order
Denying Full Force And Effect Petition") (Ex. 14) at 2-3 (emphasis added).

[18] Id. at 3.

[19] "The exploration activities described within this exploration plan are scheduled to be
completed within two years."  Mountain Coal Company, Notice of Intent to Explore (updated
Nov. 8, 2017) ("Sunset Trail Area Exploration Plan") (excerpts attached at Ex. 10) at 12.

[20] Id.

[21] "The access road upgrade and new construction should begin one to two weeks prior to
moving the drill rig onto the site....  The construction, drilling, and reclamation activities should

would prevent Arch from completing both phases of its exploration plan within the two-year (24-month) time-frame anticipated by the company's own schedule.[22]

Moreover, it is unlikely a brief stay of exploration of coal reserves in the Lease Modifications would cause economic harm to Arch Coal's ongoing or planned mining, since the West Elk Mine can continue operations with its current reserves for approximately eight years. Lease Modifications SFEIS (Ex. 5) at 20.  Thus, Arch can keep mining coal it already owns at the West Elk Mine until about 2025, even without the reserves that may or may not exist within the Lease Modifications.  Arch Coal thus also has many years to find other coal reserves to mine.[23]  Delaying Arch's exploration activities within the Lease Modifications area by a few weeks or months to permit orderly briefing of this case is thus unlikely to impact Arch's bottom line.  Even if it did, any harm Federal Defendants and Arch Coal may suffer would likely be purely financial, and "financial concerns alone generally do not outweigh environmental harm." Valley Cmty. Pres. Comm'n v. Mineta, 373 F.3d 1078, 1087 (10th Cir. 2004).  See also Acierno v. New Castle Cnty., 40 F.3d 645, 653 (3d Cir. 1994) ("Economic loss does not constitute irreparable harm ....").

---

take an average of 16 days per hole." Id.  See also Lease Modifications SFEIS (Ex. 5)at 41 (same).

[22] Elsewhere, Arch Coal estimates it would complete exploration activities by October 2020, nearly three years from now, making a few-months stay even less consequential.  K. Welt, Notice Of Intent To Explore Involving Removal Of 250 Tons Or Less Of Coal (Nov. 8, 2017) (Ex. 11) at 2.

[23] Similarly, in a map filed with State mining regulators in May 2017, Arch "projected" that mining at West Elk would occur in other areas far from the Lease Modifications until 2022, at least four years from now.  Mountain Coal Company, Map 51- E-Seam Projected Operations (Ex. 15).

Finally, temporarily enjoining exploration activities is consistent with the expectations of the Federal Defendants and the natural course of events.  Arch's proposal to explore in late December is not contemplated by Federal Defendants' environmental analysis, which states that "[e]xploration … activities would be completed <u>by October 31</u> each year," presumably to avoid construction in snowy winter conditions.  Lease Modifications SFEIS (Ex. 5) at 41 (emphasis added).  Arch apparently intends to turn a rare weather event – an extremely dry, warm winter – into an entitlement to act, when in any normal year, conditions would make it difficult if not impossible to implement exploration activities.

Because Plaintiffs face irreparable environmental harm from imminent road and drill pad construction across the Sunset Roadless Area, and Federal Defendants and Arch Coal face only, at most, some speculative and reparable monetary harm, the balance of harms tips sharply in Plaintiffs' favor.  A brief stay would simply preserve the parties' relative positions while the parties and this Court have more time to address this complex case.

## III.    THE PUBLIC INTEREST FAVORS GRANTING A STAY.

The public interest tips decidedly in favor of a preliminary injunction.  Protecting public lands, and ensuring compliance with the law—in particular compliance with laws that protect the environment and public participation—are in the public interest.

First, the public has a strong interest in protecting the environment and public lands, which the Exploration Plan will damage.  In a case challenging a timber sale on Forest Service land, this Court concluded that "[t]here is an overriding public interest in the preservation of biological integrity and the undeveloped character of the Project area that outweighs public or private economic loss in this case." <u>Colo. Wild v. U.S. Forest Serv.</u>, 299 F. Supp. 2d 1184,

1190-91 (D. Colo. 2004) (Colo. Wild I).  The Tenth Circuit has held that "there is an overriding

public interest in preservation of the undeveloped character of the area recognized by [NEPA]."

Wyo. Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1250 (10th Cir. 1973) overruled on

other grounds by Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970 (10th Cir.

1992) (en banc).  Other courts have similarly found a public interest in "preserving nature."  See

All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1138 (9th Cir. 2011) ("We recognize the

well-established public interest in preserving nature and avoiding irreparable environmental

injury.") (quotation omitted).[24]  An injunction in this case would serve the public interest by

preserving the forests, habitat, scenery, and the recreation and environmental values of the lands

owned by all Americans pending a ruling on the merits of this case.

Second, the public has an interest in ensuring that federal agencies comply with laws

designed to protect the environment, public lands, and public participation.  As one court in this

district has held, "[t]he public has an undeniable interest in the [federal agency's] compliance

with NEPA's environmental review requirements and in the informed decision-making that

NEPA is designed to promote."  Colo. Wild II, 523 F. Supp. 2d at 1223.  The Tenth Circuit has

agreed.  Davis, 302 F.3d at 1116 (holding that the public interest in completing a highway

project must yield to the obligation to construct the project in compliance with environmental

laws); see also Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv., 910 F. Supp. 2d 1269, 1290 (D.

---

[24] In Alliance for the Wild Rockies, the Ninth Circuit concluded that the public interest in
"preserving nature" outweighed the public interest in creating temporary jobs for the challenged
project.  632 F.3d at 1138-39.

Colo. 2012) ("there is public interest in ensuring that federal agencies adhere to" federal laws, including those that guarantee public involvement).

Defendants may argue that development of the nation's mineral resources is in the public interest. But any interest in potential future development of the Lease Modifications coal must be weighed against the public interest in vibrant public lands and informed decisionmaking. Courts have recognized that our need for energy does not trump environmental considerations. In a case involving natural gas (methane) development in neighboring Wyoming, a court held:

> The Court is cognizant of the importance of mineral development to the economy of the State of Wyoming. Nevertheless, mineral resources should be developed responsibly, keeping in mind those other values that are so important to the people of Wyoming, such as preservation of Wyoming's unique natural heritage and lifestyle. The purpose of NEPA ... is to require agencies ... to take notice of these values as an integral part of the decisionmaking process.

Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs, 351 F. Supp. 2d 1232, 1260 (D. Wyo. 2005). Here, the public interest in lawful decisionmaking and the natural heritage of the forests and wildlife within the Sunset Roadless Area weighs heavily in favor of an injunction, especially in light of Federal Defendants' prior failure to comply with NEPA as held by this Court in High Country.

## IV.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs allege that Federal Defendants have violated NEPA by relying on a flawed SFEIS for the Lease Modifications. Accordingly, this Court's review is governed by the Administrative Procedure Act ("APA"). Utah Shared Access All. v. Carpenter, 463 F.3d 1125, 1134 (10th Cir. 2006). Under the APA, courts must invalidate actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the agencies violated NEPA for two key reasons. First, while the "general

analysis" of greenhouse gas emissions in the Lease Modifications SFEIS quantifies the <u>amount</u>

greenhouse gas emissions from mining and burning West Elk coal, the agencies fail to provide

any assessment of the <u>impact</u> that these emissions have on climate change, making precisely the

same error this Court found unlawful in <u>High Country</u>.  Second, the Lease Modifications SFEIS

arbitrarily inflated the economic benefits of the Lease Modifications, even as it failed to disclose

the social costs.  Because the agencies approved the Lease Modifications based on a SFEIS "not

in accordance" with NEPA, their decisions violate the APA and Plaintiffs are likely to succeed

on the merits.[25]

> **A.     The SFEIS Failed to Take a Hard Look at the Climate Impacts of the Lease Modifications.**

The SFEIS admits that the Lease Modifications could result in up to 47.64 million tons of

greenhouse gas emissions, about as much as running Colorado's most polluting coal-fired power

plant for five years.[26]  Yet, the SFEIS fails to take a hard look at the climate impacts of these

emissions, violating NEPA and making two of the same errors deemed "arbitrary and capricious"

by this Court in <u>High Country</u>.  First, the SFEIS provides only a "general discussion" of

greenhouse gas emissions that fails to disclose the scale and nature of the climate impacts

resulting from the tens of millions of tons of climate pollution the Lease Modification will cause.

---

[25] Plaintiffs do not raise all claims in their complaint in this motion due to the urgency of briefing this motion.  Plaintiffs may raise additional claims in merits briefing.

[26] Combusting the additional 17.6 million tons of coal that the Lease Modifications would make available could result in up to 45 million additional tons of $CO_2e$ of climate pollution.  Lease Modifications SFEIS (Ex. 5) at 85.  Extending the life of the mine for 2.7 years would thus result in up to 2.64 million tons of $CO_2e$ from methane pollution.  <u>Id.</u> at 103, Table 3-7 (977,000 tons of $CO_2e$ per year).  EPA's greenhouse gas database shows the Comanche Power Plant emitted 8.8 million tons of carbon dioxide in 2016.  <u>See</u> https://ghgdata.epa.gov/ghgp/main.do (last viewed Dec. 18, 2017).

High Country, 52 F. Supp. 3d at 1189-90.  Second, the SFEIS fails to justify its refusal to use the

social cost of carbon protocol, which remains a valid and scientifically sound tool to

"characterize the impacts of the GHG [greenhouse gas] emissions."  Id. at 1190.  In addition, the

agencies rely on the flawed 2016 analysis of climate impacts prepared for the Colorado Roadless

Rule North Fork Coal Mining area SFEIS, which further illustrates the arbitrariness of the

agencies' actions.

       1.   The Lease Modifications SFEIS' Analysis of Climate Impacts Is Inadequate.

NEPA defines impacts or effects to include "ecological," "economic," and "social"

impacts of a proposed action.  40 C.F.R. § 1508.8(b).  Where an agency action causes

greenhouse gas pollution, NEPA mandates that agencies analyze and disclose the impacts of that

pollution on the environment.  See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety

Admin., 538 F.3d 1172, 1217 (9th Cir. 2008); see also WildEarth Guardians v. BLM, 870 F.3d

1222, 1237 (10th Cir. 2017) (failure to disclose climate impacts of various alternatives "defeated

NEPA's purpose").  A "general discussion of the effects of global climate change" does not

satisfy NEPA's hard-look requirement.  High Country, 52 F. Supp. 3d at 1189-90.

Here, the SFEIS admits that the Lease Modifications will have climate impacts.  "The

proposed action will contribute to the increase of atmospheric concentrations of greenhouse

gases."[27]  The SFEIS acknowledges that extending the life of the mine's methane emissions, a

result of the selected alternative, would have "cumulative impact[s] [that] could be substantial at

a global scale."[28]  But the Lease Modifications SFEIS makes no attempt to account for the

---

[27] Lease Modifications SFEIS (Ex. 5) at 988.

[28] Lease Modifications SFEIS (Ex. 5) at 255-56.

climate impacts of these emissions on the environment.  This is unlawful and contrary to High Country, in which the court held that the Forest Service had a duty to disclose the climate impacts of emissions from mine operation and coal combustion and that the agency erred in giving only a "general discussion of the effects of global climate change."  High Country, 52 F. Supp. 3d at 1189-90; see also Mont. Env'l Info. Ctr. v. U.S. Office of Surface Mining, --- F. Supp. 3d ----, 2017 WL 3480262, at *15 (D. Mont. 2017) (reaching same conclusion in case involving challenge to NEPA compliance concerning coal mining).

The Forest Service cannot satisfy its obligations under NEPA by claiming that it "qualitatively" disclosed the "effects of climate change for this project" and "quantified GHG emissions across all alternatives."[29]  The SFEIS did exactly what the High Country court found inadequate: explaining only in broad terms the kinds of impacts climate change can have without attempting to disclose the scale and nature of the climate impacts resulting from the tens of millions of tons of climate pollution this decision will cause.  While the Lease Modifications SFEIS may have quantified (counted) greenhouse gas emissions, as it did in the prior case, the volume of greenhouse gases emissions from a particular project does not give the decisionmaker (or anyone else) an understanding of the scale of the "ecological," "economic," and "social" impacts of a proposed action.  40 C.F.R. § 1508.8(b).  Both this Court in High Country and the court in Montana Environmental Information Center held that NEPA required agencies to disclose environmental impacts and not just emission volumes.  See High Country, 52 F. Supp.

---

[29] Forest Service ROD (Ex. 8) at 17.  A "qualitative" discussion of climate change merely recounts the impacts of climate change generally, without providing any sense of the scope or scale of the impacts caused by an individual agency decision.  Such a qualitative analysis could effectively be cut and pasted into any EIS.

3d at 1190 ("Beyond quantifying the amount of emissions relative to state and national emissions and giving general discussion to the impacts of global climate change, [the agencies] did not discuss the impacts caused by these emissions."); <u>Mont. Env'l Info. Ctr.</u>, 2017 WL 3480262, at *13 (rejecting the argument that the agency "reasonably considered the impact of greenhouse gas emissions by quantifying the emissions which would be released if the [coal] mine expansion is approved, and comparing that amount to the net emissions of the United States").

By failing to disclose the climate impacts of the Lease Modifications, the Federal Defendants failed – again – to take the hard look require by NEPA, the same approach the <u>High Country</u> concluded violated NEPA.

> 2. <u>The Social Cost of Carbon Tool Offers a Valid and Scientifically Sound Method for Disclosing Climate Impacts.</u>

In <u>High Country</u>, this Court found that it was simply not reasonable for the Forest Service to "completely [] ignore" the social cost of carbon protocol, "a tool in which an interagency group of experts invested time and expertise." <u>High Country</u>, 52 F. Supp. 3d at 1193. Here, the social cost of carbon protocol remains the most scientifically valid tool for assessing the project-specific impacts of the proposed Lease Modifications. There is no valid basis for the Federal Defendants continued refusal to undertake a "project-level" social cost of carbon analysis.[30]

The social cost of carbon protocol is based on multiple peer-reviewed models and represents the best available approach for assessing the impacts of carbon emissions. <u>High Country</u>, 52 F. Supp. 3d at 1190 ("The protocol—which is designed to quantify a project's contribution to costs associated with global climate change—was created with the input of

---

[30] Forest Service ROD (Ex. 8) at 17.

several departments, public comments, and technical models.").  It a simple tool that is easy for federal agencies to use and easy for the public to understand.  Putting a dollar figure on each ton of $CO_2$ emitted as a result of a federal project places climate impacts in a social and economic context that both decision makers and the public can readily comprehend.  As the <u>High Country</u> court instructed, NEPA requires its use to inform agency decisions about projects that cause greenhouse gas emissions, unless the agency can provide a reasoned basis for ignoring it.

Federal Defendants falsely claim that "no tools exist" to enable the agency to disclose the impacts of the Lease Modifications attributable to climate pollution.[31]  For example, the Lease Modifications SFEIS defends its lack of disclosure of climate impacts, and reliance only on the volume of climate emissions by claiming a "lack of project specific analysis tools ….  The disclosed impacts [the volume of CO2-equivalent emissions] represent the best available data to describe how this project (as a whole) will contribute to projected global climate change."[32]  The SFEIS also asserts that "[s]pecific global or local climate effects to socioeconomic issues, as a result of the proposed action, cannot be determined."[33]

This Court in <u>High Country</u> has already rejected these excuses.  When the Forest Service made the identical argument to this Court in 2014, alleging that the climate impacts to natural systems from the prior version of these Lease Modifications cannot be predicted or quantified,

---

[31] Lease Modifications SFEIS (Ex. 5) at 112 ("no tools exist to describe how the minor amount of incremental GHG increase (relative to the cumulative, i.e. global annual GHG burden) would directly contribute to modeled climate change impacts").

[32] Lease Modifications SFEIS (Ex. 5) at 981.

[33] Lease Modifications SFEIS (Ex. 5) at 286.

the Court stated: "a tool is and was available: the social cost of carbon protocol." High Country, 52 F. Supp. 3d at 1190.

Federal Defendants cannot escape the logic of High Country by claiming that the social cost of carbon protocol may not be used to address small increases in climate emissions. The Lease Modifications SFEIS asserts that while "[e]ach of the alternatives would contribute incrementally to climate change … we are unable to effectively compare effects of alternatives due to the small increments of GHG's relative to the scales at which climate change is observed, and measured."[34]  This rationale is arbitrary and capricious because the social cost of carbon protocol was specifically designed to "make it possible for agencies to incorporate the social benefits from reducing carbon dioxide emissions into cost-benefit analyses of regulatory actions that have small, or 'marginal,' impacts on cumulative global emissions."[35]  In other words, the social cost of carbon was designed to disclose the cost of an additional unit of carbon into the atmosphere. Here, millions of tons of carbon are at stake. The Forest Service is wrong to contend that no tool exists to address the marginal impacts of the Lease Modifications.

Federal Defendants fail to provide a rational explanation for "why these agencies believed the protocol was inaccurate or not useful in this [site-specific] instance." High Country, 52 F. Supp. 3d at 1192.  The Forest Service declines to apply the social cost of carbon for three more reasons, neither of which withstands scrutiny. First, the Forest Service claims that it need

---

[34] Lease Modifications SFEIS (Ex. 5) at 289.

[35] Interagency Working Group on Social Cost of Carbon. Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (Feb. 2010) (Ex. 16) at 2 (emphasis added); see also id. at 1 ("The SCC is an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year").

not use the social cost of carbon protocol because it "did not monetize comparable economic benefits and costs" of the mining the Lease Modifications as part of a formal cost-benefit analysis.[36]  But the SFEIS <u>does</u> catalogue the monetary impacts (i.e., benefits) of the Lease Modifications as part of an economic impact analysis, disclosing jobs, economic activity from sale of the coal, and royalty revenues that will be prolonged by the Lease Modifications.[37] Whether or not this is a cost-benefit analysis is "a distinction without a difference where, as here, the economic benefits of the action were quantified while the costs were not."  <u>Mont. Env'l Info. Ctr.</u>, 2017 WL 3480262, at *13 n.9; <u>High Country</u>, 52 F. Supp. 3d at 1190-91 (faulting the agency for touting "several specific economic benefits—coal recovered, payroll, associated purchases of supplies and services, and royalties" but then "explain[ing] that a similar analysis of the <u>costs</u> was impossible when such an analysis was in fact possible and was included in an earlier draft EIS [utilizing the Interagency Working Group's social cost of carbon tool].").

Second, the Forest Service refuses to use the social cost of carbon protocol on the grounds that it does not know the "incremental domestic and global change in GHGs between the no action and action alternatives."[38]  But the Forest Service is not "excused from making emissions estimates just because the emissions in question might be partially offset by reductions

---

[36] Forest Service ROD (Ex. 8) at 17; Letter from Maribeth Gustafson to Edward Zukoski, December 7, 2017 (Ex. 7) (response to objections), at 7; Lease Modifications SFEIS (Ex. 5) at 129.

[37] Lease Modifications SFEIS (Ex. 5) at 281-86. For example, Table 3-39 demonstrates that the Lease Modifications proposed alternative will result in an additional $397 million in "economic impact," and 887 jobs each year for an additional 2.7 years (the term the life of mine is extended with the addition of the Lease Modifications' coal).  The analysis focuses on three counties (two of which are directly impacted, and a third indirectly impacted) and breaks down the economic impact as such.

[38] Letter from Maribeth Gustafson to Edward Zukoski, December 7, 2017 (Ex. 7) at 8.

elsewhere." Sierra Club v. Fed. Energy Regulatory Comm'n, 867 F.3d 1357, 1374-75 (D.C. Cir.

2017).[39] NEPA requires the Forest Service to determine whether its decision to consent to or

reject the proposed Lease Modifications at West Elk impact greenhouse gas emissions, and if so,

to what extent. This Court thus found that the Forest Service violated NEPA when it failed to

analyze the "reasonably foreseeable effect" of the Lease Modifications on greenhouse gas

emissions. High Country, 52 F. Supp. 3d at 1198. The Forest Service's continued refusal to

undertake this analysis violates NEPA, as made clear by this Court's prior decision.[40]

Third, the Forest Service rejected reliance on the social cost of carbon for the agency's

Record of Decision, in part alleging that addressing those costs at the project level is improper.[41]

Neither the Forest Service's Record of Decision nor the Lease Modifications SFEIS provide any

argument or analysis supporting the contention that a social cost analysis is inappropriate at the

project level, a strategy that this Court in High Country, and another court, have rejected. High

---

[39] In Sierra Club v. Federal Energy Regulatory Commission, the D.C. Circuit Court recently invalided a Federal Energy Regulatory Commissions ("FERC") NEPA analysis for a proposed natural gas pipeline where the agency refused to use the social cost of carbon protocol and similarly attempted to sidestep the question of whether its decision to approve the pipeline would result in changes to overall levels of greenhouse gas emissions. Sierra Club, 867 F.3d at 1374–75. There, FERC, like the federal agencies here, asserted that the project's greenhouse gas emissions "might be partially offset by reductions elsewhere." Id. at 375. The D.C. Circuit Court of Appeals rejected this obvious dodge, reasoning that "[a]n agency decisionmaker reviewing this EIS would thus have no way of knowing whether total emissions, on net, will be reduced or increased by this project, or what the degree of reduction or increase will be." Id. "In this respect, then," the FERC analysis in Sierra Club, like Lease Modifications SFEIS challenged here, "fails to fulfill its primary purpose." Id.

[40] Further, a trio of recent decisions have also held that agency decisions causing increased fossil fuel development violate NEPA when agencies provided no information regarding the effect of their decisions on overall greenhouse gas emissions. See WildEarth Guardians, 870 F.3d at 1237; Sierra Club, 867 F.3d at 1375; Mont. Env'l Info. Center, 2017 WL 3480262, at *15.

[41] Forest Service ROD (Ex. 8) at 15 ("[I] believe that the analysis was conducted at the appropriate [rulemaking] level at that time, consistent with the intended use of the protocol.").

Country, 52 F. Supp. 3d at 1192 (Forest Service and BLM "do not explain why these agencies believed the protocol was inaccurate or not useful in this [site-specific] instance."); Mont. Env'l Info. Ctr., --- F. Supp. 3d ----, 2017 WL 3480262, at *13 ("While Defendants are correct that the [SCC] Protocol was developed to support cost-benefit analysis, that argument does not answer Plaintiff's insistence that the Enforcement Office acted arbitrarily and capriciously by failing to adequately consider the costs of greenhouse gas emissions" for a site-specific mine expansion).

Federal Defendants have not demonstrated that quantifying the incremental emissions of the project would be infeasible.  Nor have Federal Defendants complied with NEPA's mandate that agencies explain why such essential information cannot be obtained and provide its analysis based on generally accepted principles.  40 C.F.R. § 1502.22.  Federal Defendants thus have not provided a satisfactory explanation for why quantifying the impacts of climate pollution emissions is "out of the scope for this project."[42]  It is a feasible and recognized method of providing the required "hard look" at climate impacts.

Ultimately, it is undisputed that the social costs of carbon overwhelmingly outweigh the benefits for North Fork coal mining, as documented by Dr. Power.[43]  The Forest Service does not dispute this point.[44]  Yet by deciding not to quantify the costs at all, Federal Defendants effectively "zeroed out the cost in its quantitative analysis."  High Country, 52 F. Supp. 3d at

---

[42] Forest Service ROD (Ex. 8) at 17.

[43] As Dr. Power explains in his expert analysis, "the results of the benefit-cost analysis in the CRR EIS process are overwhelmingly negative and if the Forest Service had paid attention to the scientific literature associated with the SCC, the results of the benefit-cost analysis would have been not only all negative, but would have been dramatically more negative."  See Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) (Ex. 17) (emphasis in original).

[44] Forest Service ROD (Ex. 8) at 16.

1192.  This uninformed analysis violates NEPA's dual purpose of informed decision-making and

public participation.  Sierra Club, 867 F.3d at 1374 (without an analysis of the social cost of

carbon, "it is difficult to see how FERC could engage in 'informed decision making' with respect

to the greenhouse-gas effects of this project, or how 'informed public comment' could be

possible.") (citation omitted).

By failing "to offer non-arbitrary reasons why the [social cost of carbon] protocol should

not have been included" in the analysis of the Lease Modifications, the Forest Service violated

NEPA, and capriciously disregarded this Court's ruling in High Country, 52 F. Supp. 3d at 1191-

92.

3.  Any Reliance on the Flawed Social Cost of Carbon Analysis Prepared for the
Colorado Roadless Rule Would Be Arbitrary and Capricious.

Instead of preparing a social cost of carbon analysis for the Lease Modifications, the

Forest Service gives contradictory statements about its reliance on the social cost of carbon

analysis performed for the SFEIS on the reinstatement of the Colorado Roadless Rule North Fork

Coal Mining Area exception.[45]  These inconsistent explanations are misleading and fail to

provide the Court or the public with a rational explanation for the agencies' analysis of climate

impacts (or lack thereof).  See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (holding that agency

actions must be reversed as arbitrary and capricious when the agency fails to "examine the

relevant data and articulate a satisfactory explanation for its action including a rational

---

[45] Compare Forest Service ROD (Ex. 8) at 26 ("My decision does not rely on the SCC [Social Cost of Carbon] protocol and technical documents.") with id. at 15 (claiming that the social cost of carbon analysis for the Colorado Roadless Rule "informs my decision and the public" and asserting the belief that the social cost analysis "was conducted at the appropriate [rulemaking] level").

connection between the facts found and the choice made") (internal quotation marks omitted).

Even if Federal Defendants do intend to rely on the analysis in the Colorado Roadless Rule

SFEIS, they cannot do so because that analysis is inherently flawed and does not provide an

accurate basis for assessing or disclosing the climate impacts of the Lease Modifications.  The

Forest Service's reliance on that flawed analysis underscores the arbitrariness of its decision-

making process for the Lease Modifications.

To take the required "hard look" at a proposed project's effects, "an agency may not rely

on incorrect assumptions or data in an EIS."  Native Ecosystems Council v. USFS, 418 F.3d 953,

964–65 (9th Cir. 2005); 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency

comments, and public scrutiny are essential to implementing NEPA.").  Yet, the climate analysis

for the Colorado Roadless Rule suffers from a number of serious inaccuracies, as detailed by Dr.

Power.[46]  Most importantly, the analysis assumed that coal-fired power plants would be subject

to limits on greenhouse gas pollution adopted by the Clean Power Plan, thereby reducing

demand for coal as a substitute fuel.  But the courts have stayed the Clean Power Plan, and the

Trump administration has moved to rescind it.[47]  Utilities will therefore purchase more coal to

substitute for natural gas and other cleaner fuels, which would lead to an increase in North Fork

---

[46] Dr. Power submitted comments on the Colorado Roadless Rule EIS, which identified multiple flaws in the social cost of carbon analysis prepared for that rulemaking.  See Power Consulting et al., Objections to the Colorado Roadless Rule SFEIS (Dec. 2016) at 2-7 (Ex. 18).  In addition, he had previously submitted specific comments for the Lease Modification regarding additional flaws in the social cost of carbon analysis for the Colorado Roadless Rule.  See Power Consulting et al., Comments on the Federal Coal Lease Modifications COC-1362 & COC-67232 (July 23, 2017) (Ex. 19) at 13-16, 68-86.

[47] EPA news release, EPA Takes Another Step To Advance President Trump's America First Strategy, Proposes Repeal Of "Clean Power Plan" (Oct. 10, 2017) (announcing that EPA is "proposing to repeal" the CPP) (Ex. 20).

coal substituting for less polluting forms of energy.  As Dr. Power's expert report, submitted to

the Forest Service in comments on the Lease Modifications supplemental draft EIS, explained,

this substitution effect will result in significantly greater total greenhouse gas emissions (and

hence a greater social cost) than if the Plan were in effect.[48]  By failing to take into account this

substitution effect, and the resultant increase in emissions from coal-fired power plants, the

Forest Service's Colorado Roadless Rule SFEIS significantly understated the climate impacts of

that rule.

The Colorado Roadless Rule's NEPA analysis is also flawed because, as Dr. Power

pointed out, it ignores the basic economic principle that as the price of a product (coal) goes

down, the amount of the product consumed generally goes up.  The North Fork Coal mining

exception will make more coal available on the market, which will tend to make the price of

coal-fired electricity decline, thus inducing additional demand for electricity, which will then

result in increased climate pollution.[49]  This phenomenon is referred to as the price elasticity of

demand.[50]  In their comments, the experts from Power Consulting faulted the Forest Service for

not accounting for the social costs of this increased demand and urged the Forest Service to use a

model capable of accounting for price elasticity of demand.  Id. at 4.  However, in the Colorado

Roadless Rule SFEIS, the Forest Service did not account for this possible increased demand in

---

[48] See Power Consulting et al., Comments on the Federal Coal Lease Modifications COC-1362 & COC-67232 (July 23, 2017) (Ex. 19) at 13-16, 68-86.

[49] See Power Consulting et al., Objections to the Colorado Roadless Rule SFEIS (Dec. 2016) at 2-4 (Ex. 18).

[50] Id. at 3.

disclosing either the volume of greenhouse gases likely to increase as a result of opening roadless lands to coal mining or the impact of those additional greenhouse gases.[51]

Although the Lease Modifications SFEIS fails to acknowledge any of the flaws in the Colorado Roadless Rule's analysis of climate impacts, the Forest Service stated that it relied on that flawed analysis to "inform" its decision regarding the Lease Modifications.[52]  The agency's reliance on an "arbitrarily and capriciously skewed" analysis of the social cost of carbon violates NEPA's hard-look requirement, Native Ecosystem Council, 418 F.3d at 964–65, and further illustrates the arbitrariness of their actions.  Without an accurate analysis of climate impacts as required by this Court, Federal Defendants have not provided an informed analysis of the climate impacts of the Lease Modifications, as required by NEPA.  See 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").  As several courts have recognized recently, this type of failure amounts to a failure to take a "hard look" at the decision's climate impacts.  See Mont. Env'l Info. Ctr., 2017 WL 3480262, at *15 (calling the agency's assertion that its decision to approve or reject the leases would have no impact on overall greenhouse gas emissions "inaccurate"); WildEarth Guardians, 870 F.3d at 1235-36, 1238 (calling a similar assertion "irrational," "unsupported by hard data," and "contrary to basic supply and demand principles"); Mid States Coalition for

---

[51] U.S. Dept. of Agriculture Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Final Environmental Impact Statement, Nov. 2016 (Ex. 21), at E-62 ("There is a lack of data supporting the phenomena where retail electric rates would decrease enough to cause a noticeable change in electric demand due to changes in fuel prices, in response to shifts in fuel supply of the magnitude modeled in this action.  In this present case, evidence has not been presented to support the claim that elasticity demand would change with the addition or subtraction of projected amounts of North Fork Coal from the coal supply. . . .").

[52] Forest Service Record of Decision (Ex. 8) at 15.

<u>Progress v Surface Transportation Board.</u> 345 F.3d 520, 532 (8th Cir. 2003) ("The proposition that the demand for coal will be unaffected by an increase in availability and a decrease in price ... is illogical at best.").

In sum, the Lease Modifications failed to comply with this Court's clear direction in <u>High Country</u> to either analyze the climate impacts of the project or justify why the social cost of carbon is not an appropriate tool.  It did neither.  The Forest Service's ROD contradictory, simultaneous embrace and rejection of the Colorado Roadless Rule's flawed analysis simply underscores the arbitrary and uninformed nature of their decisions.  The agencies violated NEPA, and thus, Plaintiffs are likely to succeed on the merits.

**B.      The SFEIS Fails to Take a Hard Look at the Socioeconomic Impacts of the Lease Modifications.**

While the SFEIS underestimated the Lease Modifications' social cost, that analysis simultaneously and erroneously inflated the project's estimated economic impacts and benefits. This skewed analysis violates NEPA's hard-look requirement, as made clear by this Court in <u>High Country</u>.  Federal Defendants wholly failed to engage Dr. Power on this issue, further violating NEPA's requirement to discuss and indicate the agency response to "responsible opposing view[s]."  40 C.F.R. § 1502.9(b).

The <u>High Country</u> court faulted the Forest Service for conducting half of a cost-benefit analysis for the previous lease modification decision, holding that agency acted arbitrarily and capriciously in quantifying only the economic benefits of the Lease Modifications.  <u>High Country</u>, 52 F. Supp. 3d at 1191.  The Forest Service commits the same reversible error here.

The SFEIS includes an assessment of the Lease Modifications' economic impacts (benefits) that uses questionable and unexplained assumptions that differ, without explanation,

from those the Forest Service had employed for years in evaluating the Colorado Roadless Rule

and its North Fork Coal Mining Area exception.  These arbitrary and unexplained changes boost

the alleged jobs and labor income figures far higher than previous estimates.  The SFEIS thus put

a thumb on the scale of the economic benefits of the Lease Modifications, even as it zeroed out

the social costs.

In its draft SEIS, and in all of its modeling from 2012-2016 of the impacts of North Fork

Coal mining, the Federal Defendants focused on a five-county study area in accounting for the

project's socioeconomic impacts.[53]  Dr. Power, an emeritus economics professor at the

University of Montana, explained in comments on the Leases Modifications supplemental draft

EIS that this study area was too broad, because the mine's economic impacts were more

localized, and thus that the analysis would overstate the mine's economic benefits.[54]  In

response, the Forest Service revised its economic analysis in the Lease Modifications SFEIS,

properly narrowing its study area to a two- to three-county area.[55]  However, the SFEIS's

estimated jobs multiplier—which measures how many non-mining jobs are created by spending

by the mine and by mine employees per one mining job—jumped from ratio of two jobs created

per every mining job in prior analyses to three or four jobs created in the SFEIS.[56]  Given the

smaller modeling area, meaning a focus on an area with a smaller economy and fewer jobs, the

---

[53] Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) (Ex. 17) at 20.

[54] Power Consulting et al., Comments on the Federal Coal Lease Modifications COC-1362 & COC-67232 (July 23, 2017) (Ex. 19) at 23-24.

[55] Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) (Ex. 17) at 19.

[56] Id. at 20.

38

SFEIS should have found a smaller jobs multiplier, not a larger one.[57]  Dr. Power found that

SFEIS's new conclusion violated basic economic principles and "is most certainly an error in the

economic analysis that skews the results to make the economic impact appear greater than it

actually is."[58]  As Dr. Power pointed out in his analysis of the SFEIS (submitted by Plaintiffs as

part of their official objections to the Forest Service's analysis), this Forest Service's new, higher

multiplier differed differed from prior analyses prepared by the Forest Service in 2012, 2015, and

2016 concerning the impacts of the North Fork Coal Mining Area exception.[59]  The Forest

Service failed to respond to this criticism.[60]  The Forest Service acknowledges Dr. Power's

report in its 2017 Lease Modifications Record of Decision and claims to have responded to it in

its discussion of the social cost of carbon.[61]  At no point, however, does the Forest Service

respond to Dr. Power's report critiquing of the Forest Service's socio-economic modeling

(known as IMPLAN or Impact Analysis for Planning).[62]

---

[57] Id.

[58] Id. at 19.  The Forest Service focused on the 2-3 counties where the impacts of the mine are likely to be felt, instead of analyzing the impact on counties far from the mine or statewide, as prior Forest Service modeling efforts for the Lease Modifications or the Colorado Roadless Rule had done.  A more focused analysis should show a smaller multiplier simply because it is capturing a smaller number of businesses where jobs can be created.  The Forest Service's contrary conclusion finds no support in economic principles or studies.  Id.

[59] Id.

[60] See Letter from Maribeth Gustafson to Edward Zukoski, Dec. 7, 2017 (Ex. 7) (response to objections).

[61] Forest Service ROD (Ex. 8) at 34.

[62] Dr. Power's report includes a separate section critiquing the Forest Service's IMPLAN modeling.  See Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232, Oct. 2017 (Ex. 17) at 18-24.

The Lease Modifications' IMPLAN analysis contained another arbitrary assumption – this one concerning miner pay – that drastically differs from prior analyses in a way that makes the Lease Modifications economic impact look bigger.  In the Forest Service's 2012 final EIS on the Colorado Roadless Rule, and in its 2015 SDEIS and 2016 SFEIS on the reinstatement of the North Fork Coal Mining Area exception, the Forest Service assumed that the each direct (mining job) would pay about $110,000 to $120,000.[63]  But nine months after the Forest Service completed the Colorado Roadless Rule SFEIS in October 2016, that agency, in the Lease Modifications SFEIS, assumed that miner pay was 40% greater (nearly $167,000 in constant dollars).

| Pay Per Direct Job (2016 $s)[64] | |
| --- | --- |
| Forest Service Document with IMPLAN | Pay per Direct |
| 2012 CRR FEIS | $      109,87 |
| 2015 CRR SDEIS | $      119,23 |
| 2016 CRR SFEIS | $      119,23 |
| 2017 SFEIS Lease Modifications  without | $      166,71 |

When Plaintiffs raised this issue in their objections on the Lease Modifications SFEIS, the Forest Service did not respond.

The Forest Service's failure to explain or address these serious differences between the agency's earlier disclosure of economic impacts and the Lease Modifications SFEIS is arbitrary and capricious and violates NEPA's "hard look" doctrine.  This is no mere flyspeck, because it put a thumb on the scale of the economic benefits of the project, while at the same time the

[63] Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) (Ex. 17) at 22.

[64] Table taken from Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) (Ex. 17) at 22

agency downplayed the costs of climate pollution.  Nor is this a case of a "battle of the experts,"

for the Forest Service provided no explanation at all, from experts or anyone else, to dispute Dr.

Power's analysis.

Just as it did in 2012, when the agency declined to respond to Dr. Power's critique of the

agency's analysis of coal markets and climate pollution, the Forest Service here wholly failed to

address Dr. Power's opposing scientific analysis, in this case with regard to the economic

impacts of the Lease Modifications.  "This failure to engage with Dr. Power's report violates 40

C.F.R. § 1502.9(b)."  High Country, 52 F. Supp. 3d at 1198; see also Ctr. for Biological

Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1168 (9th Cir. 2003) (finding Forest Service's

failure to disclose and respond to evidence and opinions challenging EIS's scientific assumptions

violated NEPA).

## V.        THE COURT SHOULD IMPOSE NO BOND OR A NOMINAL ONE.

Finally, if this Court enters a TRO or preliminary injunction, Plaintiffs respectfully

request that the Court waive the bond requirement, or impose no bond or a nominal bond under

the public interest exception to Rule 65(c).

Although Rule 65(c) requires a security to be posted in conjunction with a preliminary

injunction, "the trial judge has wide discretion in the matter of requiring security" and under

some circumstances, "no bond is necessary."  Continental Oil Co. v. Frontier Refining Co., 338

F.2d 780, 782 (10th Cir. 1964).  The Tenth Circuit and its district courts routinely hold that a

substantial bond is not required from litigants who, like Plaintiffs here, seek to enforce

environmental laws to protect the public interest.  This specifically includes enforcement of

NEPA: "[W]here a party is seeking to vindicate the public interest served by NEPA, a minimal

bond amount should be considered." Davis, 302 F.3d at 1126 (requiring only nominal bond).[65]

Here, Plaintiffs are five not-for-profit organizations seeking to protect the environment

and vindicate the public interest.  As intended by Congress, they do so by enforcing NEPA

through the Administrative Procedure Act's judicial review provisions.  They have no pecuniary

interest in the case's outcome.[66]  A bond order that exposes the Plaintiffs to substantial financial

liability would effectively preclude their ability to enforce NEPA.[67]  None of the Plaintiffs can

afford to post a substantial bond in every case where they seek temporary injunctive relief.[68]  If

bringing a citizen suit to enforce environmental laws exposes these non-profit organizations to

substantial liability, they could be forced to curtail their efforts to enforce environmental laws,

which would be contrary to the public interest and congressional intent in enacting these

statutes.[69]

---

[65] See Kansas v. Adams, 705 F.2d 1267, 1269 (10th Cir. 1983) ("only nominal bonds … are imposed in NEPA cases"); San Luis Valley Ecosystem Council, 657 F. Supp. 2d at 1248 (declining to impose bond because "the imposition of substantial security would impede Plaintiff's access to judicial review"); Colo. Wild II, 523 F. Supp. 2d at 1231 (no substantial bond required where its "[i]mposition … would preclude [p]laintiffs' request for review of [an agency's] … decision and frustrate the policies underlying NEPA and the APA").

[66] See, e.g., Decl. of John Horning (Dec. 16, 2017) (Ex. 22) at ¶ 8; Declaration of Kieran Suckling (Dec. 17, 2017) (Ex. 24) at ¶ 5; Decl. of Pat Gallagher (Dec. 17, 2017) (Ex. 26) at ¶ 10.

[67] Decl. of John Horning (Ex. 22) at ¶¶ 9-10; Decl. of Sloan Shoemaker (Dec. 16, 2017) (Ex. 23) at ¶ 7; Declaration of Kieran Suckling (Ex. 24) at ¶¶ 10-11, 13; Decl. of Brett Henderson (Ex. 25) (Dec. 16, 2017) at ¶ 6; Decl. of Pat Gallagher, (Ex. 26) at ¶¶ 2, 5.

[68] Id.

[69] Id.

## CONCLUSION

Plaintiffs satisfy the test for a temporary restraining order and preliminary injunction, and the Court should enjoin the Exploration Plan and preserve the status quo until it can rule on a preliminary injunction, or, alternatively, until a ruling on the merits.


Respectfully submitted December 18, 2017,

<u>/s/ *Edward B. Zukoski*</u>
Edward B. Zukoski
Earthjustice
633 16th Street, Suite 1600
Denver, CO 80202
(303) 623-9466
Fax: (303) 623-8083
tzukoski@earthjustice.org

Mary Emily Splitek
Earthjustice
633 16th Street, Suite 1600
Denver, CO 80202
(303) 966-9613
Fax: (303) 623-8083
esplitek@earthjustice.org


*Attorneys for Plaintiffs High Country Conservation Advocates, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2017, I filed the foregoing **Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support** with the Court's electronic filing system, thereby generating service upon the following parties of record:

Michael Drysdale
DORSEY & WHITNEY LLP
50 South Sixth Street, Ste. 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-5652
Facsimile: (612) 340-8800
Email: drysdale.michael@dorsey.com

Scott P. Sinor
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202
Telephone: (303) 629-3400
Facsimile: (303) 629-3450
Email: sinor.scott@dorsey.com

Attorneys for Mountain Coal Company

JOHN S. MOST, Trial Attorney
Natural Resources Section
Virginia Bar No. 27176
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-3353
Email: john.most@usdoj.gov

Counsel for Federal Defendants

s/ Edward B. Zukoski

# INDEX OF EXHIBITS

| Exhibit # | Description |
|---|---|
| Exhibit 1 | Declaration of Jeremy Nichols (Dec. 16, 2017) |
| Exhibit 2 | Declaration of Allison Melton (Dec. 16, 2017) |
| Exhibit 3 | Declaration of Matt Reed (Dec. 16, 2017) |
| Exhibit 4 | Declaration of Peter Hart (Dec. 16, 2017) |
| Exhibit 5 | U.S. Dept. of Agriculture Forest Service, Supplemental Final Environmental Impact Statement:  Federal Coal Lease Modifications COC-1362 & COC-67232, Aug. 2017 (excerpts) |
| Exhibit 6 | High Country Conservation Advocates, et al.'s Objections to Federal Coal Lease Modifications COC-1362 & COC-67232, Oct. 23, 2017 |
| Exhibit 7 | Letter from Maribeth Gustafson to Edward Zukoski (Dec. 7, 2017) (Forest Service Response to Objections) |
| Exhibit 8 | U.S. Dept. of Agriculture Forest Service, Final Record of Decision. Federal Coal Lease Modifications COC-1362 & COC-67232, Dec. 11, 2017 |
| Exhibit 9 | Dept. of the Interior Bureau of Land Management, Record of Decision, DOI-BLM-CO-S050-2015-0042-EIS, December 15, 2017 |
| Exhibit 10 | Mountain Coal Company, Notice of Intent to Explore (updated Nov. 8, 2017) ("Sunset Trail Area Exploration Plan") (excerpts) |
| Exhibit 11 | K. Welt, Notice Of Intent To Explore Involving Removal Of 250 Tons Or Less Of Coal |
| Exhibit 12 | FWS Concurrence letter (June 16, 2010) |
| Exhibit 13 | Letter of M. Stilley (July 24, 2017), comment on the Lease Modifications SDEIS |
| Exhibit 14 | Order, In re West Elk Exploration Plan, IBLA-2013-170 (July 10, 2013) ("IBLA Order Denying Full Force And Effect Petition") |
| Exhibit 15 | Mountain Coal Company, Map 51- E-Seam Projected Operations |
| Exhibit 16 | Interagency Working Group on Social Cost of Carbon. Technical Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866 (Feb. 2010) |
| Exhibit 17 | Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications COC-1362 & COC 67232 (Oct. 2017) |

| Exhibit 18 | Power Consulting et al., Objections to the Colorado Roadless Rule SFEIS (Dec. 2016) |
|---|---|
| Exhibit 19 | Power Consulting et al., Comments on the Federal Coal Lease Modifications COC-1362 & COC-67232 (July 23, 2017) |
| Exhibit 20 | EPA news release, EPA Takes Another Step To Advance President Trump's America First Strategy, Proposes Repeal Of "Clean Power Plan" (Oct. 10, 2017) |
| Exhibit 21 | U.S. Dept. of Agriculture Forest Service, Rulemaking for Colorado Roadless Areas, Supplemental Final Environmental Impact Statement, Nov. 2016 |
| Exhibit 22 | Declaration of John Horning (Dec. 16, 2017) |
| Exhibit 23 | Declaration of Sloan Shoemaker (Dec. 16, 2017) |
| Exhibit 24 | Declaration of Kieran Suckling (Dec. 17, 2017) |
| Exhibit 25 | Declaration of Brett Henderson (Dec. 17, 2017) |
| Exhibit 26 | Declaration of Pat Gallagher (Dec. 17, 2017) |