# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-3025-PAB

HIGH COUNTRY CONSERVATION ADVOCATES, WILDEARTH GUARDIANS, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and WILDERNESS WORKSHOP,

      Plaintiffs,

v.

UNITED STATES FOREST SERVICE, U.S. DEPARTMENT OF AGRICULTURE, U.S. DEPARTMENT OF THE INTERIOR, U.S. BUREAU OF LAND MANAGEMENT, DANIEL JIRÓN, Acting Under Secretary of Agriculture for Natural Resources and Environment, Dept. of Agriculture, SCOTT ARMENTROUT, Supervisor, Grand Mesa, Uncompahgre, and Gunnison National Forests, KATHARINE MACGREGOR, Deputy Assistant Secretary, Land and Minerals Management, Dept. of the Interior,

      Federal Defendants,

         and

MOUNTAIN COAL COMPANY, LLC,

      Intervenor-Movant.

---

## FEDERAL DEFENDANTS' OPPOSITION TO
## MOTION FOR TEMPORARY RESTRAINING ORDER

---

Federal Defendants, including the Departments of Agriculture ("Agriculture") and the Interior ("Interior"), the United States Bureau of Land Management ("BLM"), and the U.S. Forest Service (the "Service"), hereby oppose Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction.  ECF No. 8.

## INTRODUCTION

Plaintiffs' motion asks the Court to enjoin the agencies "and any other necessary parties" from "authorizing, allowing or implementing" a coal exploration plan in the North Fork Valley of western Colorado.  The affected lands are located in an area of the Grand Mesa, Uncompahgre, and Gunnison National Forests that is "blessed with valuable resources."  *High Country Conservation Advocates v. United States Forest Service* ("*HCCA 1*"), 52 F. Supp. 3d 1174 (D. Colo. 2014) (merits decision).  The initial exploration activities, which may lead to coal mining permits, are expected to disturb just eight acres of land, through the construction of about two miles of temporary roads and three drill pads, all of which will eventually be reclaimed and revegetated.

As a threshold matter, Federal Defendants note that the exploration activities have already been "authoriz[ed]" and "allow[ed]" and the Court cannot enjoin a completed act. *See Maxedon v. Texaco Producing, Inc.*, 710 F. Supp. 1306, 1310 (D. Kan. 1989) ("An injunction is a coercive order by a court directing a party to do or refrain from doing something, and applies to future actions"), quoting *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987).

Nor should the Court enjoin implementation of the exploration plan.  These activities were lawfully approved, in a manner that accounts for the legal deficiencies

identified by this Court in a September 2014 order involving a previous attempt to conduct exploration activities in this area. *See High Country Conservation Advocates v. United States Forest Service* ("*HCCA 2*"), 67 F. Supp. 3d 1262 (D. Colo. 2014) (remedy decision). That order vacated three government actions: (i) two lease modifications for the tracts of land also at issue here; (ii) an exploration plan nearly identical to the one before the Court; and (iii) a portion of the Service's Colorado Roadless Rule, 36 C.F.R. § 294.43(c)(1)(ix), known as the "North Fork Coal Mining Area Exception." The rule and its exception were designed to maintain roadless characteristics in the Forest while addressing Colorado's concern that valuable mining opportunities in the North Fork Valley not be foreclosed. *See* 81 Fed. Reg. 91816; Service Record of Decision for the Colorado Roadless Rule at 15-17. Immediately following this approximately three-year effort to remedy the deficiencies, Plaintiffs filed this action.

The motion should be denied because Plaintiffs fail to demonstrate entitlement to the "drastic and extraordinary remedy" of an injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003). As Federal Defendants explain herein, Plaintiffs' substantive claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, lack merit because, following the September 2014 ruling which vacated the three noted actions, the Service prepared two comprehensive and legally adequate supplemental EISs, one supporting reissuance of the vacated roadless rule, and another supporting re-issuance of the lease modifications and exploration plan. *See* ECF No. 14-16. These statements addressed deficiencies identified by the Court in the agencies' prior

consideration of project impacts, including impacts of greenhouse gas ("GHG") emissions and climate change.

The motion should also be denied because the legal deficiencies Plaintiffs cite (inadequate consideration of climate and socio-economic impacts) relate to impacts of coal mining and subsequent combustion of coal, not impacts of exploration. Coal mining and combustion will occur for quite a while, if at all. Further, before they can occur, the operator must obtain a mining permit from the State of Colorado, as well as approval of a mining plan modification by the Secretary of the Interior, on the recommendation of the Office of Surface Mining Reclamation and Enforcement.

Thus, with respect to the impacts of concern to Plaintiffs (climate and socio-economics), there is simply no emergency. Plaintiffs offer no reason why the parties could not pursue their legal positions in this action through merits briefing completed on a non-emergency basis. If it appears during the course of briefing (but before the Court rules on the merits) that coal mining operations have become imminent, Plaintiffs could seek a preliminary injunction at that point in time. But they should not be permitted to derail exploration activities on an emergency basis just because some later aspect of the project, that may not occur, could suffer from a legal inadequacy. Injunctive relief must be carefully tailored to correct or prevent the harm imminently threatened. *Monsanto*, 561 U.S. at 159-166. An order disallowing the exploration activities is simply too broad an axe stroke when the only legal deficiencies Plaintiffs advance, as a basis for emergency injunctive relief, involve remote, and merely possible, harm. In short, Plaintiffs are not threatened by any imminent irreparable harm.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 15, 2017, the Bureau of Land Management ("BLM") issued a Record of Decision ("ROD") approving the modification of two federal coal leases, COC-1362 (held by Mountain Coal Company, LLC ("MCC")) and COC-67232 (held by Ark Land LLC ("Ark")) (collectively "lessees") and an "on-lease exploration plan." ECF No. 14-16 at 15 (BLM ROD).  The approval occurred following issuance by the Service of an August 2017 Supplemental Final Environmental Impact Statement ("SFEIS") and, on December 11, 2017, a ROD.  The Service's ROD reflected its decision, as surface managing agency, to consent to the lease modifications and stated its concurrence in the proposed exploration plan.  ECF No. 14-16 at 15 (Service ROD).

MCC mines coal under existing leases at the West Elk Mine near Somerset, Colorado in the North Fork Valley.  Following the September 2014 Order, MCC applied anew for lease modifications covering 1,720 acres, to allow continued mining in contiguous areas and on December 5, 2016 MCC resubmitted its exploration plan. This would help ensure that compliant and super-compliant coal reserves (i.e., high-quality coal or coal characterized by a high BTU, low-ash, and low-moisture content) are recovered and not bypassed.  As noted, the modification areas are within NFS lands managed by the Grand Mesa, Uncompahgre and Gunnison National Forests.  *See* BLM ROD at 3 on December 18, 2017.  As is the case with all NFS lands, BLM administers the mineral estate pursuant to the Mineral Leasing Act of 1920.

In response to these applications, the Service, in cooperation with BLM and

other agencies, prepared the August SFEIS to support possible re-issuance of the lease modifications.  The SFEIS addressed the Court-identified deficiencies and provided a thorough qualitative analysis of the climate impacts associated with GHG emissions, within the context of the lease modifications, and it quantified GHG emissions. *See* SFEIS at 122-30, 286-87.  As noted, the order in *HHCA 2* had vacated the earlier, but substantially similar, lease modifications and an exploration plan, and it also had vacated the North Fork Exception to the Colorado Roadless Rule.  *See* 36 C.F.R. § 294.43(c)(1)(ix).

In addition to preparing an SFEIS for the lease modifications, the Service also prepared a supplemental FEIS to support reinstatement of the vacated Colorado Roadless Rule exception.  The reinstated rule became effective April 17, 2017.  *See* 36 C.F.R. § 294.43, "Roadless Area Conservation; National Forest System Lands in Colorado,'' 81 Fed. Reg. 91811 (December 19, 2016).  The SFEIS for the Colorado Roadless Rule included a thorough discussion of the impacts -- on roadless area characteristics -- of GHG emissions from both mine operation and eventual coal combustion.  *See* CRR SFEIS at 261, 98-104, 168-183, 193, 197, 217-18.  It also considered impacts of the exploration plan on recreation, a deficiency noted in *HCCA 1*. *See* CRR SFEIS at 233-38.

In response to public concerns regarding impacts of the final rule on climate change, the SFEIS for the Colorado Roadless Rule estimated the gross greenhouse gas emissions of mining and combusting the estimated 172 million tons of coal and indicated this could result in emissions of approximately 443 million metric tons of

carbon dioxide ("$CO_2$") equivalent, occurring between 2016 and 2054 (the projected timeframe over which coal resources could be produced).  The FSEIS also estimated gross annual GHG emissions of approximately 13.5 million metric tons of $CO_2$ equivalent at the projected "low production" level, and 39.9 million metric tons of $CO_2$ equivalent at the projected "high production" level based on established air quality permits.  This was a conservative estimate which likely overestimated potential GHG emissions.  *See* 81 Fed. Reg. 9181.  Based on these figures, the SFEIS estimated a net increase in carbon emissions from energy production, transportation, and combustion of about 17 million metric tons of $CO_2$ equivalent from 2016 to 2054.  It also estimated a net increase in methane gas emissions from coal operation releases of 16.7 million metric tons of $CO_2$ equivalents from 2016 to 2054.  *Id.*

On December 15, 2017, Plaintiffs brought suit then moved for a TRO on December 18, 2017.

## LEGAL BACKGROUND

### 1.  National Environmental Policy Act

NEPA is a procedural statute that does not impose substantive results.  Instead it ensures that federal agencies consider environmental consequences of major federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4332; 40 C.F.R. § 1501.1.  This consideration serves NEPA's dual purpose of informing agency decision makers of the environmental effects of proposed actions and ensuring that relevant information is made available to the public so that it "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA's intent is to focus the attention of agencies and the public on a proposed action so its consequences may be studied before implementation.  42 U.S.C. § 4321; 40 C.F.R. § 1501.1; *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

To assist in meeting these goals, NEPA requires preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332 (2)(C); 40 C.F.R. § 1502.3.  The EIS must examine, among other things, "alternatives to the proposed action," and the project's direct, indirect and cumulative impacts.  42 U.S.C. § 4332 (2)(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7, 1508.8.

Judicial review of agency NEPA compliance is deferential.  *Marsh*, 490 U.S. at 377.  The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Balt. Gas & Elec. Co.*, 462 U.S. at 97-98; Sierra Club I, 867 F.3d at 196.  A Court may not substitute its own judgment for that of the agency.  *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 555 (1978).

### 2.  Mineral Leasing Act of 1920

The BLM regulates and manages coal leases on Forest Service lands under the Mineral Leasing Act, 30 U.S.C. § 181 *et seq*.  The Act provides for development of oil and gas resources as well as solid minerals, including coal.  See 30 U.S.C. §§ 181 (generally), 201 (coal), 226 (oil and gas).  As the Tenth Circuit explained, the Act, as amended, states a policy of making "public lands . . . available for mineral leasing in an

effort to reduce our energy dependence on foreign sources and to protect our national security." *Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 620 (10th Cir. 1987), *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992) (*en banc*).

Before leasing mineral resources beneath NFS lands, BLM must obtain consent from the Service, which manages the surface estate. *See* 30 U.S.C. §§ 201(a)(3)(iii), 207(a); 43 C.F.R. § 3425.3(b).  In providing that consent, the Service retains the authority to impose conditions to protect forest resources.  *Id.*  The same consent procedure applies to lease modifications.  43 C.F.R. § 3432.3(d).

## STANDARD OF REVIEW

As noted, an injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto*, 561 U.S. at 165; *Greater Yellowstone Coalition,* 321 F.3d at 1256 (given the extraordinary nature of a preliminary injunction, "the right to relief must be clear and unequivocal") (citation omitted); *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009) ("a preliminary injunction [is] an extraordinary remedy"). As the Supreme Court has stated, a plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *accord RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (quoting *Winter*).

Importantly, the Tenth Circuit "presume[s] that all governmental action pursuant to a statutory scheme is 'taken in the public interest.'" *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n.6 (10th Cir. 2006) (rejecting "the less rigorous fair-ground-for-litigation standard" in case brought by medical provider challenging parental notification law); *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 n.15 (10th Cir. 2006) (also brejecting "less rigorous fair-ground-for-litigation standard").  Here, the less rigorous standard should not be applied because Plaintiffs challenge governmental action taken pursuant to statutory mandate and reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.[1]

If a plaintiff fails to meet its burden on any of the four requirements for injunctive relief, its request must be denied. *See, e.g., Winter*, 555 U.S. at 20 (denying injunctive relief on the "public interest" and "balance of harms" requirements alone, even assuming irreparable injury to endangered species and a NEPA violation); *accord Chem. Weapons Working Group, Inc. v. Dep't of the Army*, 111 F.3d 1485, 1489 (10th Cir. 1997) (holding that the plaintiffs' failure on the balance of harms "obviat[ed]" the need to address the other requirements).[2]  Under the *Winter* standard, "[i]t is not enough for a

---

[1] *See Hobby Lobby Stores, Inc. v. Sebelius*, No. 120-6294, 2012 U.S. App. LEXIS 26741, at *6–8 (10th Cir. Dec. 20, 2012) (applying "substantial-likelihood-of- success" standard and rejecting the "fair-ground-for-litigation" standard), *rev'd on other grounds Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (*en banc*), *cert. granted sub nom. Sebelius v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 678 (2013).

[2] *See also Sprint Spectrum, L.P. v. State Corp. Comm'n of Kan.*, 149 F.3d 1058, 1060 (10th Cir. 1998) ("The district court ruled that the wireless providers failed to satisfy the first two preliminary injunction requirements. However, [the court of appeals] [did] not address the second because the first -- substantial likelihood of prevailing on the merits -- clearly support[ed] the denial of the preliminary injunction.").

court considering a request for injunctive relief to ask whether there is a good reason

why an injunction should not issue; rather, a court must determine that an injunction

should issue under the traditional four- factor test . . . ." *Monsanto*, 561 U.S. at 158.

Further, an injunction should issue only if it is "needed to guard against any present or

imminent risk of likely irreparable harm[,]" *id*. at 160, and only where a plaintiff makes

a "clear showing" and presents "substantial proof" that an injunction is warranted.

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).[3]

Further, in any case seeking injunctive relief, "courts must balance the competing

claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation and

citation omitted).  Even where success on the merits is likely or "serious questions" are

raised, an injunction "is not a remedy which issues as of course," even in an

environmental case.  *Monsanto*, 561 U.S. at 157 (reversing affirmance of injunction");

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (reversing court of appeals'

determination that an injunction was required to address unpermitted discharges of

pollutants following a finding of liability against the Navy under the Clean Water Act).

Moreover, the Supreme Court has rejected a presumption of irreparable injury even

where an agency fails to evaluate thoroughly the environmental impact of a proposed

action.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545–46 (1987) (court

---

[3] In *Mazurek*, the Supreme Court noted that the movant's "requirement for substantial
proof is much higher" to prevail on a motion for a preliminary injunction than to defeat a
motion for summary judgment. *Mazurek*, 520 U.S. at 972. Therefore, it is not enough for
a plaintiff to rely on generalized allegations of harm. *Id*.

cannot presume elevation of subsistence interests over economic concerns); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (court may weigh costs to industry and public of delaying oil and gas exploration activities).

Finally, even if a plaintiff demonstrates that it might suffer a potentially irreparable injury if an injunction does not issue, a court should not issue an injunction if the public interest counsels against it. *See Winter*, 555 U.S. at 23–24 (even if plaintiffs had shown irreparable harm, public interest weighed against injunction).

## ARGUMENT

A. Plaintiffs Have Not Shown They Will Be Irreparably Harmed if the Court Denies Their Request for Injunctive Relief.

As noted at the outset, Plaintiffs' claims of harm involve impacts of coal mining and subsequent combustion of coal, not impacts of exploration. The effects of coal mining and combustion will not be felt for quite a while, if at all. As MCC explains in its TRO opposition brief, there is a possibility that the exploration phase will result in a decision not to proceed with full mine development. And in any event, it is certain that full mine development is still several years removed. An injunction prohibiting exploration activities is not necessary to protect Plaintiffs from effects of *possible* future mining and combustion. The Supreme Court has made clear that an injunction, if found necessary, must be narrowly tailored to the particular harm to be addressed. *Monsanto*, 561 U.S. at 159–66. The injunction Plaintiffs seek does not do so, and there is no reason why briefing on the alleged deficiencies in the RODs and supporting SFEISs cannot occur on a non-emergency basis, with traditional merits briefing and record review. If

Plaintiffs are correct that the agencies' consideration of GHG and socio-economic impacts was deficient, there will be ample opportunity for entry of a remedy order given the additional approvals required and the need to perform exploration before those approvals may be sought.  Given these circumstances, Plaintiffs fail to demonstrate any imminent threat of irreparable harm.

In this regard, MCC notes that if the exploration phase is delayed through the winter, the delay may cause the company to abandon hopes of mining in the areas encompassed by the lease modifications.  This possibility makes the harm Plaintiffs complain of even more remote.  As Ex. 1 (Declaration of Ms. Suzanne M. Mehlhoff) notes, the operation may be moved to a new location.  If that occurs, it is possible that returning to this area would not be economic.  In such a circumstance, a preliminary injunction that delays exploration could be tantamount to a permanent injunction, even if the Court were inclined to hold, in the final analysis, that the supplemental FEISs had adequately corrected the deficiencies identified in *HCCA 1*.  This is an unfair risk to impose on the operator, where Plaintiffs fail to demonstrate an imminent threat of irreparable harm.

It also bears mention that while trees will be removed as necessary to put in temporary roads and pads, that activity viewed in the larger context is insufficient to support a claim of irreparable injury.  First, as a factual matter, temporary disturbances from constructing and then reclaiming roads and pads, which will open up certain forested areas, will not significantly change the current mix of vegetation types and open areas that now exist in the Lease Modification area.  *See* Service SFEIS at 169, 172-77.

Moreover, the mature stands of aspen and other trees that Plaintiffs describe are in fact aging and prone to disease, damage, and potentially fire. *Id.* at 168, 170-71, 174, 182-83. Clearing areas of mature or over-mature trees will not be materially different from the effects of natural processes, under which lands transform back and forth between forested and open conditions. *Id.* at 163, Service ROD at 19.

      B.    <u>The balance of harms favors denial of the motion</u>.

As discussed above, the potential harm Plaintiffs complain of is far from imminent and, if necessary, could be remedied in a future proceeding for emergency relief. On the other hand, if an injunction issues, Federal Defendants and the State of Colorado could face the risk of lost royalty revenue. For example, if the Court enters an injunction delaying the exploration phase through the winter, and if that results in a determination by MCC that returning to and mining the lease modification tracts would be uneconomic, the tracts would almost certainly be bypassed and the coal would be stranded and never developed. In that scenario, royalty revenue to Colorado and the United States would be permanently lost. *See* Ex. 1. Additional harms to MCC would also result and are addressed in detail in MCC's opposition brief.

      C.    <u>The Public Interest Compels Denial of an Injunction</u>.

The public interest compels denial of Plaintiffs' request for extraordinary relief. It is not simply that granting an injunction would harm MCC's business interests; rather, an injunction may harm the actual interests that the Colorado Roadless Rule was designed to protect. In doing so, it would injure, rather than further, the public interest. Federal Defendants ask the Court to consider that, in its petition for the Colorado Roadless Rule,

Colorado expressly requested that the Secretary of Agriculture consider the need to facilitate "exploration and development of coal resources in the North Fork coal mining area." 77 Fed. Reg. 39576.  This was entirely appropriate.  Both the Service and BLM are charged with fostering the responsible development of energy resources on public lands.  The coal found in the North Fork Valley is low in pollutants (i.e., sulphur, ash, and mercury), while retaining high energy content, making its production highly desirable. 77 Fed. Reg. at 39578.  Moreover, mines in the North Fork Valley account for "40% of all the coal production in the State of Colorado" and provide for many jobs (direct, indirect and induced).  *Id*.  The public interest favors production of this quality resource and the contributions to the statewide economy that would flow from doing so.

At the same time, it merits mention that the entire geographic area of the North Fork exemption -- encompassing the activities of the West Elk mine and two other mines -- is only 19,100 acres, or less than 0.5% of all the Colorado Roadless Areas. 77 Fed. Reg. at 39578.  The Sunset Roadless Area itself is only 5,800 acres.  Of that, the lease modifications at issue here comprise about 1,700 acres.  And of greatest relevance, the surface disturbance anticipated for temporary road and pad construction under the approved Exploration Plan involves a geographical area that is orders of magnitude smaller.  As MCC explains in its opposition brief, exploration activities are expected to impact just eight acres of land, through construction of about two miles of temporary roads and three well pads.  It is thus clear that the benefits of coal exploration, which keeps open the possibility of coal development, substantially outweigh what is in fact a relatively small burden on the overall landscape.

D.     Plaintiffs Fail to Demonstrate a Likelihood of Success on the merits.

Plaintiffs argue that the agencies' supplemental FEISs, prepared to correct the deficiencies identified in *HCCA 1*, failed to adequately consider climate and socio-economic effects.  Both arguments lack merit.  The agencies set out to correct the deficiencies identified in *HCCA 1* and did so.

1.     The Agencies' Analysis of Climate Change Satisfies NEPA's Requirements.

The SFEIS for the Coal Lease Modifications extensively discussed the environmental consequences and resource impacts cause by the effects of climate change in Chapter 3 and provided a thorough qualitative analysis of the climate impacts associated with GHG emissions, within the context of the lease modifications.   Climate change impacts were discussed for the following resources: Air Quality, Greenhouse Gases and Climate, SFEIS Section 3.4.5.2 at 122-130; Cumulative Effects and Climate Change, Section 3.21.6 at 286-287;  Soils, Section 3.7.5.1 at.151; Watershed, Section 3.8.5.1 at pp. 165-167; Carbon Sequestration, Section 3.9.1.2 at 170-171; Vegetation, Section 3.9.6.2 and 3.9.6.3 at 182-183; Wildlife, Section 3.10.1.6 at 193, Section 3.11.3 at 197; Range Resources, Section 3.15.6 at 232-233; Recreation, Section 3.16.5 at 238; Transportation System, Section 3.17.4 at p. 243; and Socioeconomics impacts, Section 3.21.6 at pp.286-287.

Climate change was also discussed in response to comments.  SFEIS at 982-985. These responses demonstrate the agency's recognition of the deficiencies identified in *HCCA 1*.  Notably, the Court did not order the agency to use the Social Cost of Carbon (SCC) protocol to monetize the impacts of GHG emissions resulting from the lease modifications.  Rather the Court found that, even though NEPA does not require a cost-benefit analysis, the agencies were arbitrary in "quantify[ing] the *benefits* of the lease modifications and then explain[ing] that a similar analysis of the *costs* was impossible when such an analysis was in fact possible and was included in an earlier draft EIS."  *Id.* at 1182 (emphasis added).  The Court concluded that the agencies had prepared "half of a cost-benefit analysis" and then incorrectly claimed it was "impossible to quantify the costs," while relying on the "anticipated benefits to approve the project."  *Id.*, citing *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446–48 (4th Cir. 1996) ("it is essential that the EIS not be based on misleading economic assumptions).[4]

---

[4] Plaintiffs also contend that because the economic impact analysis in the FSEIS identifies certain economic benefits, therefore the agency must use the SCC protocol to correspondingly examine the costs.  Otherwise, Plaintiffs reason, it is half of a cost benefit analysis, something the court faulted the agency for in *HCCA 1*.  Plaintiffs' reasoning is unsound because the economic impact analysis did not include (and is not required to include) the total economic benefits of coal production, considered at a global level; rather it included only the regional economic benefits of the project, expressed principally in terms of jobs.  In contrast, the SCC protocol seeks to identify the total monetary cost, on a global scale, of GHG emissions.  Thus what Plaintiffs essentially demand is that the government compare apples to oranges.  But in order to allow for meaningful comparison of project benefits to costs, as determined by the SCC protocol, the economic impact analysis would necessarily require a similarly comprehensive look at the broader benefits of coal production at a global level, just as the protocol does.  For example, the economic impact analysis would have to take into account more than just job creation and the associated economic benefits.  As the ROD explained, if the agency "sets out to quantify climate impacts as monetized costs, it would be necessary to balance these costs by also quantifying the benefits of burning coal to produce electricity, such as

In its responses to comments in the August 2017 SFEIS, the agency noted there are "different approaches that an agency can take to examine climate impacts associated with greenhouse gas emissions." SFEIS at 983. The Service explained that it

> examined the possible use of social cost of carbon/greenhouse gas estimates and determined to use a different approach for the SDEIS and revised SFEIS that quantified greenhouse gas emissions as the common metric used to compare across alternatives and then qualitatively discussed potential cumulative climate impacts at the local/state/region, and global scale.

SFEIS at p. 983. The Service provided detailed reasons why climate change and potential climate impacts were not well understood, and relied on research that indicated that, for most people, difficult environmental issues such as climate change are more readily understood when the issue is at a scale relatable to their everyday life. SFEIS at 983-84. In particular, the Forest Service presented the data and information in a manner that follows many of the guidelines for effective climate change communication developed by the National Academy of Science. SFEIS 984.

> There is no standard methodology to determine how a project's incremental contribution to GHG would result in physical effects on the environment, either local or globally. The approach taken for this SEIS provides quantitative GHG emissions as a common metric across alternatives and qualitatively discusses climate impacts, thus effectively informing the decision-maker and the public of potential climate impacts at global, region/state, and local scale.

---

providing affordable, reliable electricity and the resultant benefits of having electricity in general such as human health from medical advancements, comfort, work efficiencies, etc. and other actions that are beyond the scope of [the] decision." Service ROD at 16. The agency also addressed this consideration in a December 7, 2017 letter to Plaintiffs' counsel, responding to his formal objections. *See* Ex. 2 (explaining that the "total economic benefits of coal production . . . would be needed for a benefit-cost analysis, alongside the social cost of carbon estimates or other monetized costs, in order to be meaningful to the public and decision maker). This a rational explanation, entitled to deference.

SFEIS at p. 984.  This meets the "hard look" requirement, as other Courts have held.  *See WildEarth Guardians v. Jewell*, No. 1:16-CV-00605-RJ, 2017 WL 3442922, (D.N.M. Feb. 16, 2017).  There, the court sustained a climate change analysis that used the predicted volume of GHG emissions as a proxy for assessing a mining plan's potential climate change effects.  The court noted that CEQ's regulations discourage the use of cost-benefit analyses in situations involving important qualitative considerations, 40 C.F.R. § 1502.23, and held that Respondent's choice of methodology for assessing impacts relating to GHG emissions had a rational basis and is not arbitrary or capricious.  *Id.* at 24, citing *Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004); *Utahns for Better Transp.*, 305 F.3d at 1171.

Federal Respondents also respectfully note that it is not the Court's task to "decide which party utilized the better methodology in conducting its . . . analysis.  Rather, [the court] simply determine[s] whether the appellees' choice of methodology had a rational basis . . . taking relevant considerations into account," *Jones v. Peters,* 2007 WL 2783387 *22 (D. Utah 2007) (quoting *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 711 (11th Cir.1985)).  Further, courts should "defer to an agency's judgment to use a particular model if the agency examines the relevant data and articulates a reasoned basis for its decision."  *Nat. Res. Def. Council v. Herrington*, 768 F.2d 1355, 1385 (D.C. Cir. 1985).  Here, the agencies have done just that.

In addition, the record reflects that the Forest Supervisor who signed the ROD explained why he did not believe it necessary to use the SCC protocol to monetize global costs of GHG emissions in lieu of the approach selected.  First, the Forest

Supervisor discussed the SCC analysis completed in the FSEIS for the reinstated

Colorado Roadless Rule.  He explained he was familiar with that analysis and that he

believed it was conducted at the appropriate level at the time and in the appropriate

context.  It is clear from the record that this analysis informed his, as well as BLM's,

decision making and informed the public.  ROD at 15 (stating the Forest Supervisor's

understanding that "the potential costs of GHG emissions are not 'zero' and indeed,

depending on what assumptions prove to be true, may be significant").

The Forest Supervisor also considered a recent Executive Order, number 13783,

which disbanded the Interagency Working Group on the Social Cost of Greenhouse

Gases and withdrew technical supporting documents used for the analysis, but he

concluded that, and so stated, that even if the Executive Order had not issued, and even

if the GHGs for this project had been monetized, "this type of analysis would not better

inform my decision for this project, which fully recognizes the significant potential

future costs of GHG emissions." *Id.* at 16.  This discussion is rational, supported by the

record and entitled to deference.  Here, the Service, in cooperation with BLM, made a

reasoned decision, informed by the climate analysis, that an SCC analysis at the project

level would not better inform his decision.  The Court should sustain this reasoned

determination.

> 2.   The Agencies' Analysis of Socio-Economic Impacts Satisfies NEPA's Requirements.

Plaintiffs contend that the agency erroneously inflated the project's economic

impacts, resulting in a "skewed analysis."  They add that the Draft SFEIS focused on a

five-county study area in assessing socio-economic impacts and that Dr. Power had commented that the study area was too broad.  In response to this, the August 2017 SFEIS narrowed the study to a three-county area and reflected data generated by a standard model, called IMPLAN, used to assess economic impacts.  This is explained in the Declaration of Joshua Sidon, Ph.D.  *See* Ex. 3.  Dr. Sidon explains that multipliers for smaller regions can be bigger than those for larger areas if they are more concentrated at a county level than for the state as a whole.  As the declaration demonstrates, Plaintiffs' claim that the agencies overstated economic impacts is itself overstated and amounts to nothing more than fly-specking.

## CONCLUSION

For all these reasons, Federal Defendants respectfully request that the Court deny Plaintiffs' motion.

Respectfully submitted this 20th day of December, 2017.

JEFFREY H. WOOD
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

 */s/ John S. Most*
JOHN S. MOST, Trial Attorney
Natural Resources Section
Virginia Bar No. 27176
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-3353
Email: john.most@usdoj.gov

*Counsel for Federal Defendants*

**Of Counsel**

Lois Witte
Office of General Counsel,
Mountain Region
U.S. Department of Agriculture
Lakewood, Colorado

Kristen Guerriero
Office of the Solicitor,
Rocky Mountain Region,
U.S. Department of the Interior
Denver, Colorado

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2017, a copy of the foregoing notice was served by electronic means on all counsel of record by the Court's CM/ECF system.

/s/ *John S. Most*
JOHN S. MOST