# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-3025-PAB

HIGH COUNTRY CONSERVATION ADVOCATES, et al.,

      Plaintiffs,

v.

UNITED STATES FOREST SERVICE, et al.,

      Federal Defendants, and

MOUNTAIN COAL COMPANY, LLC,

      Defendant-Intervenor.

─────────────────────────────────────────────────────────

## PLAINTIFFS' AMENDED OPENING BRIEF ON THE MERITS[1]

─────────────────────────────────────────────────────────

The case is about the Bureau of Land Management's (BLM's) and the U.S. Forest Service's (collectively, "the Agencies") repeated failures to protect the environment and inform the public about the significant impacts of decisions opening public lands to coal mining. In 2014, this Court held that decisions by the Agencies to allow Mountain Coal Company's (MCC's) West Elk mine to expand into a National Forest roadless area violated the National Environmental Policy Act (NEPA) in large part because the Agencies turned a blind eye to a significant impact: the climate pollution caused by mining and burning millions of tons of coal at issue. High Country Conservation Advocates v. Forest Serv., 52 F. Supp. 3d 1174 (D. Colo.

---

[1] This brief amends that filed by Plaintiffs on March 23, 2018 (Dkt. No. 40) by updating citations to page numbers assigned in the corrected Administrative Record, lodged March 30, 2018 (Dkt. No. 46), and by removing one footnote describing now-addressed record pagination issues.

2014) (High Country).

The Agencies have again violated NEPA in their most recent and ill-informed attempts to approve MCC's mine expansion. In 2016, the Forest Service adopted the North Fork Coal Mining Area exception (the Exception) to the Colorado Roadless Rule, opening 19,700 acres of roadless National Forest to road construction for coal mining. In 2017, the Agencies then approved MCC's applications for Lease Modifications, allowing the company to access 1,700 of those 19,000 acres for mining in the Sunset Roadless Area.

Plaintiffs High Country Conservation Advocates, WildEarth Guardians, Center for Biological Diversity, Sierra Club, and Wilderness Workshop (collectively, "Conservation Groups") ask this Court to declare unlawful and vacate these two new agency decisions because each violates NEPA. In adopting the Exception, the Forest Service: (1) failed to fully consider an alternative to protect the Pilot Knob Roadless Area and its unique ecology, (2) failed to disclose the potential impacts of mining and road construction on roadless areas by ignoring those areas' values, and (3) failed to disclose fully the climate impacts of making available for mining 172 million tons of coal. And in adopting the Lease Modifications, the Agencies: (1) failed to disclose the climate impacts of mining the 17 million tons of public and private coal there, and (2) failed to fully consider alternatives that would require MCC to mitigate its significant methane pollution.

## STATEMENT OF FACTS

## I.   STATUTORY BACKGROUND

Congress enacted NEPA, 42 U.S.C. §§ 4321–4370m, to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote

government efforts "which will prevent or eliminate damage to the environment," Id. § 4321. NEPA requires federal agencies to take a "hard look" at the environmental impacts of proposed actions. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). To do so, federal agencies must prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1501.4. An EIS must "provide [a] full and fair discussion of significant environmental impacts" associated with a federal decision and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Taking the required "hard look" requires agencies to "utiliz[e] … the best available scientific information." Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1171 (10th Cir. 1999) (Dombeck).

## II.   FACTUAL BACKGROUND[2]

The 5,800-acre Sunset Roadless Area hugs the west flank of Mount Gunnison and the West Elk Wilderness east of Paonia, Colorado.[3] The area's scenic, undisturbed lands contain wide swaths of aspen and mixed conifer forest, wildflowers, meadows, and streams. See Decl. of Jeremy Nichols (Mar. 22, 2018) (Ex. 1), at ¶ 11; Decl. of Allison Melton (Mar. 16, 2018) (Ex. 2), at ¶¶ 15, 19–25; Decl. of Matt Reed (Mar. 15, 2018) (Ex. 3), at ¶¶ 3–7; Decl. of Peter Hart (Mar.

---

[2] Federal Defendants lodged separate administrative records (ARs) for the decisions at issue in this case. We refer to the Forest Service 2017 Lease Modifications decision AR as "FSLeasingII-xxxx;" to the BLM's 2017 Lease Modifications decision AR as "BLM-xxxx;" to Forest Service's 2016 North Fork Coal Mining Area Exception AR as "CRR2-xxxx;" and to the Forest Service's 2012 Colorado Roadless Rule AR as "CRR-xxxx." Cited documents can be accessed via the hyperlink in the spreadsheet index provided for each AR.

[3] Forest Serv., Supplemental Final EIS, Federal Coal Lease Modifications COC-1362 & COC-67232 (Aug. 2017) ("Leasing SFEIS"), at 244–45 (FSLeasingII-0000373–74).

15, 2018.) (Ex. 4), at ¶ 28–31. These habitats support abundant wildlife, including deer, elk, black bear, and imperiled Canada lynx. Leasing SFEIS at 245 (FSLeasingII-0000374). Hunters and hikers treasure the area for its remoteness and beauty. See, e.g., Melton Dec. (Ex. 2), at ¶ 18; Reed Dec. (Ex. 3), at ¶¶ 7, 9, 11.

A proposed expansion of the West Elk Mine has threatened the Sunset area since 2009. MCC plans to construct within this forest a network of roads, drilling pads, and drainage wells in order to vent methane (a potent greenhouse gas) to ensure safe conditions in the underground mine. In 2012 and 2013, the Agencies issued a suite of decisions paving the way for road and drilling pad construction within a 1,700-acre area at the heart of the Sunset Roadless Area. First, the Forest Service approved the Colorado Roadless Rule in 2012, which provided management direction for four million acres of roadless National Forest lands statewide, including a ban on most road construction. See High Country, 52 F. Supp. 3d at 1184; 77 Fed. Reg. 39,576, 39,576 (July 3, 2012) (Colorado Roadless Rule). The rule, however, contained a proviso allowing road construction for coal mining on about 20,000 acres of roadless forest in the North Fork Coal Mining Area, including the Sunset, Pilot Knob, and Flatirons areas. See High Country, 52 F. Supp. 3d at 1184. Second, in 2013, with Forest Service consent, BLM approved two Lease Modifications granting MCC the right to mine coal under part of the Sunset Roadless Area. Id. Third, BLM in 2013 approved an exploration plan for the area. Id. at 1185.

This Court, however, in 2014 found unlawful and vacated each of the Agencies' decisions. High Country, 52 F. Supp. 3d at 1189–1200 (finding Agencies violated NEPA); High Country Conservation Advocates v. U.S. Forest Serv., 67 F. Supp. 3d 1262, 1266–67 (D. Colo. 2014) (High Country II) (vacating decisions). The Court held that the Agencies violated NEPA

in their environmental reviews by ignoring the significant climate costs of mining and burning coal from the Exception area while carefully accounting for mining's alleged economic benefits, an approach that subverted the law's "hard look" mandate. High Country, 52 F. Supp. 3d at 1194–98. This Court also held that the Agencies failed to disclose the climate-related impacts of mining the Lease Modifications using a proven tool for disclosing such costs—the social cost of carbon protocol—or providing valid reasons for not using the protocol. Id. at 1189–93.

Following the Court's ruling, MCC renewed its mine expansion application, for which the Agencies conducted new NEPA analyses. First, in 2016 the Forest Service completed a supplemental EIS on whether to open 19,700 acres across three roadless areas in the North Fork Coal Mining Area to road construction for coal mining.[4] This proposal presented a far narrower question than the agency's 2012 Colorado Roadless Rule analysis, which addressed managing 363 roadless areas totaling four million acres. Roadless Area Conservation, National Forests in Colorado, 77 Fed. Reg. at 39,576. Following that review, the Forest Service adopted the North Fork Exception rule, opening the Sunset, Pilot Knob, and Flatirons Roadless Areas to coal roads. See 81 Fed. Reg. 91,811 (Dec. 19, 2016) (CRR2-000367) ("Exception ROD"); 82 Fed. Reg. 9973 (Feb. 9, 2017) (delaying Exception rule's effective date).

Second, in 2017, the Forest Service, with BLM and other agencies as cooperators, prepared a supplemental EIS on MCC's new application to lease 1,700 acres of coal within the

---

[4] Forest Serv., Rulemaking for Colorado Roadless Areas, Supplemental Final EIS (Oct. 2016) (CRR2-0000001) ("Exception SFEIS"); see also Forest Serv., Rulemaking for Colorado Roadless Areas, Supplemental Draft EIS (Nov. 2015) (CRR2-0102890) ("Exception SDEIS"). Conservation Groups commented on the SDEIS. Comments of High Country Conservation Advocates et al. (Jan. 15, 2016) (CRR2-0105736) ("HCCA Jan. 2016 Exception Ltr.").

Sunset Roadless Area.[5] In December 2017, the Forest Service and BLM issued decisions approving the Lease Modifications, approving MCC's right to expand into the Sunset area, and to access 17.6 million tons of federal and private coal.[6] The Leasing SFEIS predicted that MCC would bulldoze 6.5 miles of new road crisscrossing much of the 1,700-acre area, and construct 48 methane venting pads, flattening about 72 acres of roadless forest to access coal. Leasing SFEIS at 90 (FSLeasingII-000219). This construction will allow MCC to vent a projected 26,000 tons of methane annually for 2.7 years. Id. at 103 (Table 3-7, West Elk Emissions) (FSLeasingII-000232).

Also on December 15, 2017, BLM approved a coal exploration plan within the Lease Modifications, which will result in scraping to dirt nearly 23 acres of forest. Leasing SFEIS at 41 (FSLeasingII-000170); BLM Leasing ROD at 5 (BLM000007). MCC completed Phase I exploration this winter; Phase II, which MCC intends to begin this spring and summer, involves constructing four miles of road and seven drill pads.[7]

---

[5] Leasing SFEIS (FSLeasingII-0000108); see also Forest Serv., Supplemental Draft EIS for Federal Coal Lease Modifications COC-1362 & COC-67232 (June 2017) (FSLeasingII-0047457) ("Leasing SDEIS"). Conservation Groups commented on the Leasing SDEIS. Comments of High Country Conservation Advocates et al. (July 24, 2017) (FSLeasingII-0038919) ("HCCA July 2017 Leasing Ltr."). Conservation Groups filed official "objections" to the Forest Service's proposed consent to the Lease Modifications. High Country Conservation Advocates, et al.'s Objections to Federal Coal Lease Modifications (Oct. 23, 2017) (FSLeasingII-0040796) ("HCCA Oct. 2017 Objection Ltr.").

[6] Forest Serv., Final Record of Decision, Federal Coal Lease Modifications COC-1362 & COC-67232 (Dec. 11, 2017) (FSLeasingII-0000045) ("FS Leasing ROD"); Dep't of the Interior, BLM, Record of Decision, DOI-BLM-CO-S050-2015-0042-EIS (December 15, 2017) (BLM000001) ("BLM Leasing ROD").

[7] MCC, Notice of Intent to Explore (updated Nov. 8, 2017), at 7 (describing Phase 2), Dkt. No. 14–17; K. Welt, Notice Of Intent To Explore Involving (Nov. 8, 2017), at 2, Dkt. No. 14–18.

Despite having new chances to properly disclose the impacts of the Exception and leasing, the Agencies again violated NEPA, making some of the same types of mistakes in their 2016-17 decisions that this Court held violated NEPA in <u>High Country</u>.

## STANDARD OF REVIEW

The standard of review for NEPA claims is found in the Administrative Procedure Act (APA), 5 U.S.C. § 551 <u>et seq.</u> <u>See</u> <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 375–76 (1989). The APA authorizes federal courts to set aside agency decisions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

> An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment."

<u>N.M. ex rel. Richardson v. BLM</u>, 565 F.3d 683, 704 (10th Cir. 2009) (citation omitted) (<u>New Mexico</u>). An agency action "must be upheld, if at all, on the basis articulated by the agency itself." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.</u>, 463 U.S. 29, 50 (1983). Further, an agency action must be "supported by the facts in the record." <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560, 1575 (10th Cir. 1994). "An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review.'" <u>Id.</u> at 1574 (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971)). "Although the arbitrary and capricious standard is a 'narrow one,' [courts] are required to 'engage in a substantial inquiry.'" <u>Lamb v. Thompson</u>, 265 F.3d 1038, 1046 (10th Cir. 2001) (quoting <u>Overton Park</u>, 401 U.S. at 415).

**ARGUMENT**

**I.    CONSERVATION GROUPS HAVE STANDING.**

Article III standing requires the plaintiffs show: 1) an injury in fact that is 2) fairly

traceable to the challenged action and 3) likely to be redressed by judicial intervention. Lujan v.

Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). To establish injury-in-fact from inadequate

NEPA analysis, "a litigant must show: 1) that in making its decision without following the

NEPA's procedures, the agency created an increased risk of actual, threatened or imminent

environmental harm; and 2) that this increased risk of environmental harm injures its concrete

interest." Sierra Club v. U.S. Dep't of Energy, 287 F.3d 1256, 1265 (10th Cir. 2002); see also

Comm. to Save Rio Hondo v. Lucero, 102 F.3d 445, 452 (10th Cir. 1996).

Conservation Groups meet the three-part standing test. See WildEarth Guardians v. BLM,

870 F.3d 1222, 1231–32 (10th Cir. 2017) (WildEarth Guardians) (finding standing for NEPA

challenge to coal lease); High Country, 52 F. Supp. 3d at 1186–87 (finding plaintiff groups had

standing to challenge prior West Elk lease and Colorado Roadless Rule decisions). Conservation

Groups are injured by an increased risk of actual, threatened, and imminent environmental harm.

Each group has members who use and enjoy the Sunset Roadless Area which will be impacted

by the Leasing and Exception decisions, and those members' recreational and use interests will

be injured by bulldozing and pollution facilitated by those decisions. See Exs. 1–4 (declarations).

That harm results from the Agency's "uninformed decisionmaking" in violation of NEPA. Rio

Hondo, 102 F.3d at 452. Further, the Exception decision increases the risk of road construction

within the Pilot Knob and Flatirons Roadless Areas, which the Groups' members also use and

enjoy. That increased risk satisfies the imminence requirement for claims concerning that area.

<u>See</u> Exs. 1–4. A plaintiff "does not need to prove that [a] mining project will surely harm the

environment, and that it will go forth because of the [challenged action];" a plaintiff "need only

show that, in making its decision without following the NEPA … procedures, the agency created

an increased risk of actual, threatened, or imminent environmental harm." <u>Sierra Club</u>, 287 F.3d

at 1265.

## II.   THE FOREST SERVICE'S ADOPTION OF THE NORTH FORK COAL MINING AREA EXCEPTION RULE VIOLATED NEPA.

The Forest Service's 2016 decision to adopt an exception to the Colorado Roadless Rule,

which opens to road construction for coal mining 19,700 acres within three roadless areas, was

arbitrary and capricious. The agency violated NEPA in three ways. First, the Forest Service

failed to consider the reasonable alternative of protecting one the three roadless areas at issue

(Pilot Knob) and its unique habitat values. Second, the Forest Service failed to provide

information on the resources and values within the three roadless areas that will be opened to

damaging road and pad construction. Third, the Forest Service again failed to analyze adequately

the climate impacts of its decision by overlooking the increased demand for electricity which is

likely to be induced by more coal availability and lower coal prices.

### A.   The Exception SFEIS Fails to Consider a Reasonable Alternative to Protect the Pilot Knob Roadless Area from Road Construction.

#### 1.   NEPA Requires Agencies to Consider All Reasonable Alternatives.

To take the required "hard look" at impacts, an EIS must "study, develop, and describe"

reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii), (2)(E). This

alternatives analysis "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

The "touchstone" for courts reviewing challenges to an EIS under NEPA "is whether an EIS's

selection and discussion of alternatives fosters informed decision-making and informed public participation." California v. Block, 690 F.2d 753, 767 (9th Cir. 1982).

NEPA's implementing regulations require that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14 (emphasis added); see also New Mexico, 565 F.3d at 703 (quoting same); Custer Cty. Action Ass'n v. Garvey, 256 F.3d 1024, 1039 (10th Cir. 2001) (agencies must "rigorously explore all reasonable alternatives ... and give each alternative substantial treatment in the environmental impact statement."). The agency's purpose and need statement sets the parameters for what constitutes a reasonable alternative. See Dombeck, 185 F.3d at 1174–75. Although agencies "enjoy[] considerable discretion" in defining their objectives and are not required to consider an unlimited number of alternatives, Colo. Envtl. Coal. v. Salazar, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012), they may not dismiss an alternative unless they have, in "good faith," found it to be "too remote, speculative, or impractical or ineffective," Dombeck, 185 F.3d at 1174 (quotation omitted), or not "significantly distinguishable from the alternatives already considered." New Mexico, 565 F.3d at 708-9.

### 2. The Forest Service Failed to Consider the Reasonable Alternative of Excluding Pilot Knob from the Exception.

The Forest Service violated NEPA because it dismissed an alternative that would protect one of the three roadless areas proposed to be open to road construction—Pilot Knob—while allowing road construction in the other two areas. See HCCA Jan. 2016 Exception Ltr. at 92 (CRR2-105827). This reasonable alternative would meet the Exception's purpose and need, and is significantly distinguishable from the two action alternatives the agency reviewed in full.

The Forest Service's "specific" purpose and need was to "provide management direction for conserving ... CRAs [Colorado Roadless Areas] while addressing the State's interest in not foreclosing opportunities for exploration and development of coal resources." Exception SFEIS at 3 (CRR2-000011). To address this purpose, the Forest Service analyzed the effects of three alternatives:

- Alternative A, the no-action alternative, under which all Colorado Roadless Areas would be protected from road construction for coal mining.

- Alternative B, the chosen alternative, allowing road construction on 19,700 acres in the Sunset, Flatirons, and Pilot Knob Roadless Areas for coal mining, and access to about 172 million tons of coal; and

- Alternative C, allowing road construction on 12,600 acres in the Sunset, Flatirons, and Pilot Knob Roadless Areas (64% of the area open under Alternative B), and access to about 92 million tons of coal (53% of that available under Alternative B), while protecting 6,100 acres of land identified as "wilderness capable" in the Sunset and Flatirons Roadless Areas.

Exception SFEIS at 22 (Table 2-2) (CRR2-000030).

Conservation Groups proposed a fourth unique alternative: protecting the Pilot Knob Roadless Area. This alternative would allow road building on 14,800 acres in the Sunset and Flatirons areas (75% of the area open under the proposed action, Alternative B), and access to about 128 million tons of coal (75% of that available under Alternative B, and almost 40% more than available under Alternative C). Id. at 21, 23 (CRR2-000029, CRR2-000031); HCCA Jan. 2016 Exception Ltr. at 92 (CRR2-105827). The volume of coal available under the Pilot Knob alternative would be roughly midway between that made available by Alternatives B (172 million tons) and C (95 million tons). HCCA Jan. 2016 Exception Ltr. at 92 (CRR2-105827).

The Pilot Knob alternative meets the agency's objectives for this project. It conserves the Pilot Knob Roadless Area but does not foreclose opportunities for coal exploration and

development in most of the Exception landscape. The Pilot Knob alternative is also

"significantly distinguishable" from the other alternatives. New Mexico, 565 F.3d at 708-9.

Protecting Pilot Knob would conserve a geographically and ecologically distinct area northwest

of, and separated from, the Sunset and Flatirons Roadless Areas. See Exception SFEIS at 15

(CRR2-000023) (Map of Alternative B) (Ex. 5). The generally dryer, south-facing slopes of Pilot

Knob are characterized by more grasslands and shrubs than Sunset and Flatirons (which include

more forest and wetlands). Pilot Knob boasts the only winter range for deer and bald eagles in

the North Fork Coal Mining Area, and the only severe winter range for elk. See Earthjustice,

Map, Elk (Jan. 11, 2016) (CRR2-155745) (Ex. 6); Earthjustice, Map, Mule Deer (Jan. 11, 2016)

(CRR2-155747) (Ex. 7); Earthjustice, Map, Bald Eagle (Jan. 11, 2016) (CRR2-177636) (Ex. 8).

It also contains historic (and potential future) habitat for the imperiled Gunnison sage-grouse.

Earthjustice, Map, Gunnison Sage Grouse (Jan. 11, 2016) (CRR2-155751) (Ex. 9); Exception

SFEIS at E-51 (CRR2-0000331). Analyzing this alternative would have thrown into sharp relief

the trade-offs of protecting, or not, differing ecological values of the three roadless areas.

Although the Pilot Knob alternative fulfills the Exception's purpose, the Forest Service

dismissed it from detailed analysis, apparently on the grounds that it would prevent access to

coal. The Exception SFEIS states:

> This alternative was dismissed from detailed analysis because the Colorado Roadless
> Rule is considering access to coal resources within the North Fork Coal Mining Area
> over the long-term based on where recoverable coal resources might occur….
> Preserving coal exploration and development opportunities in the area is a means of
> providing community stability.

Exception SFEIS at 21 (CRR2-000029). This rationale is arbitrary and capricious and contradicts

the record. The Pilot Knob alternative would "preserve the option of future coal exploration and

development" and meet the "State-specific concern" for allowing coal mining. It would open

75% of roadless forest in the Exception area to road construction, allowing access to 128 million

tons of coal. That tonnage is nearly 40% more than that available under Alternative C, which the

Forest Service analyzed as a reasonable alternative. Exception SFEIS at 23 (Table 2-2) (CRR2-

000031); HCCA Jan. 2016 Exception Ltr. at 92 (CRR2-105827).

The Forest Service also appears to allege that it need not consider an alternative to

preserve Pilot Knob's unique wildlife values because those values could be protected in "future

NEPA evaluations, forest plan consistency reviews, and Forest Service decisions." Exception

SFEIS at E-47 (CRR2-0000327); Exception ROD, 81 Fed. Reg. at 91,820 (CRR2-000376). The

Forest Service does not explain why the potential for the agency to protect resource values later

renders unreasonable an alternative providing <u>certain</u> landscape protection <u>now</u>. Further, the

Forest Service's 'we can deal with it later' rationale would justify eliminating consideration of

every alternative that limited road construction for coal mining anywhere, an absurd result.

Finally, the Forest Service argues that it considered certain Pilot Knob wildlife values in

its 2012 Colorado Roadless Rule EIS. <u>See</u> Exception SFEIS at E-47 (CRR2-0000327) ("data did

inform the evaluation of alternatives for the Colorado Roadless Rule" in 2012); 81 Fed. Reg. at

91,820 (CRR2-000376) (same). The fact that Forest Service had some relevant data in 2012 does

not render unreasonable an alternative aimed at protecting the values that the agency admits were

present then and are present now. Further, the 2012 Colorado Roadless Rule EIS never evaluated

an alternative that protected Pilot Knob while allowing road building for coal mining elsewhere.

<u>See</u> Forest Serv., Rulemaking for Colorado Roadless Areas, Final EIS (Apr. 2012) ("2012 CRR

FEIS") at 13–15 (CRR-153301–03) (discussing alternatives considered). There is no indication

that the 2012 data informed the Forest Service's refusal to consider an alternative to protect those values in 2017.

The Pilot Knob alternative is a reasonable, middle-ground alternative that would protect unique resources and achieve the agency's need to balance conservation with access to coal. The Forest Service's arbitrary failure to consider this alternative violates NEPA.

**B.   The Forest Service Failed to Provide Key Data About Existing Resources in the Exception Area and to Analyze Impacts to Those Resources.**

Although the Exception would open three roadless areas to road construction, the Forest Service failed to disclose the values of those areas—including important habitat for deer, elk and other wildlife, as well as wetlands—that could be impacted under each alternative.

NEPA requires agencies to "succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act 41 (1997), https://ceq.doe.gov/publications/cumulative_effects.html (last visited Mar. 23, 2018). "Without establishing ... baseline conditions ... there is simply no way to determine what effect [an action] will have on the environment and, consequently, no way to comply with NEPA." Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988); see also N. Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1084–85 (9th Cir. 2011) (holding that agency did not take a sufficiently "hard look" at environmental impacts because it did not collect baseline data).

Further, "[a]gencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2; see also New Mexico, 565 F.3d at 718 (agencies must "assess[] all reasonably foreseeable impacts ... at the earliest practicable point.") (quotations & citations omitted).

NEPA's regulations also "encourage[]" agencies to "tier" their analyses when applicable. 40 C.F.R. § 1502.20. Tiering occurs when an agency has completed a "broad environmental impact statement" for a program or policy, and subsequently prepares another, narrower, NEPA analysis for "an action included within the entire program or policy." Id. While the subsequent analysis may rely on parts of the discussion of environmental issues contained in the broader EIS, id. § 1508.28, an agency may not tier to an analysis where the prior environmental review fails to cover the environmental effects of the later proposal. See Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1214 (9th Cir. 1998) (tiering not appropriate where programmatic EIS did not address significant new information concerning changes to forest due to fire); Pit River Tribe v. U.S. Forest Serv., 469 F.3d 768, 783 (9th Cir. 2006) (agency may not rely on programmatic EIS that "does not adequately address the potential impacts of" the site-specific action).[8]

The Exception SFEIS violates NEPA because it fails to provide baseline data necessary to assess the impacts of each alternative. The North Fork Coal Mining Area is comprised of three roadless areas totaling 19,700 acres, compared to the more than four million acres in 363 areas

---

[8] See also 43 C.F.R. § 46.120(c) (Interior Department NEPA regulations mandating that tiering is appropriate only when the prior analysis "adequately assesses the environmental effects of the proposed action and reasonable alternatives.").

state-wide addressed in the 2012 Colorado Roadless EIS. See 77 Fed. Reg. at 39,576. Yet the

Exception SFEIS, the purpose of which is to "not foreclos[e] opportunities" for coal mining,

identifies (and compares the potential for alternatives to have different effects on) only four

resources of the three areas: coal; air and greenhouse gas pollution; climate change; and

threatened, endangered, proposed and sensitive species. See Exception SFEIS at 3 (CRR2-

00011); id. at Ch. 3 (CRR2-000034–131). The SFEIS estimates varying amounts of coal that

would be mined (and combusted) under three alternatives. Id. at 33–34 (CRR2-000041–42). The

Forest Service has estimated that mining the 172 million tons of coal within the three areas under

the proposed action will require building a massive network of roads and methane drainage pads.

Three miles of road and up to 20 drainage pads per square mile (totaling 72 miles of road and up

to 480 pads) will crisscross the landscape. Exception SFEIS at 23, 32 (CRR2-000031, CRR2-

000040). The Exception SFEIS provides virtually no data about the resources—including

vegetation, watersheds, surface and ground water quality, hydrology, visual resources,

topography, and recreational resources—across the roadless areas that would be harmed by these

roads and pads. This lack of data makes it impossible for a decisionmaker or the public to

understand and compare the impacts of opening none, some, or all of the Exception area to road

construction.

　　For example, the Exception SFEIS contains no description of big game (deer and elk)

habitat, despite the fact that such habitat varies across the three roadless areas. As noted, Pilot

Knob differs from the Sunset and Flatirons Roadless Areas; the former is drier, and less forested,

and has more important winter range for deer and elk. See supra at 11. Disclosing this

information would make clear that an alternative barring road construction at Pilot Knob would

protect more of that key habitat. In addition, the Exception SFEIS contains no data about

wetlands, despite the fact that the 2012 Colorado Roadless Rule Final EIS (2012 CRR FEIS)

stressed the importance of roadless area protection to healthy water values. 2012 CRR FEIS at 4–

5 (CRR-153292–93). Forest Service maps omitted from the SFEIS show 16 identifiable ponds in

the Sunset Roadless Area in lands open to road construction under Alternative B, but only two

such ponds in areas open to road construction under Alternative C.[9] Alternative C would thus

protect more wetlands than Alternative B. The Exception SFEIS neither discloses these values

nor analyzes how impacts to wetlands may vary by alternative.

Despite the importance of big game and wetlands data to understanding the different

impacts that may result from each alternative, the Forest Service gives two conflicting rationales

for failing to disclose these values. The Forest Service states that it already provided sufficient

analysis in the 2012 CRR FEIS. In addition, the agency contends that it need not identify or

examine impacts to such resources because its action is programmatic in nature and does not

actually authorize any mining. Exception SFEIS at E-49 (CRR2-0000329). Neither of these

rationales has merit.

First, the Forest Service argues it need not provide such data because the 2012 CRR FEIS

sufficiently analyzed impacts to such resources. Exception SFEIS at E-47–E-48 (CRR2-000327–

28) (arguing "[e]arlier specialist reports for the 2012 FEIS and roadless rulemaking for

Colorado" provided more detailed information). This statement is erroneous. Although the 2012

---

[9] Compare Forest Service, Map, 2015 North Fork Coal Mining Area, Alternative C (July 8, 2015) (CRR2-0155659), with Forest Service, Map, 2015 North Fork Coal Mining Area, Alternative B (July 9, 2015) (CRR2-0155661). See also HCCA Jan. 2016 Exception Ltr. at 23–24 (CRR2-0158696-97).

CRR FEIS contains some data about big game and wetlands generally across millions of acres, and generally acknowledges that mining can impact them, the CRR FEIS contains almost no information about the values of, or impacts to, the three discrete roadless areas at issue, and none addressing how impacts might vary by the alternative considered in the Exception SFEIS. Regarding deer and elk, the 2012 CRR FEIS merely notes that "[w]inter range is often the primary limiting factor for wild ungulates (such as deer [and] elk …)," that roadless forest is "very important to sustaining ungulate populations," 2012 CRR FEIS at 213 (CRR-153501), and that "mining operations can remove or reduce habitat, increase fragmentation … and increase the potential for road-related mortality of wildlife." Id. at 219 (CRR-153507). The 2012 CRR FEIS, however, fails to describe how habitat differs within and among the three Exception roadless areas so that the public can understand what values road and pad construction may threaten.[10] This "paltry" analysis does not meet NEPA's hard look mandate. See WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 927 (9th Cir. 2015) (decision opening large landscapes to snowmobiles violated NEPA where Forest Service provided "paltry," broad-brush data on location of and impacts to big game).

Similarly, the 2012 CRR FEIS lacks information about wetlands that could help the public and decisionmakers understand potential impacts of the varying Exception alternatives.

---

[10] "Specialists reports" for the 2012 CRR FEIS add little to the picture. One such report merely identifies whether or not each of the hundreds of roadless areas is identified as of "high value and concern for" threatened, endangered and sensitive species "and other wildlife," and finds that the Sunset and Pilot Knob areas meet that criteria. Terrestrial T&E Species associated with Colorado Roadless Areas (Sep. 16, 2011), at 1, 3 (CRR-0077075, CRR-0077077). But what type of "other wildlife" is of concern, what habitat that wildlife relies on, and where that habitat might be located within any roadless area is not disclosed.

The 2012 CRR FEIS includes no analysis of the potential for different impacts to occur to wetlands under Alternatives B and C of the Exception SFEIS, nor could it, since the 2012 did not evaluate such alternatives. In fact, the 2012 CRR FEIS professes ignorance about wetlands generally: "As the number and locations of wetlands and the amount and locations of potential activities ... is not known, it is impossible to quantify the potential impacts to wetlands for any alternative." 2012 CRR FEIS at 120 (CRR-153408). But the location and number of wetlands in the three areas at issue here is readily determinable from agency maps, and so the Exception SFEIS should have disclosed potential impacts to wetlands from the predicted tight network of roads and pads. The Forest Service made no attempt to address the 2012 EIS's lack of data, violating NEPA. See Pit River Tribe, 469 F.3d at 783 (where programmatic EIS does not adequately address impacts, more analysis is required).

Second, the Forest Service tries to have it both ways, stating that it need not disclose wildlife, wetland, and other information in the Exception SFEIS because it can address those values at a later decisionmaking stage. Exception SFEIS at 9 (CRR2-000017) (wildlife, wetlands and other "resources are more appropriately examined when a project-level application for exploration or leasing action is received"); id. E-49 (CRR2-0000329) ("future site-specific NEPA evaluations" are more appropriate stage to address impacts). This rationale is arbitrary because it not only conflicts with the agency's earlier statement that it conducted sufficient analysis in 2012, it also ignores that the agency had specific information for these three areas, and admits that mining can degrade these resources. See supra at 17-18. The Forest Service cannot "avoid an obligation to analyze in an EIS environmental consequences that foreseeably arise ... merely by saying that the consequences are unclear or will be analyzed later when [it

conducts analysis] for a site-specific program." <u>Kern v. BLM</u>, 284 F.3d 1062, 1072 (9th Cir.

2002) (holding that BLM must address in a programmatic EIS, rather than in a later site-specific

NEPA analysis, the impacts that timber sales would have on spreading a pathogen). Where

impacts are reasonably foreseeable, they must be disclosed. <u>See</u> <u>New Mexico</u>, 565 F.3d at 718. It

is reasonably foreseeable that the hundreds of pads and dozens of miles of road that the

Exception predicts could be built will impact wildlife and wetlands values within the three

roadless areas. The areas' differing values mean that those impacts will vary by alternative. If up

to 20 pads and 3 miles of road per square mile due to mining is foreseeable, so must be impacts

from that construction. The Forest Service cannot "kick the can down the road" until a later stage

to disclose wildlife and wetlands values, potential impacts to those values from roads, and how

those impacts differ by alternative. The areas' values are known, so impacts are foreseeable now,

and so must be assessed now. By failing to disclose this critical information, the Forest Service

violated NEPA.

### C. The Forest Service Failed to Analyze Adequately the Climate Impacts of Adopting the North Fork Exception Rule.

The Forest Service failed to take a "hard look" at the Exception decision by declining to

take into account the fact that adding 172 million tons of coal to the market will lead to cheaper

electricity prices, which will lead to more power consumption and thus to more climate pollution

and climate-induced costs. The induced electricity consumption could be as much as the

production of a coal-fired power plant for nearly six years. <u>See</u> <u>infra</u> at 24.

"Accurate scientific analysis … [is] essential to implementing NEPA." 40 C.F.R.

§ 1500.1(b). To take the required "hard look," "an agency may not rely on incorrect assumptions

or data in an EIS." <u>Native Ecosystems Council v. U.S. Forest Serv.</u>, 418 F.3d 953, 964 (9th Cir.

2005). The Tenth Circuit has set aside NEPA analysis based on unsupported assumptions about coal and electricity markets, and climate pollution. See WildEarth Guardians, 870 F.3d at 1237. Further, where NEPA documents contain benefit-cost analyses, such analysis cannot be misleading. Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446–48 (4th Cir. 1996); High Country, 52 F. Supp. 3d at 1182, 1191 (same).

To address the Agencies' failure to take the required hard look at the climate impacts of coal combustion in their 2012 EISs, as held by the High Country decision, the Forest Service in 2015-16 prepared a cost-benefit analysis for the Exception rule. This included a market analysis to determine how the coal made available by the Exception would impact energy markets, a prerequisite to understanding the proposal's net climate pollution and the costs of that pollution. Exception SFEIS at 99 (CRR2-000107). However, as Dr. Power, an expert on economic modeling, pointed out, the agency's analysis ignores the basic economic principle that as the price of a product declines, consumption of the product generally rises. The Exception will make more coal available on the market, which will make coal cheaper relative to other, less climate polluting fuels, an impact the Forest Service addressed. But increasing the coal supply will also tend to make electricity prices decline, thus inducing additional demand for electricity, which will in turn result in increased climate pollution.[11] This phenomenon—in which the falling price of a good (electricity) generally results in more consumption of the good—is referred to as the price elasticity of demand. Power Jan. 2016 Exception Comments at 2 & n.12 (CRR2-155909).

---

[11] See Power Consulting, Inc. Comments on Exception SDEIS (Jan. 2016), at 2–4, 22–24 (CRR2-0155909–11, CRR2-0155929–31) ("Power Jan. 2016 Exception Comments"); see also Power Consulting, Inc., Objections to the Colorado Roadless Rule SFEIS (Dec. 2016), at 2–4 (CRR2-0164325–27) ("Power Dec. 2016 Exception Objections").

In comments on the Exception SDEIS, Dr. Power faulted the Forest Service for using a model which does not account for the increased demand for electricity due to its falling price, and informed the agency that other models could account for price elasticity. Id. at 22–24 (CRR2-155929-31). Assuming electricity demand would be unaffected by price was a key basis of the agency's analysis. Exception SFEIS at 101 (CRR2-0000109) (admitting that the Forest Service's model "assumes electricity demand is at pre-established levels"); 81 Fed. Reg. at 91,814 (Forest Service analysis assumes "electricity generation across all fuel sources, by year, would remain constant across alternatives").

The Forest Service's response to Dr. Power fails to meaningfully consider expert comments or to adequately disclose the climate costs of additional electricity consumption for at least two reasons. First, the Exception SFEIS states that "[t]here is a lack of data" supporting the phenomenon of price elasticity of demand for electricity. Exception SFEIS at E-62 (CRR2-0000342). To the contrary, as Dr. Power stated, price elasticity of demand for electricity is "something that economists, as well as federal agencies, have been aware of, understand, and have known how to account for, for some time." Power Jan. 2016 Exception Comments at 23–24 (CRR2-155930–31) (citing supporting studies).[12] The Forest Service arbitrarily ignores, without explanation, evidence Dr. Power presented.

---

[12] See also Power Dec. 2016 Exception Objections at 2 (CRR2-0164325); id. at 2–3 nn. 6–10 (CRR2-0164325–26) (citing studies and noting that there is "a wealth of evidence" that "making a large quantity of cheaper coal available does cause an increase in electric[ity] demand, and indeed would do so at quantities in line with the increase in coal production expected under the [adoption of the Exception].").

Second, the Forest Service justifies its assertion that demand for electricity is not elastic by referring to data that is irrelevant and refuted by the agency's own data and statements. The Forest Service states that between 2004 and 2015, natural gas prices fell, but electric rates went up, alleging that this somehow demonstrates that lower electricity prices cannot result in increased demand. Exception SFEIS at E-63 (CRR2-0000343). However, as Dr. Power noted, the natural gas analog is "irrelevant" to the question of whether demand for electricity is elastic. Power Dec. 2016 Exception Objections at 5 (CRR2-164328). The issue is not whether lower electricity rates will occur as a result of making more coal available. Lower electricity costs are precisely what the Forest Service's own modeling shows will happen. Exception SFEIS at 100 (CRR2-000108) (stating that "electricity generation costs are lower" under the chosen alterative, and that "cost savings, or cost reductions, are the basis for estimating benefits" of the Exception). Rather, the issue is whether those lower costs will induce more energy consumption, a result studies cited by Dr. Power predict. The Forest Service points to no analysis or data refuting Dr. Power's conclusions. The Forest Service's unsupported statement denying that demand elasticity does not exist for coal is arbitrary, obscures the climate costs of the Forest Service's decision, and runs counter to the evidence before the agency.

Further, the Forest Service's denial that its action will increase electricity demand contradicts the Exception SFEIS's recognition that increasing the supply of coal can result in additional electric generation: "When opportunities for expanded coal production … are created … a number of chain reactions may occur[, including] … an increase in total electricity production…." Exception SFEIS at C-19 (CRR2-000251) (emphasis added). That increased

production will cause additional climate impacts, impacts that the Forest Service does not account for.

Here, as in another coal mining case, it was an "abuse of discretion" for the Forest Service "to rely on an economic assumption, which contradict[s] basic economic principles, as the basis for distinguishing between [alternatives]." See WildEarth Guardians, 870 F.3d at 1237–38. This deficiency is "more than a mere flyspeck." Id. (quotation omitted). Dr. Power estimated that the lower cost of electricity would result in increased electrical demand of 7,377 GWh to 29,508 GWh—the production of a coal-fired power plant over 1.4 to 5.7 years. Power Dec. 2017 Exception Objections at 3–4 & n.21 (CRR2-164326–27). Further, it was arbitrary for the Forest Service to account for the benefits of lower electricity prices (which it counts as a benefit) but not account for the induced costs of that price reduction. Hughes River, 81 F.3d at 446–48.

## III. THE AGENCIES FAILED TO TAKE A HARD LOOK AT THE CLIMATE IMPACTS OF THE LEASE MODIFICATIONS.

After approving the Exception to the Colorado Roadless Rule opening 19,700 acres to road building for coal, the Agencies addressed MCC's applications for Lease Modifications to expand mining into 1,700 of those acres within the Sunset Roadless area. Millions of tons of climate pollution will be among the leases' most significant harms. But the Leasing SFEIS fails to take the required hard look at the impacts that pollution will cause, making some of the same errors the High Country court deemed arbitrary and capricious. First, the Leasing SFEIS provides only a "general discussion" of greenhouse gas emissions, failing to disclose the scale and nature of the climate impacts resulting from the millions of tons of climate pollution the Lease Modifications will cause. High Country, 52 F. Supp. 3d at 1189–90. Meanwhile, the analysis precisely discloses the leases' hundreds of millions of dollars in economic benefits.

Second, the Leasing SFEIS fails to provide a rational basis for declining to use a valid and

scientifically sound tool to "characterize the impact of the GHG [greenhouse gas] emissions":

the social cost of carbon. Id. at 119 (quotation omitted). Third, the Agencies cannot rely on the

2016 Exception SFEIS's climate impacts analysis because that analysis was based on now-

erroneous assumptions concerning implementation of the Clean Power Plan's coal plant

regulations. These three errors, which ignore or lead to an underestimate of the Lease

Modifications' climate impacts, violate NEPA's hard look mandate.

### A.    The Lease Modifications SFEIS Fails to Disclose Climate Impacts.

Where an agency action may cause greenhouse gas pollution, it must disclose that

pollution and that pollution's climate impacts. Ctr. for Biological Diversity v. Nat'l Highway

Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008) ("The impact of greenhouse gas

emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA

requires agencies to conduct"); see also WildEarth Guardians, 870 F.3d at 1234-37 (finding

unlawful BLM analysis that assumed no climate pollution from leasing billions of tons of federal

coal). A "general discussion of the effects of global climate change," as opposed to disclosing

the particular project's impacts on climate change, does not satisfy NEPA's hard-look

requirement. High Country, 52 F. Supp. 3d at 1189–90. Nor does a general discussion of climate

impacts, without more, permit the public or the decisionmaker to meaningfully compare the

outcomes of differing alternatives, the heart of the NEPA process.

Contrary to this precedent, the Leasing SFEIS merely characterizes the volume of climate

pollution attributable to the Lease Modifications, and discusses climate change generally. The

Leasing SFEIS admits that the Lease Modifications "will contribute to the increase of

atmospheric concentrations of greenhouse gases," and the Agencies admit that those impacts may be "substantial" and "significant."[13] The Leasing SFEIS also quantifies the volume of greenhouse gas emissions from methane pollution (more than 2.5 million tons) that will result from extending mining at West Elk for 2.7 years.[14] The SFEIS estimates the volume of climate pollution attributable to burning the Lease Modifications' 17.6 million tons of coal, although it fails to undertake a market analysis to determine whether making more coal available would result in additional climate impacts. See Leasing SFEIS at 111–12 (FSLeasingII-000240–41); WildEarth Guardians, 870 F.3d at 1234–38 (finding agency violated NEPA where it failed to use market analysis to disclose climate pollution from coal lease). Finally, the Leasing SFEIS discusses the regional and global impacts of climate change generally without attributing any impacts to the Lease Modifications. Leasing SFEIS at 122–30 (FSLeasingII-000251–59). The Forest Service avers that the agency need only "qualitatively disclose" the "effects of climate change for this project" and "quantif[y] GHG emissions across all alternatives." FS Leasing ROD at 17 (FSLeasingII-000061).

---

[13] Leasing SFEIS at 988 (FSLeasingII-0001117) ("will contribute"); id. at 289 (FSLeasingII-0000418) (making similar statement); id. at 255–56 (FSLeasingII-0000384–85) (extending life of the mine's methane emissions would have "cumulative impact[s] [that] could be substantial at a global scale"); FS Leasing ROD at 15 (FSLeasingII-0000059) (costs of climate pollution "may be significant"); id. at 16 (FSLeasingII-0000060) (recognizing "the significant potential future costs of GHG emissions").

[14] Extending the mine's life for 2.7 years would cause 2.53 million more tons of carbon dioxide ($CO_2$) equivalent from methane pollution. Compare Leasing SFEIS at 109 (FSLeasingII-0000238) (methane emissions under 'no leasing' alternative equivalent to 9.38 million tons of $CO_2$) with id. at 111 (FSLeasingII-0000240) (methane emissions under selected alternative equivalent to 11.91 million tons of $CO_2$).

Even assuming the Leasing SFEIS correctly quantified (i.e., counted) the proposal's greenhouse gas pollution, disclosing only the volume of greenhouse gases emissions from a project does not give the decisionmaker (or the public) an understanding of the scale of the project's "ecological," "economic," and "social" impacts, as NEPA requires. 40 C.F.R. § 1508.8(b). Nor does it permit the decisionmaker (or the public) to compare the impacts among alternatives. In fact, the Leasing SFEIS did exactly what the High Country and Montana Environmental Information Center courts held inadequate: explaining the kinds of impacts climate change generally can have without attempting to disclose the scale and nature of the climate impacts resulting from the climate pollution this decision will cause. See High Country, 52 F. Supp. 3d at 1190 ("Beyond quantifying the amount of emissions relative to state and national emissions and giving general discussion to the impacts of global climate change, [the agencies] did not discuss the impacts caused by these emissions."); Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining, 274 F. Supp. 3d 1074, 1096–99 (D. Mont. 2017) (rejecting the argument that the agency "reasonably considered the impact of greenhouse gas emissions by quantifying the emissions which would be released if the [coal] mine expansion is approved, and comparing that amount to the net emissions of the United States").

It is as if the agency disclosed the effects of a decision of dumping a million tons of pesticide into a river by only quantifying the volume of pollution without disclosing the extent of impacts on drinking water, fish, or aquatic habitat. Federal courts have struck down such an approach. See Klamath-Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 995 (9th Cir. 2004) ("A calculation of the total number of acres to be harvested in the watershed is … not a sufficient description of the actual environmental effects that can be expected from logging those acres.").

By failing to disclose the Lease Modifications' climate <u>impacts</u>, the same flaw that led to

reversal in the <u>High Country</u> case, the Agencies failed—again—to take the hard look NEPA

requires.

**B.      The Leasing SFEIS Fails to Utilize a Valid and Scientifically Sound Method for Disclosing Climate Impacts, or Explain Why It Cannot.**

The Agencies claim they cannot address the Lease Modifications' climate impacts

because no tools exist to disclose such impacts, which are too small to measure. They also

provide multiple excuses for not using a scientifically-based, tested and refined tool for

disclosing climate pollution impacts: the social cost of carbon. They allege that the social cost of

carbon protocol would result in an unfair comparison of costs and benefits; that using the

protocol would require undertaking additional analysis; and that coal leasing decisions are not an

appropriate decision stage at which to use the protocol. The Agencies' excuses for declining to

disclose the leases' climate impacts, and declining to use the social cost of carbon to do so, are

arbitrary and capricious. This is especially so because the Agencies again identify the millions of

dollars of alleged benefits from the Lease Modifications, while making no attempt to disclose the

leases' obvious, significant, and potentially overwhelming damage from climate change

pollution. By turning a blind eye to the climate harms side of the ledger, the Agencies have

deprived the public and decisionmakers of a critical way to weigh alternatives, violating NEPA.

First, the Agencies falsely claim that "no tools exist to describe how the minor amount of

incremental GHG increase … would directly contribute to modeled climate change impacts."

Leasing SFEIS at 112 (FSLeasingII-000241). The Leasing SFEIS similarly claims the agency

lacks "project specific analysis tools" or a way to determine "[s]pecific global or local climate

effects to socioeconomic issues." <u>Id.</u> at 981, 286 (FSLeasingII-001110, 0000415). This Court in

High Country already rejected these identical excuses stating: "a tool is and was available: the social cost of carbon protocol." 52 F. Supp. 3d at 1190. This remains true, and the Agencies' arbitrary rejection of this means of addressing the leases' climate emissions without providing any other method of disclosure violates NEPA's hard look mandate.

The social cost of carbon protocol is based on multiple peer-reviewed models and represents a facially reasonable approach for assessing the environmental impacts of carbon emissions. "The protocol—which is designed to quantify a project's contribution to costs associated with global climate change—was created with the input of several departments, public comments, and technical models." Id. The Government Accountability Office and the National Academy of Sciences have reviewed the social cost metric and found it to be based on widely used and accepted models.[15] It is a simple tool that is easy for federal agencies to use and easy for the public to understand. The social cost tool is built on models of impacts to temperature, sea level rise, ecosystem services, and other physical impacts, together with assessments of how these physical changes will impact agriculture, human health, and other values. The social cost protocol then identifies the social cost imposed by a ton of emissions' contribution to these environmental harms. EPA, Fact Sheet, Social Cost of Carbon (Dec. 2016), at 1 (FSLeasingII-031713). Assigning a dollar figure on the damage caused by each additional ton of $CO_2$ emitted

---

[15] Nat'l Acad. Sci., Eng. & Medicine, Assessment of Approaches to Updating the Social Cost of Carbon: Phase 1 Report on a Near-Term Update 1 (2016) (FSLeasingII-0037530) (supporting continued near-term use of the existing social cost of carbon estimates); GAO, Regulatory Impact Analysis: Development of Social Cost of Carbon Estimates (July 2014), at 12–13 (FSLeasingII-0037618–19) (noting that the interagency working group that created the social cost of carbon relied on existing, widely used models and used consensus-based decisonmaking). See also Inst. for Policy Integrity et al., Comments (July 24, 2017), at 8–11 (FSLeasingII-0035470–73) (explaining social cost of carbon is based on "state-of-the-art" models);

as a result of a federal project places climate impacts in a social and economic context that both

decisionmakers and the public can readily comprehend. The <u>High Country</u> court concluded that

where the agency had accounted for the economic benefits of the Lease Modifications, NEPA

required the Forest Service to disclose the social cost of the Modifications' climate pollution, or

provide a reasoned basis for ignoring it. 52 F. Supp. 3d at 1191–92 (holding the Agencies failed

to provide a rational explanation for "why these agencies believed the protocol was inaccurate or

not useful in this [site-specific] instance"). The Leasing SFEIS's statement that "no tool exists"

is thus plainly erroneous.

Second, the Forest Service uses several arguments to try to escape the holding and logic

of <u>High Country</u> that where an agency prepares what is effectively half of a cost-benefit analysis

of coal leasing (by disclosing the economic benefits of coal production), it must also address and

disclose the climate costs. <u>Id.</u> at 1191. The Forest Service claims that its Lease Modifications

analysis discloses coal's "impacts" on the economy, but did not monetize economic "benefits" as

part of a formal cost-benefit analysis. The agency also avers that because its economic "impacts"

analysis does not disclose some social benefits of coal combustion, comparing the disclosed

"impacts" to the social costs of carbon would result in a biased analysis, and not an apples-to-

apples comparison.[16] Each of these rationales is arbitrary, because the Leasing SFEIS did

---

[16] <u>See</u> Leasing SFEIS at 129 (FSLeasingII-0000258) ("Since a cost-benefit analysis was not
conducted for the SEIS, neither the economic benefits of coal production nor the social cost of
emissions were included in monetary values."); FS Leasing ROD at 16 (FSLeasingII-0000060)
("If we … quantify climate impacts as monetized costs, it would be necessary to balance these
costs by also quantifying the benefits of burning coal to generate electricity such as providing
affordable, reliable electricity and the resultant benefits of … human health from medical
advancements, comfort, work efficiencies, etc….."").

disclose the economic "benefits" of coal production, and effectively zeroed out climate costs, by declining to quantify leasing's climate harms. This results in the very type of biased, blinkered analysis that NEPA prohibits. The Agencies' failure to compare costs with benefits is especially troubling because the Forest Service itself has admitted that the climate costs of North Fork coal likely outweigh any monetary benefits of mining it. FS Leasing ROD at 16 (FSLeasingII-000060) (acknowledging that Exception SFEIS shows that "under most scenarios the economic costs associated with GHGs emission likely exceed the economic benefits of electricity generation associated with coal.").

Contrary to the Agencies' semantic parsing, the Leasing SFEIS's "impacts" analysis is effectively identical to the "benefits" side of a cost-benefit analysis. The SFEIS discloses the Lease Modifications' monetized impacts (i.e., benefits). It projects the economic value of coal produced (the "total industry output"), ranging from $284 million to $294 million annually, depending on the alternative, resulting in a total economic value of about $800 million over the 2.7 years that the lease will extend the West Elk mine's operations. See Leasing SFEIS at 278 (FSLeasingII-000407) (Table 3-38).[17] The Agencies also disclose the dollar value of coal, jobs, economic activity from sale of the coal, and royalty revenues prolonged by the leases. Leasing SFEIS at 281–86 (FSLeasingII-000410–15); id. at 282 (FSLeasingII-000411) (Table 3-39, estimating "Economic Impacts" of the selected alternative to include a combined $397 million in annual impact in Delta, Montrose, and Mesa counties and 887 jobs per year in those counties).

---

[17] See also Power Consulting, Inc., Analysis of the Federal Coal Lease Modifications (Oct. 2017), at 4–5 (FSLeasingII-0042957–58) ("Oct. 2017 Power Leasing Report") (explaining SFEIS's economic analysis). The Forest Service's contention that the Leasing SFEIS did not include "the economic benefits of coal production," see supra at 30 n.16, is thus erroneous.

This is nearly the same analysis that the High Country court found represented an unlawful benefits-only analysis. See 52 F. Supp. 3d at 1190–91 (finding arbitrary an analysis that touted "specific economic benefits—coal recovered, payroll, associated purchases of supplies and services, and royalties" but then "explain[ed] that a similar analysis of the costs was impossible when such an analysis was in fact possible" using the social cost of carbon). Whether or not the Agencies style their "economic impact" analysis a formal cost-benefit analysis or not is "a distinction without a difference where … the economic benefits of the action were quantified while the [climate] costs were not." Mont. Envtl. Info. Ctr., 274 F. Supp. 3d at 1096 n.9.

Further, the Agencies excuse that it would be unfair to compare the leases' social cost of carbon against the benefits of coal production because the economic analysis does not include all of coal's benefits is meritless. See supra at 30 n.16. Coal is a commodity, thus its price (what consumers are willing to pay) includes the "demand for and economic value of electricity." See Oct. 2017 Power Leasing Report at 4–5 (FSLeasingII-042957–58). The Agencies cite no studies or analysis indicating that the price of coal somehow does not account for the commodity's total value. On the other hand, climate pollution is an externality with significant costs that the market does not price; thus the need for the social cost of carbon protocol to disclose those costs.

Defendants cannot argue that providing a social cost of carbon analysis would result in an apples-to-oranges comparison of costs and benefits. The Leasing SFEIS monetizes the alleged benefits and effectively zeroes out costs by failing to monetize the leases' significant climate pollution externalities. This is an apples-to-nothing comparison. In doing so, the Agencies have donned blinders to ignore all of the climate costs of coal mining and combustion, a result NEPA does not permit. See Hughes River, 81 F.3d at 446–48. The social cost of carbon permits those

climate pollution impacts to be disclosed using the best available science and information. Using

the social cost protocol thus results in a hard-look analysis, which cannot be said for the

Agencies' approach of arbitrarily ignoring climate pollution's millions of dollars of impacts.

Third, the Agencies' claim that "no tools exist" to address "small increments" of

additional climate pollution also fails. See Leasing SFEIS at 112, 289 (FSLeasingII-000241,

FSLeasingII-000418). This rationale is arbitrary and capricious because the social cost of carbon

was specifically designed to "make it possible for agencies to incorporate the social benefits

from reducing carbon dioxide emissions into cost-benefit analyses of regulatory actions that have

small, or 'marginal,' impacts on cumulative global emissions."[18] Moreover, this decision will

cause the equivalent of more than two millions tons of carbon from methane emissions (and

millions more from coal combustion). See supra at 26 n.14.

Fourth, the Forest Service alleges that disclosing the social cost of carbon is "not

feasible" because doing so would require the agency to prepare an analysis addressing how

adding the leases' coal to the market would result in a net increase (or not) in carbon pollution.

FS Leasing ROD at 16 (FSLeasingII-0000060) ("[Q]uantifying these benefits and the SCC

[social cost of carbon] were not feasible here in the absence of an analysis of effects on domestic

and international energy and economic systems as a whole."). Defendants provide no basis

alleging such analysis is not feasible. Further, this argument contradicts Tenth Circuit precedent,

and this Court's High Country decision, holding that in approving coal leases, federal agencies

---

[18] Interagency Working Group on Social Cost of Carbon. Technical Support Document (Feb. 2010), at 2 (FSLeasingII-0033668) (emphasis added); see also id. at 1 (FSLeasingII-0033667) ("The SCC is an estimate of the monetized damages associated with an incremental increase in carbon emissions in a given year.") (emphasis added).

may not simply assume that adding coal to the marketplace will result in no additional climate

pollution. WildEarth Guardians, 870 F.3d at 1236–37; High Country, 52 F. Supp. 3d at 1197–98;

see also Mont. Envtl. Info. Ctr., 274 F. Supp. 3d at 1098. Indeed, the Forest Service prepared

such an analysis (albeit flawed) for the Exception SFEIS, analyzing the market's response to

additional coal, and disclosing the climate costs of climate pollution. Claiming such an analysis

is "not feasible" is thus contrary to NEPA, court precedent, and the record before the Agencies.

Fifth, the Forest Service's Leasing ROD rejects using the social cost of carbon on the

grounds that addressing those costs at the project level is not appropriate. FS Leasing ROD at 15

(FSLeasingII-000059) ("[I] believe that the analysis was conducted at the appropriate

[rulemaking] level at that time…."). The Agencies provide no support for this conclusion, one

this Court and one other have rejected. High Country, 52 F. Supp. 3d at 1192 (Forest Service and

BLM "do not explain why these agencies believed the protocol was inaccurate or not useful in

this [site-specific] instance."); Mont. Envtl. Info. Ctr., 274 F. Supp. 3d at 1098 (agency acted

arbitrarily and capriciously by failing consider the costs of greenhouse gas emissions" for a coal

mine expansion).

The climate impacts of mining and burning coal that the Lease Modifications make

available, when monetized, likely outweigh the benefits for North Fork coal mining.[19] The Forest

Service apparently does not dispute this point. See supra at 31. Yet by deciding not to disclose or

---

[19] As Dr. Power explains, "the results of the benefit-cost analysis in the [Exception SFEIS] process are overwhelmingly negative and if the Forest Service had paid attention to the scientific literature associated with the SCC, the results of the benefit-cost analysis would have been not only all negative, but would have been dramatically more negative." Oct. 2017 Power Leasing Report at 13 (FSLeasingII-0042966).

quantify at all the climate impacts, the Agencies effectively "zeroed out the cost in its quantitative analysis." High Country, 52 F. Supp. 3d at 1192. This uninformed analysis violates NEPA's "hard look" mandate by giving the public and the decisionmaker the false impression that approving the Lease Modifications will have hundreds of millions of dollars in benefits and no measureable countervailing costs. By failing "to offer non-arbitrary reasons why the [social cost of carbon] protocol should not have been included" in the Leasing SFEIS, and failing to address climate costs any other way, the Agencies violated NEPA, and capriciously ignored this Court's ruling in High Country. Id. at 1191–92.

### C.   The Forest Service Cannot Rely on the Flawed Social Cost of Carbon Analysis Prepared for the Colorado Roadless Rule.

Instead of disclosing the Lease Modifications' climate impacts in the Leasing SFEIS, the Forest Service appears in some cases to rely on, or tier to, the social cost of carbon analysis performed for the Exception SFEIS.[20] The Agencies, however, cannot rely on the Exception SFEIS because a key assumption in that analysis – that the Clean Power Plan would be in effect – was outdated and inaccurate by the time the Leasing SFEIS was complete. That unreasonable assumption means the Exception SFEIS analysis underestimated the climate costs of mining

---

[20] Compare FS Leasing ROD at 26 (FSLeasingII-0000070) ("My decision does not rely on the SCC protocol…."), with id. at 15 (FSLeasingII-0000059) (claiming that the social cost of carbon analysis for the Colorado Roadless Rule "informs my decision and the public" and asserting that the social cost analysis "was conducted at the appropriate [rulemaking] level"); Leasing SFEIS at 129 (FSLeasingII-0000258) ("the monetary value of social cost GHG was not calculated" for the Leasing SFEIS).

North Fork coal by as much as 20 percent.[21] Further, the Agencies cannot rely on the Exception

SFEIS because, as noted above, it failed to address the elasticity of demand for electricity.

The Agencies may not rely on the Exception SFEIS's social cost analysis because that

November 2016 market analysis assumed that U.S. coal-fired power plants would be subject to

limits on carbon pollution set forth in the Clean Power Plan. Exception SFEIS at 114 (CRR2-

000122) (EIS's market analysis model "[a]ccount[s] for implementation of the final Clean Power

Plan").[22] The Exception SFEIS used economic models to test whether making more (cheaper)

North Fork coal available would lead to utilities choosing to burn more coal rather than choosing

cleaner energy (thus resulting in relatively more climate pollution), or whether the additional

North Fork coal would replace (substitute for) other coal and thus result in little additional

climate pollution. The Clean Power Plan would result in fewer opportunities for utilities to burn

more, cheaper coal because the Plan limits coal plant carbon pollution, and so limits the amount

of coal burned. July 2017 Power Report on Leasing at 13–16 (FSLeasingII-036290–93). Because

utilities would be generally constrained from burning more coal even if more coal is added to the

market, adding Exception area coal to the market under the Clean Power Plan was predicted to

have only a modest increase in climate pollution. See id. at 13–16, 68–86 (FSLeasingII-036290–

93, FSLeasingII-036345–63). The Exception SFEIS acknowledged that assuming the Clean

Power Plan was in effect reduced the Forest Service's prediction of climate pollution attributable

to the Exception. Exception SFEIS at 117 (CRR2-000124) (concluding that there would be

---

[21] Power Consulting, Inc., Comments on the Federal Coal Lease Modifications COC-1362 & COC-67232 (July 23, 2017), at 14 (FSLeasingII-0036291) ("July 2017 Power Report on Leasing").

[22] The Clean Power Plan was adopted on October 23, 2015. 80 Fed. Reg. 64,662 (Oct. 23, 2015).

"reduced substitution between coal and those [cleaner] sources of energy under revised market and regulatory conditions represented by" the Exception SFEIS's market model, which assumes Clean Power Plan implementation).

Changed circumstances following the Exception SFEIS's completion in November 2016 rendered it unreasonable for the Agencies to assume, as they prepared the Leasing SFEIS in mid-2017, that the Clean Power Plan would regulate future coal plant carbon emissions. Following a legal challenge in the D.C. Circuit Court of Appeals, the Supreme Court stayed the Clean Power Plan in February 2016. See 82 Fed. Reg. 48,035, 48,037 (Oct. 16, 2017). In the 13 months following the Exception EIS's publication, and before the Lease Modifications decisions:

- President Trump issued an Executive Order calling for review and repeal of the Clean Power Plan (Executive Order 13,783, § 4, 82 Fed. Reg. 16,093, 16,095 (Mar. 28, 2017));

- EPA Administrator Pruitt signed a Federal Register notice announcing EPA's review, and potential rescission, of the Plan (82 Fed. Reg. 16,329, 16,329 (Apr. 4, 2017));

- The Department of Justice, citing these prior two "significant developments," sought and won in April 2017 a motion to hold in abeyance for 60 days the case challenging the Plan before the Court of Appeals, D.C. Circuit; the D.C. Circuit has repeatedly issued orders holding the case in abeyance since then, and the Supreme Court's stay of the Plan remains in place;[23] and

- EPA Administrator Pruitt proposed to repeal the Clean Power Plan on the grounds that the Plan exceeds EPA's statutory authority (82 Fed. Reg. at 48,038).[24]

---

[23] See EPA Status Report, West Virginia v. U.S. EPA, Dkt. No. 15-1363 (D.C. Cir. 15-1363), Doc. #1708422 (Dec. 11, 2017), at ¶¶ 1, 4 (Ex. 10) (asking for case to remain in abeyance pending conclusion of Clean Power Plan repeal rulemaking); Order, West Virginia v. U.S. EPA, Dkt. No. 15-1363 (D.C. Cir. 15-1363), Doc. #1720228 (Mar. 1, 2018) (Ex. 11) (most recent order maintaining stay). This Court may take judicial notice of publicly-filed court records. United States v. Ahidley, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007).

[24] See also EPA news release, EPA Takes Another Step To Advance President Trump's America First Strategy, Proposes Repeal Of "Clean Power Plan" (Oct. 10, 2017) (FSLeasingII-0041273); EPA Status Report, West Virginia v. U.S. EPA (Ex. 10), at ¶ 5.

In short, by the time the Agencies approved the Lease Modifications, the Clean Power Plan was then (and remains) not in effect. The Administration was then working (and continues working) to prevent the Plan from going into effect while EPA adopts a rule to ensure the Plan will never go into effect. Indeed, the Leasing SDEIS turned aside a comment that the Agencies must consider the Clean Power Plan's carbon limits by stating that the Trump administration intended to repeal the Plan. See Leasing SDEIS at 809 (FSLeasingII-000938). It is arbitrary and disingenuous for Federal Defendants on the one hand to work to repeal the Clean Power Plan (and to advocate keeping in place the Supreme Court stay of the Plan while it does so), and on the other hand to argue that they can reasonably rely on an environmental review that assumes the Plan will be in effect for decades. The Agencies can't have it both ways, especially here where their arbitrary assumption that the Clean Power Plan would be in effect materially impacted the Exception SFEIS's estimate of the social cost of mining additional North Fork coal. Blue Mountains, 161 F.3d at 1214 (tiering not appropriate where programmatic EIS failed to address significant new information); see Native Ecosystems Council, 418 F.3d at 964–65 (EIS may not rely on incorrect assumptions).[25]

This arbitrary assumption is not a mere flyspeck; it goes to the heart of balancing the leases' impacts and benefits. As Dr. Power's July 2017 report concluded, assuming the reality that the Clean Power Plan is not in effect "results in significantly greater GHG emissions, and so almost certainly a significantly greater social cost, than the Exception SFEIS predicts." July 2017

---

[25] Other federal agencies by January 2017 were modeling a "no Clean Power Plan" analysis as an "alternative case" for energy markets. See U.S. Energy Information Admin., American Energy Outlook 2017 (Jan. 5, 2017), at 19–20 (FSLeasingII-0031727–28).

Power Report on Leasing at 14 (FSLeasingII-036291); see also id. at 13–16, 68–86

(FSLeasingII-036290–93, FSLeasingII-036345–63) (providing basis for conclusions about

Exception SFEIS and the Clean Power Plan). Dr. Power concluded that by assuming the Clean

Power Plan's implementation, the Exception SFEIS underestimated the carbon emissions from

coal combustion by about 20%, potentially resulting in hundreds of millions of dollars in

underestimated social costs. Id. at 15 (FSLeasingII-036292). Given this key flaw, the Agencies

cannot rely on, or tier to, the Exception SFEIS's outdated analysis to address the Lease

Modifications' climate impacts.

The Agencies cannot rely on the Exception analysis to satisfy NEPA's hard look mandate

for the Leasing Modifications for the additional reason that, as discussed supra at 20–24, that the

Exception SFEIS ignores the elasticity of demand for electricity. The Leasing SFEIS does not

correct this error. Correcting this error would, like correcting the Exception SFEIS's Clean

Power Plan assumption, increase the climate costs of the Lease Modifications. The Agencies'

reliance on an analysis that fails to accurately disclose the Lease Modifications' climate impacts

violates NEPA's hard-look requirement. Native Ecosystem Council, 418 F.3d at 964–65.

## IV.   THE LEASE MODIFICATIONS SFEIS FAILED TO CONSIDER IN DETAIL AN ALTERNATIVE TO REQUIRE MCC TO FLARE METHANE.

In addition to failing to disclose climate impacts in the Leasing SFEIS, the Agencies

violated NEPA by refusing to consider in that analysis a reasonable alternative that would

mitigate those impacts: requiring MCC to flare methane emitted from drainage wells as a

condition of mining publicly-owned coal beneath publicly-owned lands. Methane is a potent

greenhouse gas far more damaging to the climate than $CO_2$, but readily-available technologies

that flare methane emissions effectively reduce its warming potency by as much as 87 percent—

which could yield significant environmental benefits considering that West Elk is the largest industrial methane polluter in Colorado. Leasing SFEIS at 55–61 (FSLeasingII-000184–190) (mitigation); id. at 98 (FSLeasingII-000227) (methane potency); HCCA 2017 Objections at 11 (FSLeasingII-040813) (state's largest industrial methane polluter, per EPA data).

Requiring methane flaring fits the project's stated purpose of "facilitat[ing] recovery of federal coal resources in an environmentally sound manner." Leasing SFEIS at 6 (FSLeasingII-000135). Requiring flaring is also within the Forest Service's authority to protect surface resources (here, from climate pollution impacts). See 30 U.S.C. § 201(a)(3)(A)(iii). An expert report submitted to the Forest Service concluded that methane flaring at West Elk is feasible and could result in a healthy financial return to MCC. Raven Ridge Res., Analysis of Potential Use and Destruction of Methane Emissions at West Elk Mine (Oct. 20, 2017), at 1 (FSLeasingII-245339).[26] By flaring methane that the mine currently vents, using technology now in use at a closed North Fork coal mine just across Highway 133 from West Elk, MCC could recoup its investment within the first year. Id. at 18–19 (FSLeasingII-245356–57). Flaring in this manner would entail using surface equipment to capture methane from drainage vents; transporting the methane via pipe along existing roads and rights-of-ways (which the West Elk mine currently does in winter to heat other parts of the mine); and combusting the methane via a central, enclosed flare. Id. at 1, 11–14 (FSLeasingII-245339, FSLeasingII-245349–52).

None of the Agencies' excuses for not analyzing a methane flaring alternative are valid. First, the Agencies assert that vented mine methane is not subject to air quality regulations, and

---

[26] Federal Defendants lodged this color copy of the Raven Ridge report in a separate filing. See Dkt. No. 36-5 (Mar. 21, 2018).

so mitigation is not reasonable. See Leasing SFEIS at 963, 965, 968, 970 (FSLeasingII-0001092,

0001094, 0001097, 0001099) ("Methane is not a criteria pollutant…."). This is an arbitrary

excuse. The Agencies admit that methane is a "potent greenhouse gas," that climate change is

harming national forest and other resources, and that reducing methane pollution "would be

beneficial." Lease Mods SFEIS at 105 (FSLeasingII-0000234) (methane); id. at 970

(FSLeasingII-0001099) ("beneficial"); id. at 122–129 (FSLeasingII-0000251–58) (climate

damage). The fact that no regulations currently cap methane pollution from coal mines is legally

irrelevant. It does not diminish the benefits of reducing emissions, nor can it absolve the

Agencies from fulfilling their NEPA obligation to "[r]igorously explore and objectively evaluate

all reasonable alternatives." 40 C.F.R. § 1502.14(a).

    Second, the Agencies' wish to push consideration of methane flaring to a later

decisionmaking stage does not justify their arbitrary decision to put off to tomorrow what the

Agencies could do today. See Leasing SFEIS at 971 (FSLeasingII-001100) ("[L]easing is just

not the appropriate time to address potential permitting actions that relate to in-mine safety for

which no mine plan or ventilation plan has been prepared."); FS Leasing ROD at 35

(FSLeasingII-000079) (analysis of methane flaring "requires detailed engineering and economic

considerations that would occur later"). NEPA does not allow the Agencies to dodge

consideration of an otherwise reasonable alternative simply because more information will be

available later. New Mexico, 565 F.3d at 707 ("All environmental analyses required by NEPA

must be conducted at the earliest possible time.") (quotations omitted). The Agencies have ample

methane data from the mine because EPA has required reporting of such data for years. See, e.g.,

Leasing SFEIS at 103, 107 (FSLeasingII-000232, FSLeasingII-000236). As it prepared the

Leasing SFEIS, the Agencies knew the coal's location; the terrain and lands to be impacted; the configuration of existing coal mining panels and the depth of adjacent coal seams from MCC's ongoing operations; the volume and concentration levels of methane emissions from nearby drainage wells; and numerous other data points relevant to the potential for flaring. Here, the Agencies had sufficient data to consider an alternative requiring methane flaring at West Elk.

Further, the Agencies' current assertion that they cannot analyze methane capture at the coal leasing stage contradicts both EPA, which administers a program studying coal mine methane, and the Forest Service's own statements from 2016. As part of the Exception rulemaking, the Forest Service stated that "methane flaring is best considered at the leasing stage when there is more information on the specific minerals to be developed and the lands that would be impacted by a flaring operation." Exception SFEIS at E-15 (CRR2-000295) (emphasis added). Yet at the leasing stage, the Forest Service again seeks to punt to a later development phase. In the Leasing SFEIS, the Agencies do not acknowledge the Forest Service's earlier statement or explain why the Forest Service abandoned its prior conclusion that leasing is the appropriate stage to evaluate a methane flaring alternative. "An agency may not … depart from a prior policy sub silentio…." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).

EPA, in commenting on the earlier Exception SDEIS, stated that "consideration of these important mitigation measures," including flaring, "is an appropriate subject for this SDEIS," noting that the Forest Service "has discretion to condition leases on [its] land." EPA Exception Comment (Feb. 8, 2016), at 3 (CRR2-103904). EPA also disagreed with the Forest Service's statement that it need not address methane mitigation, even at that earlier, rulemaking stage:

> "because critical design criteria that bear upon the feasibility of such capture mitigation are too speculative at this time" (SDEIS, p. 9). EPA disagrees with this

> [Forest Service] characterization of the state of knowledge. All coal mines in the North Fork Coal Mining Area are well informed about methane capture systems, as they all deploy gas drainage systems to supplement their ventilation fans. In fact, representatives of West Elk Mine and Elk Creek mines have given presentations describing their gas drainage and use activities at past EPA Coalbed Methane Outreach Program (CMOP) events….

EPA Exception Comment (Feb. 8, 2016), Detailed Comment Attachment at 3 (CRR2-103909).

The Agencies also state that any flaring proposal would first require the Mine Safety and Health Administration (MSHA) to undertake a "thorough review of a proposed flaring system Agencies of their NEPA obligations. The Agencies specifically decline to state whether engineering or other factors would render methane flaring "infeasible." Leasing SFEIS at 971 (FSLeasingII-001099). Indeed, the Agencies admit that MSHA already "has a process in place to analyze the safety aspects of any [flaring system] designs," Leasing SFEIS at 60 (FSLeasingII-000189), and ample record evidence indicates flaring can be safely done. The State of Colorado in 2016 concluded that a "[a] properly engineered, manufactured, and operated flare with redundant safety systems can fully address [safety] concerns" at working mines. State of Colorado, Coal Mine Methane in Colorado (Mar. 2016), at 14 (FSLeasingII-037314). The Elk Creek mine across Highway 133 from West Elk employs a flare at its closed coal mine. Id. Flares at working mines in the U.K., Australia, and other countries have operated for years. See EPA, Coalbed Methane Extra, "MINOSA Successfully Deploys First CMM Flares in Mexico" (2013), at 2 (FSLeasingII-037014); HCCA July 2017 Leasing Ltr. at 32–34 (FSLeasingII-038950–52). The record contains no evidence of an accident due to flaring at any mine.

Finally, this case is distinguishable from WildEarth Guardians v. U.S. Forest Service, 828 F. Supp. 2d 1223 (D. Colo. 2011), in which this Court declined to set aside the Forest Service's refusal to consider a methane flaring alternative for a prior West Elk mine plan more than seven

43

years ago. There, the Forest Service consulted with MSHA on the feasibility of methane flaring, but MSHA concluded that, at that time, there were still "too many questions remaining unanswered" regarding miner safety for MSHA to approve flaring at the mine. Id. at 1237. Under those specific circumstances, and based largely on MSHA's statement that as of February 2008 it could not approve flaring based on unresolved safety concerns, the court held that the Forest Service appropriately deemed flaring "impractical." Id. Here, years later, there is additional evidence from the U.S., abroad, and across the highway that flaring operations are safe; and, apparently, MSHA has not expressed concerns about flaring's feasibility here. A methane flaring alternative is reasonable; it is technically feasible; and it could be accomplished safely while achieving environmental benefits. The Forest Service's refusal to consider an alternative requiring methane capture as a condition of mining under public lands is arbitrary.

## CONCLUSION AND REQUEST FOR RELIEF

Under the APA, courts "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious ... or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Forest Guardians v. Babbitt, 174 F.3d 1178, 1187–88 (10th Cir. 1999) (as used in the APA, "shall means shall") (quotation omitted). Accordingly, the normal remedy under the APA is to vacate unlawful agency action and remand to the agency to act in compliance with its legal obligations. See, e.g., WildEarth Guardians, 870 F.3d at 1239 ("Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts"); Cal. Wilderness Coal. v. U.S. Dep't of Energy, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's clear

mandate the appropriate remedy is to vacate that action"); id. at 1106 (vacating agency action for NEPA violation).[27]

This Court previously, and properly, vacated prior versions of the Colorado Roadless Rule exception, Lease Modifications, and exploration plan where it found NEPA violations. High Country II, 67 F. Supp. 3d at 1264–67. This Court should do the same here. Conservation Groups respectfully request that this Court vacate the agency decisions adopted in violation of NEPA, including: (1) the Forest Service's decision to consent to the Lease Modifications; (2) BLM's Lease Modifications; (3) the Colorado Roadless Rule North Fork Coal Mining Area exception. Because BLM's decision approving the Exploration Plan for the Sunset Roadless Area is invalid in the absence of a valid lease, and in the absence of a valid exception to the Colorado Roadless Rule, the Exploration Plan must also be vacated.

If the Court finds for Conservation Groups on any of the claims, we request the Court provide an opportunity for additional briefing on remedy.

Respectfully submitted April 4, 2018,

/s/ *Edward B. Zukoski*

| Edward B. Zukoski | Mary Emily Splitek |
| Earthjustice | Earthjustice |
| 633 16th Street, Suite 1600 | 633 16th Street, Suite 1600 |
| Denver, CO 80202 | Denver, CO 80202 |
| (303) 623-9466 | (303) 966-9613 |
| Fax: (303) 623-8083 | Fax: (303) 623-8083 |
| tzukoski@earthjustice.org | esplitek@earthjustice.org |

Attorneys for Plaintiffs High Country Conservation Advocates, et al.

---

[27] While the Tenth Circuit in WildEarth Guardians declined to vacate coal leases after it held agencies violated NEPA, it did so in part due to facts not present here: the district court had not addressed remedy, and the lease-holder had started mining the leases. 870 F.3d at 1239–40.

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2018, I filed the foregoing **PLAINTIFFS' AMENDED OPENING BRIEF ON THE MERITS** and exhibits with the Court's electronic filing system, thereby generating service upon the following parties of record:

Michael Drysdale
DORSEY & WHITNEY LLP
50 South Sixth Street, Ste. 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-5652
Facsimile: (612) 340-8800
Email: drysdale.michael@dorsey.com

Attorneys for Mountain Coal Company

Scott P. Sinor
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202
Telephone: (303) 629-3400
Facsimile: (303) 629-3450
Email: sinor.scott@dorsey.com

John S. Most, Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-3353
Email: john.most@usdoj.gov

Counsel for Federal Defendants

*/s/ Edward B. Zukoski*

# TABLE OF EXHIBITS

Exhibit 1.    Declaration of Jeremy Nichols (Mar. 22, 2018)

Exhibit 2.    Declaration of Allison Melton (Mar. 16, 2018)

Exhibit 3.    Declaration of Matt Reed (Mar. 15, 2018)

Exhibit 4.    Declaration of Peter Hart (Mar. 15, 2018)

Exhibit 5.    Forest Service, Lease Modifications SFEIS (Aug. 2017), Map of Alternative B (CRR2-000023)

Exhibit 6.    Earthjustice, Map, Elk (Jan. 11, 2016) (CRR2-0155745)

Exhibit 7.    Earthjustice, Map, Mule Deer (Jan. 11, 2016) (CRR2-0155747)

Exhibit 8.    Earthjustice, Map, Bald Eagle (Jan. 11, 2016) (CRR2-0177636)

Exhibit 9.    Earthjustice, Map, Gunnison Sage Grouse (Jan. 11, 2016) (CRR2-0155751)

Exhibit 10.   EPA Status Report, West Virginia v. U.S. EPA, Dkt. No. 15-1363 (D.C. Cir. 15-1363), Doc. #1708422 (Dec. 11, 2017)

Exhibit 11.   Order, West Virginia v. U.S. EPA, Dkt. No. 15-1363 (D.C. Cir. 15-1363), Doc. #1720228 (Mar. 1, 2018)