**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-3025-PAB

HIGH COUNTRY CONSERVATION ADVOCATES, et al.,

      Plaintiffs,

v.

UNITED STATES FOREST SERVICE, et al.,

      Federal Defendants, and

MOUNTAIN COAL COMPANY, LLC,

      Defendant-Intervenor.

_____

**PLAINTIFFS' REPLY BRIEF ON THE MERITS [Reply to ECF Nos. 51 & 52]**
_____

      Conservation Groups' opening brief shows that Federal Defendants' ("Agencies'") interconnected decisions approving the Colorado Roadless Rule coal mine exception ("Exception") and two lease modifications that together grant intervenor Mountain Coal Company ("MCC") the right to bulldoze roads and scrape drill pads within the forested Sunset Roadless Area violate the National Environmental Policy Act (NEPA). Because none of the arguments made by the Agencies or MCC to excuse the Agencies' NEPA violations have merit, the decisions must each be set aside.

**I.      CONSERVATION GROUPS' CLAIMS ARE NOT MOOT.**

      This Court should reject MCC's argument (not joined by the Agencies) that Conservation Groups' claims related to exploration and lease modification are moot. MCC is incorrect that

"Plaintiffs have failed to maintain … continuing interest in the subject lands," MCC Br. 1 (ECF 52), and that the declarants' "interest in re-visiting the lease modification areas has been extinguished." Id. at 10. This novel argument is not supported by law, relies on a selective misreading of Conservation Groups' declarations submitted in support of the motion for a temporary restraining order (ECF 14-1 to 14-9) ("TRO declarations"), and ignores clear statements averring intent to return to the area in each of the declarations submitted with Conservation Groups' merits brief (ECF 47-1 to 47-8) ("merits declarations").

MCC offers no law to support its position that Conservation Groups' declarants should be dismissed as "not credible." MCC Br. 13. In fact, the law dictates that for the purpose of determining Article III standing, a plaintiff's affidavit evidence "will be taken to be true." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); accord Comm. to Save the Rio Hondo v. Lucero, 102 F.3d 445, 449–50 (10th Cir. 1996). MCC quotes selectively from the TRO declarations, while ignoring language that provides ample context, in an attempt to fabricate an alleged inconsistency between the declarants' TRO and merits declarations. No such discrepancy exists. MCC disregards the fact that each TRO declaration attests to the harm suffered due to exploration and mining, and each declarant expressly states that they plan to use the area throughout the span of the proposed mining operations.[1] Moreover, Conservation Groups' merits

---

[1] See Nichols TRO Decl. ¶ 19 (ECF 14-2) (explaining enjoyment of Section 11 of Lease Modifications area, where exploration has not occurred to date (accord Norris Second Decl. at 4 (map) (ECF 52-1)), and noting "[i]f Arch Coal begins road construction in this area, it will ... diminish my enjoyment of future recreation"); id. ¶ 31 (ECF 14-3) (explaining harms from "Coal Lease Modifications" and noting that "[i]f these activities occur in the Sunset Roadless Area, they will substantially and irreparably impair my recreational enjoyment of the area ... when I visit in the future"); id. ¶ 32 ("The impacts of methane venting ... will significantly diminish my recreational enjoyment of this area and make it less likely that I will visit in the future."); Melton TRO Decl. ¶ 39 (ECF 14-4) (explaining wildlife impacts stemming from "construction

declarants each expressly avows to return.[2]

Additionally, the availability of relief which will prevent additional injury prevents mootness. Airport Neighbors All., Inc. v. United States, 90 F.3d 426, 429 (10th Cir. 1996). Here, further relief is available, as this Court could preclude Phase 2 exploration and years of mining, road building, tree-clearing, and venting that will occur under the lease modifications.[3]

---

associated with the exploration activities and coal mining of the lease modifications" and stating that "[a]s a result, I will be less likely to encounter ... animals on my future visits") (emphasis added); id. ¶ 40 (explaining that three years of methane venting and VOC emissions "worsen smog, further threaten my health, the forests ... and my ability to enjoy the scenic vistas"); id. ¶ 41 (noting three years of mining and stating that "continued impacts will harm my enjoyment of the roadless area"); Reed TRO Decl. ¶ 10 (ECF 14-8) (averring he is less likely to return if "bulldozing, pad construction, drilling, vehicle use, noise, dust, and increased human presence associated with the coal lease expansion and development, and in particular, the construction of roads and pads proposed in Arch Coal's exploration plan, occur") (emphasis added); Hart TRO Decl. ¶ 13 (ECF 14-9) (not limiting harms to exploration, explaining that the "Sunset Roadless Area and the Lease Modification areas … are important to me" and averring intent to return "next summer if the area hasn't been bulldozed for new road and pad construction").

[2] See Nichols Merits Decl. ¶ 31 (ECF 47-1) (discussing harms from mining and exploration and noting that "[i]f these harms occur ... I will not be able to enjoy the scenery as much as I do now ... when I visit in the future"), id. ¶ 32 (methane venting during mining "will significantly diminish my recreational enjoyment of this area and make it less likely that I will visit the area in the future"); Melton Merits Decl. ¶ 39 (ECF 47-2) ("I plan to visit and use the lands within the Sunset Roadless Area within and near the Lease Modifications and Exploration Plan area[s] in between mid-summer and early fall 2018."), id. ¶ 42 (detailing harms she expects to suffer "on ... future visits"), id. ¶ 45 (explaining that "additional harm will be caused due to mining activities" over the three years of proposed mining for lease modifications, and concluding that "[t]hese continued impacts will harm my enjoyment of the roadless area"); Reed Merits Decl. ¶ 12 (ECF 47-7) (stating that he will be less likely to visit the area if harms from "coal lease expansion" and the "exploration plan" occur); Hart Merits Decl. ¶ 38 (ECF 47-8) ("I plan to return [to Sunset Roadless Area] next summer if the area hasn't been completely destroyed.").

[3] Phase 2 exploration has not occurred. Norris Second Decl. ¶ 3 (ECF 52-1). Thus, even if MCC was correct, which it is not, that Conservation Groups' declarants unequivocally disavowed any intent to return to the area once exploration was complete, MCC's argument would fail because relief could still be granted that would prevent harm from Phase 2 of exploration.

This Court should reject MCC's invitation to create new law, unsupported by persuasive precedent, and ignore the sworn merits declarations. Conservation Groups' claims are not moot.

## II.  THE FOREST SERVICE'S ADOPTION OF THE NORTH FORK COAL MINING AREA EXCEPTION RULE VIOLATED NEPA.

### A.  The Exception SFEIS Fails to Consider a Reasonable Alternative to Protect the Pilot Knob Roadless Area from Road Construction.

1.  Agencies' Failure to Consider the Pilot Knob Alternative Violates NEPA.

The Forest Service violated its duty to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14, by arbitrarily failing to analyze the Pilot Knob alternative. "The existence of a viable but unexamined alternative renders an alternatives analysis, and the [NEPA analysis] which relies upon it, inadequate." Diné Citizens Against Ruining Our Env't v. Klein, 747 F. Supp. 2d 1234, 1256 (D. Colo. 2010). This alternative meets the Exception's purpose and need by "not foreclosing opportunities" for coal mining by opening most of the 19,700-acre Exception area for mining, while "conserving" Pilot Knob's roadless landscape values. CRR2-11. This balancing is at the heart of the Exception SFEIS because that analysis disclosed, for the first time, the climate pollution costs of opening the areas to mining.

Defendants provide a number of excuses, all arbitrary, for dismissing the Pilot Knob alternative. First, the Exception SFEIS states that the Pilot Knob alternative was eliminated from study because it would prevent "access to coal resources" and foreclose "coal exploration and development opportunities." CRR2-29. This is arbitrary. The Pilot Knob alternative is entirely consistent with Exception's purpose to provide mining opportunities because it provides access to 128 million tons of coal. See CRR2-105827. While the Agencies argue that another firm might someday mine coal in Pilot Knob in place of the now-closed Elk Creek mine, Fed. Br. 17

(ECF 51),[4] that does not make reasonable the Forest Service's decision to dismiss the Pilot Knob alternative. The Forest Service cannot take the position that the alternative fails to meet the project's purpose and need because the Exception SFEIS fully analyzed one plan, Alternative C, which provides access to far less coal than the Pilot Knob alternative. See Op. Br. 12–13 (ECF 47). For the same reason, Agencies' suggestion that some portion of all three roadless areas must be open to roads "precisely because they contain coal resources," Fed. Br. 17, is arbitrary. The goal of the Exception was to both conserve areas of natural value and make coal available. See CRR2-11. The Pilot Knob alternative would achieve both goals.

Second, the Agencies suggest that an alternative protecting Pilot Knob "would accomplish little from an ecologic standpoint" because the area is leased for oil and gas. Fed. Br. 16. This is a *post hoc* invention of counsel which the Court should disregard. See Colo. Envtl. Coal. v. Salazar, 875 F. Supp. 2d 1233, 1249–50 (D. Colo. 2012) (rejecting agency's *post hoc* rationalization for dismissing alternative consistent with project's purpose). The agency did not rely on this excuse in the record and cannot do so here. Further, protecting Pilot Knob would provide an ecological benefit. That the Pilot Knob area's flora and fauna may be vulnerable to damage from oil and gas drilling does not diminish existing natural values, nor does it prevent the Forest Service from considering protecting those values from arguably more damaging impacts, including the network of roads and pads needed for coal mining. See Op. Br. 16.

MCC advances its own *post hoc* rationalization, arguing that the Pilot Knob alternative is

---

[4] The Forest Service did not mention the Elk Creek mine by name in dismissing the Pilot Knob alternative. See CRR-29. If keeping Elk Creek or a replacement mine there open to development was part of the agency's purpose and need, the Forest Service did not say so.

"not significantly distinguishable from Alternative C," and so the Forest Service reasonably decided not to analyze it. MCC Br. 16. The Exception SFEIS does not use this rationale for dismissing the alternative. Further, the Pilot Knob alternative is "significantly distinguishable" from Alternative C. New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 708–09 (10th Cir. 2009) (New Mexico). The Pilot Knob alternative would protect different areas with unique resources, while allowing access to 40 percent more coal than Alternative C. Op. Br. 12. As MCC admits, MCC Br. 16, this alternative balances conservation and access to coal differently than Alternative C; that is why the Forest Service should have considered it.

MCC's contradictory argument that the Forest Service need not consider the Pilot Knob alternative because it is less protective than Alternative C also fails. MCC Br. 16 (citing New Mexico, 565 F.3d at 710–11). This misreads New Mexico, which faulted the agency for not considering a "significantly distinguishable" alternative that protected a "portion of the overall plan area." Id. at 711. New Mexico did not create a rule that a court will only find unreasonable agency rejection of an alternative when the agency fails to consider an alternative more protective than the others considered.

Finally, MCC argues that, in declining to consider protecting Pilot Knob, the Forest Service "did not foreclose detailed consideration of the environmental impacts should there be some future" mining proposal, since the Exception decision does not authorize roadbuilding. MCC Br. 16. This rationale would support barring consideration of all but the "open everything" alternative, an arbitrary result. See Op. Br. 13. Further, the Pilot Knob alternative provides certain protection from mining now, not the mere possibility of such protection later. See id.

In sum, the Pilot Knob alternative is a reasonable, middle-ground alternative, Defendants' *post hoc* rationalizations notwithstanding. And, contrary to MCC's assertions, any Pilot Knob deficiencies are not severable. See Diné Citizens, 747 F. Supp. 2d at 1256 (failure to consider a reasonable alternative renders NEPA analysis inadequate). Without an accurate picture of the tradeoffs involved in opening up some areas to coal exploration, while protecting other areas, the Forest Service could not make an informed decision. This renders its decision arbitrary in its entirety. See Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971) (robust alternatives analysis ensures "that the most intelligent, optimally beneficial decision will ultimately be made").

2.      Claim Preclusion Does Not Bar Conservation Groups' Pilot Knob Claim.

The Agencies' charge that the Conservation Groups' Pilot Knob claim is barred by *res judicata*, or claim preclusion, because the Groups could, and should, have brought this claim in High Country Conservation Advocates v. U.S. Forest Serv., 52 F. Supp. 3d 1174 (D. Colo. 2014) (HCCA I). "Under Tenth Circuit law, claim preclusion applies when three elements exist: (1) a final judgment on the merits in an earlier action; (2) identity of the parties [or privies] in the two suits; and (3) identity of the cause of action in both suits." MACTEC, Inc. v. Gorelick, 427 F.3d 821, 831 (10th Cir. 2005). The party asserting claim preclusion "must carry the burden of establishing all necessary elements." Taylor v. Sturgell, 553 U.S. 880, 907 (2008). The Agencies' six-sentence argument, Fed. Br. 13–14, fails to do so.

The Agencies admit that they do not establish an identity of parties in HCCA I and this case, because neither Center for Biological Diversity nor Wilderness Workshop, plaintiffs here,

took part in the earlier suit. Fed. Br. 13, n.6; Am. Compl. (ECF 39).[5]

Further, this suit and HCCA I are based on different causes of action. "[A] cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." Nwosun v. Gen. Mills Rests., Inc., 124 F.3d 1255, 1257 (10th Cir. 1997) (citations omitted). Conservation Groups' claims do not challenge the same transaction or event as the HCCA I case, but a new one: the Forest Service's decision to adopt the vacated Exception. The Exception had a narrow, "specific purpose and need," see CRR2-11 (emphasis added), different from that of the 2012 FEIS. CRR-154037. The Exception SFEIS weighed the impacts of opening a 19,700-acre area for road building for coal mining, not a range of options for managing over 4 million acres as in the Colorado Roadless Rule 2012 EIS. The Exception process included a new proposal, a new draft and final EIS, a new set of alternatives considering which areas would be open or closed to mine roads, a new decision, and a new record. The Exception decision thus represents a different "transaction." See Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 211 (4th Cir. 2009) (finding no claim preclusion where second case challenged new agency action). Importantly, the 2016 Exception SFEIS and record contain new data relevant to the Pilot Knob alternative: the closure of the only mine operating near Pilot Knob. CRR2-36. Further, a purpose of the 2016 Exception analysis was to consider the climate impacts of allowing coal mining (which the 2012 FEIS failed to do); the Pilot Knob alternative puts the tradeoff between climate pollution and roadless protection in sharp relief.

---

[5] Courts are "not able to find privity merely on the basis that all the plaintiffs are environmental groups." Or. Nat. Desert Ass'n v. Green, 953 F. Supp. 1133, 1149 (D. Or. 1997).

3.    <u>Conservation Groups Did Not Waive Their Alternatives Claim.</u>

Defendants' argument that Conservation Groups waived their alternative claim also fails.

Fed. Br. 14–16, MCC Br. 13–15. Claims are considered waived when plaintiffs fail to exhaust

administrative remedies. <u>Forest Guardians v. U.S. Forest Serv.</u>, 641 F.3d 423, 430 (10th Cir.

2011). To avoid waiver, claims must be presented "in sufficient detail to allow the agency to

rectify the alleged violation" before the violation is raised in court. <u>Id.</u> (citation omitted). The

Groups did not waive their claim because they gave the agency detailed notice, submitting

written comments seeking analysis of the alternative. CRR2-6402, 6474–75 (2015 comments);

CRR2-105736, 105826–31 (2016 comments on supplemental draft EIS).

Defendants urge that Conservation Groups can only press their alternative claim against

the <u>2016</u> rulemaking if they raised the issue in the <u>2012</u> rulemaking. This misperceives the nature

of the 2016 Exception review. This court declined to remand and instead vacated the 2012

Exception. <u>High Country Conservation Advocates v. U.S. Forest Serv.</u>, 67 F. Supp. 3d 1262,

1266–67 (D. Colo. 2014) (<u>HCCA II</u>). The agency decision at issue in 2016 was whether or not to

reinstate the revoked Exception, and if so, which areas to apply it to. The Exception, its impacts,

and alternatives to it were thus squarely at issue in the new analysis. And because the <u>HCCA I</u>

decision found the Forest Service failed to address the climate pollution impacts of coal mining,

the Exception SFEIS puts in focus the tradeoffs at stake. The Pilot Knob alternative offers one

way to calibrate those tradeoffs.

None of Defendants' precedent supports a finding of waiver. The cases Defendants cite

involve a specific and narrow remand (either to a lower court, an agency, or an appellate board)

and litigants seeking to bring claims outside the scope of the ordered remand.[6] Here, the HCCA

II court specifically declined to issue a remand, let alone a specific one; it vacated the Exception,

leaving it to the Forest Service to determine whether or not to take any subsequent action. The

Pilot Knob alternative addresses whether certain lands within the Exception should be open to

coal mining, an issue fully within the scope of the Forest Service's new analysis. Further, unlike

in West Virginia, 362 F.3d at 871–72, here the Forest Service "explicitly … reopened" the issue

of alternatives by considering in detail a new alternative (Alternative C) not analyzed in the 2012

Colorado Rule EIS. See supra at 5–6. The Groups' Pilot Knob claim is thus not waived.

### B.      The Forest Service Failed to Provide Key Data About Existing Resources in the Exception Area and to Analyze Impacts to Those Resources.

The Exception analysis focuses on 19,000 acres to be opened to road building for coal

mining, a far narrower area than the 4 million acres analyzed for the 2012 Colorado Roadless

Rule. Yet the Exception SFEIS fails to provide data on the specific resources in this narrower

area. NEPA requires "'sufficient detail to foster informed decision-making' at the stage in

question." Native Vill. of Point Hope v. Jewell, 740 F.3d 489, 498 (9th Cir. 2014). It also

---

[6] See United States v. Parker, 101 F.3d 527, 528 (7th Cir. 1996) (holding, in the context of an appeals court remand of sentencing matter, that "[i]f the opinion identifies a discrete, particular error that can be corrected on remand without the need for a redetermination of other issues, the district court is limited to correcting that error."); Avello v. SEC, 454 F.3d 619, 627 (7th Cir. 2006) (holding that when an agency voluntarily remanded a case from federal court to an administrative appeals council to address specific errors, alleged violator could not re-open the entire matter before the appeals council to raise new defenses); West Virginia. v. EPA, 362 F.3d 861, 869, 872 (D.C. Cir. 2004) (finding waiver where court "instructed the EPA" to provide specific information on remand, and because EPA did not "explicitly or implicitly reopen[] the issue" underlying plaintiffs' new claims in remand proceedings) (citation omitted); South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior, No. 3:08-cv-00616-LRH-WGC, 2012 WL 13780, at *2, *4–*5 (D. Nev. Jan. 4, 2012) (finding waiver where district court did not vacate agency decision, but issued injunction requiring agency to address specific issues in a SEIS, and where plaintiff raised claims outside the scope of issues identified in the injunction).

requires "[a]gencies [to] integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values." 40 C.F.R. § 1501.2. The Exception SFEIS does not contain the required level of detail. The Agencies argue that the 2012 Colorado Rule FEIS remedies this failure, Fed. Br. 20–22, and that such detail is not required at this stage of the decision-making process, Fed. Br. 22–23. MCC joins Agencies in this second argument, while also arguing that the Agencies' 2016 analysis was adequate. MCC Br. 17–18. None of these arguments has merit.

The Agencies fail to identify analysis in the 2016 Exception SFEIS that provides meaningful data on the Exception area's baseline wildlife and water conditions. The Agencies cite analysis from the 2012 Colorado Rule FEIS, Fed. Br. 20–22, but that data provides virtually no accounting of the values of the three discrete roadless areas that comprise the Exception area. Without such data, it is impossible to understand the tradeoffs in protecting one area (or parts of areas, as in Alternative C) versus another, subverting NEPA's hard look mandate.

Recognizing that this information is lacking, the Agencies assert it is Conservation Groups' burden to demonstrate how "differences in habitat" would "alter the agency's analysis in any meaningful way." Id. at 21. NEPA does not require this of plaintiffs. NEPA requires agencies to disclose what values exist, and then assess possible impacts to those values. An agency cannot disclose tradeoffs among alternatives if it does not know the values impacted by each alternative. Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988) ("Without establishing the baseline conditions which exist in the [area] ... there is simply no way to determine what effect the [action] will have on the environment and, consequently, no way to comply with NEPA."). Here, to understand how roads and drilling pads

may impact the three roadless areas, the Forest Service must disclose the habitat and wetland

values that may be harmed. The Groups provided the agencies with maps showing many of the

values at risk within the Pilot Knob area. See Op. Br. 12, and Exs. 6–9 (ECF 47-10 to 47-13)

(wildlife habitat maps). And the agency itself knew the location of wetlands in the Exception

areas, see Op. Br. 17 n.9, but nonetheless refused to analyze impacts to these resources.

The Agencies also excuse their failure to disclose resource data about the 19,000-acre

Exception area by stating that "site-specific" analysis is not required at the rulemaking stage.

Fed. Br. 22–23; see also MCC Br. 18–19. Whether such analysis is "site-specific" is beside the

point. NEPA mandates that the Forest Service disclose adequate information so that the public

and decision-maker can assess baseline conditions to understand what is at stake. This baseline

data is necessary to informed decision-making at this stage. See Point Hope, 740 F.3d at 498. It

is also required to understand the trade-offs between opening to construction, or protecting, lands

within the Exception area. This is why baseline data errors are not severable, as MCC suggests.

MCC Br. 19. Trade-offs are at the heart of the Forest Service's decision here, and if the agency

does not know what values are at stake, it cannot possibly make an informed decision.[7]

### C.   The Forest Service Failed to Analyze Adequately the Climate Impacts of Adopting the Exception Rule.

The Forest Service failed to take a "hard look" at a foreseeable impact of adding 172

---

[7] Agencies argue that Conservation Groups' baseline data claim is also barred by claim preclusion and waiver. Fed. Br. 18–19. These attacks fail for the same reason as the agency's attack on the Pilot Knob claim. Again, the Agencies cannot demonstrate claim preclusion because the plaintiffs in the two cases differ and are not in privity, and this suit and HCCA I are based on different transactions. See supra at 7–10. The Exception SFEIS's narrower focus makes baseline data on the three roadless areas necessary. Further, the Groups did not waive this claim; they provided written comments on the Exception SFEIS seeking disclosure of baseline data. CRR2-105736, 105749–71 (2015 comment); CRR2-6402, 6411–16 (comments on draft EIS).

million tons of coal to the market: the induced electric demand that will be caused by lower electricity prices, which will, in turn, lead to more (unaccounted for) climate pollution. NEPA requires federal agencies to fully assess the "reasonably foreseeable" impacts of their decisions. 40 C.F.R. § 1508.8(b). The Agencies argue that due to uncertainties in the coal market, increased demand for electricity is not a reasonably foreseeable result of making more coal available. Fed. Br. 24–26. However, the agency's own modeling shows otherwise.

There are two economic phenomena at play here: price elasticity of demand for <u>coal</u>, which describes the relative change in demand for coal due to its price, CRR2-251; and price elasticity of demand for <u>electricity</u>, which describes the relative change in demand for electricity due to its price, CRR2-155930. Defendants focus on the price elasticity of coal, contending that because coal demand is price "inelastic," increased demand for electricity is not likely to occur. Fed Br. 23–26; MCC Br. 19–21. However, whether coal demand is inelastic is beside the point. It is not true that in order for induced electricity demand to occur, demand for coal must be price-elastic. The necessary precursor to induced electricity demand is <u>lower electricity prices</u>, which is <u>precisely</u> what the Forest Service's modeling predicts will result from putting more North Fork coal on the market. <u>See</u> CRR2-105 (predicting "domestic power generation cost savings"—i.e., lower electricity costs—for consumers). In fact, the agency predicts that costs would decrease by as much as $784 million if additional North Fork coal is put on the market. CRR2-127 (Table 3-30) (estimating "discounted benefits" at 3% discount rate).

The Agencies do not dispute that the Exception SFEIS predicts that adding 172 million tons of North Fork coal to the market will lower electricity costs. Those lower costs are precisely what induces increased electricity demand, according to Dr. Power, an expert on economic

modeling. Op. Br. 22. Induced electricity demand is thus a reasonably foreseeable consequence of the cheaper electricity which will result from adopting the Exception. The Agencies assert that the Forest Service deserves deference with respect to its conclusions that induced electric demand is not foreseeable. Fed Br. 26. But because this conclusion conflicts with the agency's own modeling, its conclusion is arbitrary and capricious and deserves no deference.

The Forest Service failed to examine the reasonably foreseeable impacts of induced electricity demand, and thus has failed to account for all of the climate costs of its decision to reinstate the coal mining Exception, violating NEPA's "hard look" mandate.

## III.   THE AGENCIES FAILED TO TAKE A HARD LOOK AT THE CLIMATE IMPACTS OF THE LEASE MODIFICATIONS.

### A.   The Lease Modifications SFEIS Fails to Disclose Climate Impacts.

Defendants do not dispute that NEPA requires agencies to disclose the climate impacts of their actions. See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1217 (9th Cir. 2008); Op. Br. 25. Nor do they dispute that the Agencies here did exactly what the courts in HCCA I and Montana Environmental Information Center (MEIC) held did not comply with NEPA: merely reporting the volume of pollution attributable to mining and burning the coal at issue, and disclosing the impacts of climate change generally, without disclosing the climate impacts of this decision. See HCCA I, 52 F. Supp. 3d at 1190; Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining, 274 F. Supp. 3d 1074, 1096–99 (D. Mont. 2017). This is not the hard look NEPA requires. An "extensive qualitative discussion" of climate change, MCC Br. 23, while helpful to understanding the environment in which an action occurs, says nothing about an

action's climate impacts.[8] Merely counting the volume of greenhouse gas (GHG) emissions, Fed. Br. 28, discloses little about impacts.

The HCCA I court noted that a tool is available to disclose the Lease Modifications' climate impacts—the social cost of carbon—and held that the Agencies violated NEPA by failing to either use that tool or to provide a reasonable basis for not doing so, particularly where the Agencies prepared half of a cost-benefit analysis by monetizing the project's benefits but ignoring its climate costs. HCCA I, 52 F. Supp. 3d. at 1191. In their 2017 analysis, the Agencies did not employ the social cost metric, nor did they provide a reasonable basis for not doing so.

Defendants argue that the Agencies may undertake what amounts to a lopsided cost-benefit analysis—monetizing the leases' economic impacts but not their climate harms—because NEPA does not mandate cost-benefit analysis. Fed. Br. 30; MCC Br. 25. They contend that some impacts may be better described qualitatively. Id. But NEPA was not designed to suppress helpful comparisons between impacts and benefits; it "bring[s] environmental factors to peer status with dollars … in [agency] decision making." Envtl. Def. Fund, Inc. v. U.S. Army Corps of Eng'rs, 492 F.2d 1123, 1133 (5th Cir. 1974). Failing to disclose climate impacts while tallying coal's economic costs subverts this goal.

MCC contends that because "[m]any economic impacts are readily ascertainable and expressible in understandable dollar terms, ... [i]t would be uninformative and indeed silly not to disclose such dollar amounts." MCC Br. 25. This is exactly why the Agencies must use the social cost of carbon where the NEPA analysis discloses economic benefits. The social cost

---

[8] The pages in the Lease Modifications SFEIS string-cited by the Agencies discuss climate change generally, Fed. Br. 27, but do not address the Lease Modifications' climate impacts.

protocol was <u>designed</u> to make carbon pollution's impacts, otherwise difficult to describe,

readily ascertainable in dollar terms. <u>See</u> FSLeasingII-33667–69. Thus, it would be

"uninformative and silly" to <u>fail</u> to use that tool to disclose climate impacts. It would also be

arbitrary to do so where the leases' economic impacts (royalties, taxes, and the economic value

of mined coal) are disclosed in dollars. <u>See</u> Op. Br. 31. By zeroing out climate costs while

reporting economic "impacts," the Agencies make the same error that the <u>HCCA I</u> and <u>MEIC</u>

courts found violated NEPA. <u>See also</u> <u>Hughes River Watershed Conservancy v. Glickman</u>, 81

F.3d 437, 446–48 (4th Cir. 1996) ("[I]t is essential that the EIS not be based on misleading

economic assumptions."); <u>accord</u> <u>Johnston v. Davis</u>, 698 F.2d 1088, 1094–95 (10th Cir. 1983).

Defendants' allegation that disclosing the social cost of carbon would yield "misleading

results" because the Lease Modifications SFEIS does not quantify the alleged "social benefits"

of coal, Fed. Br. 31, lacks both merit and record support. The social cost of carbon, using peer-

reviewed models, meets NEPA's mandate to apply the "best available scientific information."

<u>Colo. Envtl. Coal. v. Dombeck</u>, 185 F.3d 1162, 1171 (10th Cir. 1999); Op. Br. 29–30. The

SFEIS discloses the economic value of coal while ignoring <u>any</u> climate costs, leading to a far

more "misleading result" than any failure to quantify whatever social benefits of coal, if any

beyond coal's economic value, the SFEIS may have omitted. The Agencies also provide no

support for their conclusory allegations about the alleged social benefits of coal, FSLeasingII-60,

and MCC's new arguments about such benefits, MCC Br. 28–29, are *post hoc* rationalizations

that cannot support the Agencies' conclusions.

Contrary to Defendants' argument, the weight of case law does not support the Lease

Modifications SFEIS's failure to disclose the social cost of carbon. Defendants cite no case

directly addressing the issue presented here: whether agencies can reasonably ignore the social

cost of carbon when the agencies monetize only the project's alleged benefits, effectively

presenting half of a cost-benefit analysis. EarthReports, Inc. v. FERC, 828 F.3d 949, 956 (D.C.

Cir. 2016);[9] WildEarth Guardians v. Jewell, No. 1:16-cv-00605-RJ, 2017 WL 3442922, at *13

(D.N.M. Feb. 16, 2017) (finding reasonable agency's decision declining to use social cost of

carbon, but not addressing whether declining to use social cost protocol resulted in misleading

analysis due to unfair comparison of costs and benefits); W. Org. of Res. Councils v. Bureau of

Land Mgmt., CV 16-21-GF-BMN, 2018 WL 1475470, at *14 (D. Mont. Mar. 26, 2018) (same).

The two cases that reach the issue—HCCA I and MEIC—both conclude that NEPA forbids a

blinkered analysis. This authority has the greater weight.[10]

Finally, the Agencies argue that disclosing the volume of GHG pollution but not that

---

[9] MCC's reliance on EarthReports to disparage the social cost metric is misplaced because that court misconstrued the protocol. The D.C. Circuit upheld FERC's failure to use the protocol where FERC alleged that: the protocol "does not measure the actual incremental impacts of a project on the environment"; there was no criteria for determining the significance of climate impacts; and there was no consensus about the appropriate discount rate. 828 F.3d at 956. This decision is poorly reasoned because: (1) the protocol was specifically designed to disclose damage caused by an incremental increase in climate pollution (see Op. Br. 33); (2) federal courts have long held that climate impacts must be disclosed, regardless of any significance criteria (see supra at 14); and (3) while varying discount rates, designed to capture and disclose uncertainty, FSLeasingII-33669, may result in a range of values for social cost calculations, "the value of carbon emissions reduction is certainly not zero," the value effectively assigned by ignoring social costs, Ctr. for Biological Diversity, 538 F.3d at 1200.

[10] MCC also points to the Council on Environmental Quality's NEPA guidance concerning greenhouse gases, MCC Br. 22, but that guidance "does not change or substitute for any law, regulation, or other legally binding requirement." CEQ Guidance at 1 n.3, available at https://bit.ly/2KpTpvd (Aug. 1, 2016) (last visited May 3, 2018) (withdrawn by 82 Fed. Reg. 16,576 (Apr. 5, 2017)). League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 19, 2014), is irrelevant; the ruling addresses the sufficiency of analysis concerning forest carbon storage.

pollution's impact is reasonable because climate impacts "are not well understood." Fed. Br. 29

(citing 2010 National Research Council study). This arbitrarily ignores that dollars are a well

understood metric that is readily comparable to coal leasing's alleged benefits. Further, the study

the Agencies cite was published in 2010, the same year the Interagency Working Group initially

developed the social cost of carbon; the former did not account for the latter. See FSLeasingII-

33666. Since then, the National Academy of Sciences concluded the social cost of carbon is

based on sound economic modeling, and supported continued use of the model. Op. Br. 29 n.15.

The HCCA I court held that where an agency discloses the economic impacts of coal

leasing, it should use the social cost of carbon or provide non-arbitrary reasons for declining to

do so. Here, the Agencies failed to do either.

**B.      The Agencies Cannot Rely on the Exception SFEIS's Social Cost Analysis.**

The Agencies assert that even if they must disclose the Lease Modifications' social cost

of climate pollution, they can rely on the social cost analysis in the Exception SFEIS. Fed. Br.

28. But that analysis assumed that the Clean Power Plan would limit coal plant pollution,

resulting in significantly reduced social cost predictions. Op. Br. 35–37. Because that assumption

was unreasonable by the time the Lease Modifications SFEIS and Records of Decision

("RODs") were prepared, the Agencies could not rely on the Exception analysis to disclose

climate costs.

All of the Agencies' and MCC's briefing on this point must be rejected as *post hoc*

rationalizations.[11] First, the Agencies argue that any change in the Clean Power Plan's status is

---

[11] Conservation Groups raised the issue of the Agencies' erroneous reliance on the Clean Power Plan in the Groups' comments on the leasing draft EIS and in objections to the Forest Service ROD. FSLeasingII-38919, 38926, 38968 (comments); FSLeasingII-36290–93 (expert report);

"mere flyspecking" because the social cost analysis itself "is not particularly meaningful or instructive ... at the project level." Fed. Br. 32. This hand-wave does not justify the Agencies basing its analysis on what it knows to be an inaccurate assumption concerning a controversial and significant impact. See Native Ecosystems Council v. U.S. Forest Serv., 418 F.3d 953, 964 (9th Cir. 2005) ("[A]n agency may not rely on incorrect assumptions or data in an EIS.").[12]

MCC similarly argues that the Exception SFEIS's assumption that the Clean Power Plan was in effect did not significantly impact the Agencies' social cost calculation because, MCC says, the market for North Fork coal is highly inelastic. MCC Br. 30. MCC's *post hoc* argument ignores both the Forest Service's own data and expert evidence. The Exception SFEIS itself concludes that there would be "reduced substitution between coal and those [cleaner] sources of energy" if one assumes Clean Power Plan implementation, as the Exception SFEIS's market model did. CRR2-124. Dr. Power's July 2017 report (to which the Agencies did not respond in the record, and which Defendants' briefing does not address) concluded that assuming the reality that the Clean Power Plan is not in effect "results in significantly greater GHG emissions, and so almost certainly a significantly greater social cost, than the Exception SFEIS predicts." FSLeasingII-36291. And while MCC alleges that inelasticity of demand for western coal is so

---

FSLeasingII-40796, 40806, 40870–71 (objections). The Agencies provided only one irrelevant response in the Lease Modifications SFEIS: "No court has found the 2016 reinstatement of the North Fork Coal Mining exception to be illegal." FSLeasingII-1131. The Forest Service's objection response did not address the Clean Power Plan. FSLeasingII-39128.

[12] The Agencies aver that relying on the Exception's social cost analysis to disclose the Lease Modifications' impacts is marred by uncertainty given the longer time-frame and larger volume of coal analyzed for the Exception, implying that whatever assumptions are made about the Clean Power Plan are irrelevant. Fed. Br. 32. But because the Agencies rely on the Exception's analysis to "inform" their decision, FSLeasingII-059, they cannot rely on a flawed analysis.

small that any increase in the social cost of carbon attributable to the lack of the Clean Power

Plan would negligible, MCC Br. 30–31, MCC ignores that the Forest Service concluded that the

addition of North Fork coal to the market would displace cleaner fuels even if the Clean Power

Plan were in effect, see CRR2-123, resulting in hundreds of millions, or even billions, of dollars

in climate costs. See CRR2-130 (Table 3-37, showing the Exceptions' net social cost is as high

as $3.4 billion). In the absence of the Clean Power Plan, the addition of North Fork coal will lead

to "significantly greater GHG emissions," meaning that the social costs predicted in the

Exception SFEIS are likely to rise by further hundreds of millions of dollars, hardly a

"flyspeck."[13]

MCC argues that the Clean Power Plan has not yet been repealed and "is likely to be

replaced," and so it was reasonable to assume that the Plan would remain in effect. MCC Br. 31.

It is telling that the Agencies do not join this argument. Doing so would require the Agencies to

contradict the administration's repeated commitments and actions to terminate the Plan, which

the administration has declared illegal and fought to prevent from taking effect. Op. Br. 37–38.

While MCC argues that the NEPA process "descends into chaos the moment agencies …

speculat[e] about future laws," MCC Br. 32, "[r]easonable forecasting and speculation is …

implicit in NEPA." Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n, 481 F.2d

1079, 1092 (D.C. Cir. 1973). Neither the Agencies nor MCC (nor the record) explain why in late

2017 the Agencies could reasonably forecast that a rule that was not in effect, and that this

---

[13] MCC also alleges that the Exception SFEIS "explained and qualified" the Clean Power Plan's impacts on the Forest Service's coal marketing analysis. MCC Br. 30, 31 (citing CRR2-236–38). But those "explanations" are irrelevant because they do not disclose or hint at the impacts of adding North Fork coal to the market in a world without the Clean Power Plan, as Dr. Power did.

administration had worked to stay and acted to ensure would never take effect, would regulate power plants in the future. The Agencies' reliance on the Exception's social cost analysis was thus arbitrary and capricious.

**IV.    THE LEASE MODIFICATIONS SFEIS FAILED TO CONSIDER IN DETAIL AN ALTERNATIVE TO REQUIRE MCC TO FLARE METHANE.**

**A.    The Agencies Violated NEPA by Failing to Analyze a Mandatory Methane Flaring Alternative.**

NEPA mandates both that agencies describe mitigation measures in detail, 40 C.F.R. § 1502.16(h), and that they consider all reasonable alternatives, 40 C.F.R. §§ 1502.1, 1502.14(a). These are distinct requirements. Here, the Agencies checked the first box by generally describing the flaring of vented methane, but failed to consider a reasonable alternative, proposed by Conservation Groups, that would require MCC to flare its vented methane pollution as a condition of mining publicly-owned coal beneath publicly-owned lands.

In arguing that the "Leasing SFEIS Reasonably Considered Flaring as One of Several Mitigation Measures," Fed. Br. 33, the Agencies misrepresent Conservation Groups' claim that the Agencies failed to analyze a mandatory flaring alternative.[14] See also Fed. Br. 35 (plaintiffs claim agencies violated NEPA "because they do not require MCC to consider or implement flaring as a mitigation measure."). The Agencies thus set up a strawman argument the Groups did not make. The Agencies violated NEPA by failing to "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a); Op. Br. 39–40.

---

[14] Leaving open the possibility of methane flaring in the future, Fed. Br. 35, is fundamentally different than requiring flaring as a condition of leasing. West Elk has operated for years with lease stipulations that do not preclude methane flaring, FSLeasingII-103–04, but has never instituted the practice.

In failing to address Conservation Groups' flaring alternative argument head-on, the Agencies concede crucial points. The Agencies do not deny that conditioning the coal lease on mandatory methane flaring meets the project's purpose and need and is within the Forest Service's authority to require. See Op. Br. 40. The Agencies drop the excuse, proffered in the Leasing FEIS, that they need not consider such an alternative because methane is not regulated under the Clean Air Act, see id. at 40–41, and they offer no justification for reversing course from the Forest Service's 2016 statement that "methane flaring is best considered at the leasing stage," see id. at 42. Although they suggest that more specific information could be provided in later analysis regarding ventilation plans, the Agencies do not state that the alternative is impractical because flaring is unsafe; indeed, the Lease Modifications SFEIS states that "[w]e do not speculate whether this method is infeasible or uneconomical." FSLeasingII-1100. Neither the Agencies nor MCC point to any evidence that methane flaring has caused a single accident at any working or closed coal mine anywhere in the world; they do not suggest that the Mine Safety and Health Administration flagged any safety concerns here; and they do not rebut the State of Colorado's conclusion that a properly-engineered flare can "fully address" safety concerns. Op. Br. 43–44. By failing to address these issues, the Agencies waived them. Silverton Snowmobile Club v. U.S. Forest Serv., 433 F.3d 772, 783 (10th Cir. 2006).

Although the Agencies and MCC clearly prefer to punt the evaluation of alternatives to other agencies, NEPA mandates the required analyses be conducted at "the earliest possible time." New Mexico, 565 F.3d at 707 (quoting 40 C.F.R. § 1501.2). And while federal agencies need not analyze alternatives that are "impractical," WildEarth Guardians v. Nat'l Park Serv., 703 F.3d 1178, 1183 (10th Cir. 2013), neither BLM nor the Agencies labelled methane flaring

"impractical" here. Instead, the Agencies merely defend the "propriety" of deferring

consideration of methane flaring for what they vaguely deem the "best" outcomes. Fed. Br. 34.

But as the Agencies admit, "[n]either the BLM nor the [Forest] Service is involved in [later]

aspect[s] of the decision-making process." Fed. Br. 34. The fact that more data might be

available to other agencies later does not relieve the Agencies of their NEPA obligations now.[15]

MCC is on even shakier ground, asserting that Conservation Groups do not explain why

methane flaring "cannot be more adequately studied at the later permitting and mine-planning

stages." MCC Br. 36. This is not the legal standard. NEPA "is designed to require

[environmental] analysis as soon as it can reasonably be done," New Mexico, 565 F.3d at 708

(quoting Kern v. BLM, 284 F.3d 1062, 1072 (9th Cir. 2002)), and the cases MCC cites are

inapposite. MCC Br. 36. Here, unlike plaintiffs in San Juan Citizens Alliance and Northern

Alaska Environmental Center, Conservation Groups are not challenging the Agencies' failure to

adequately describe the effectiveness of mitigation measures. San Juan Citizens All. v. Stiles,

654 F.3d 1038, 1054 (10th Cir. 2011) (alleging NEPA violation because agency merely "listed

general mitigation measures and did not analyze the effectiveness of each measure"); N. Alaska

Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 979 (9th Cir. 2006) ("Plaintiffs also argue that the EIS

did not describe and discuss mitigating measures as required by NEPA."). Although MCC argues

an alternative must be economically feasible to a project applicant to be considered under NEPA

---

[15] The mine currently removes methane via venting for miner safety. Under this alternative, the only change would be that the mine would be required to capture that methane above ground, and then to safely transport the methane for combustion in an enclosed flare. Op. Br. 40.

by a federal agency tasked with managing public resources, MCC Br. 35, the Agencies did not

adopt this *post hoc* justification, and MCC offers no legal support for this premise.

Defendants also incorrectly reject as late and irrelevant the Raven Ridge Report,

FSLeasingII-39140–80, submitted by Conservation Groups during the Forest Service's objection

period. Fed. Br. 35–36 n.20; see also MCC Br. 34. First, although the Agencies assert that the

Raven Ridge Report was "untimely," Fed. Br. 36 n.20, they nonetheless reviewed the report

prior to acting on the lease applications and responded to it in the Record of Decision.

FSLeasingII-079. Conservation Groups thus exhausted the issue. See supra at 9.

Second, the Agencies improperly dismiss the Report's conclusions as "not relevant to this

stage of the process," falling back on their stated preference that a different agency consider

flaring later. Fed. Br. 36 n.20.[16] But the Agencies did not reject methane flaring as "impractical"

on economic or any other grounds, and thus the report addresses a specific aspect of a reasonable

alternative properly before the Agencies at the time of their decisions. 36 C.F.R. § 218.8(c),

218.8(d)(6) (objectors barred from raising new "issues" but not new information).

**B.    Res Judicata Does Not Bar the Groups' Claims.**

The Agencies argue that the Conservation Groups' methane alternative claim is barred by

*res judicata*, Fed. Br. 32–33, but fail to meet their burden. They admit that there is no identity of

parties. Id. 33 n.15. The Groups' methane claim also does not involve a challenge to the same

transaction as that at issue in HCCA I because this Court chose to vacate, not remand, the prior

---

[16] The Raven Ridge Report demonstrates the economic viability of methane flaring at West Elk. Conservations Groups prevail on this claim even without the report, as they have demonstrated that mandatory methane capture is a reasonable alternative (even if MCC does not profit from the practice) that the Agencies failed to evaluate in detail as required by NEPA. Op. Br. 39–44.

leases.[17] MCC submitted new lease applications, and the Agencies prepared an entirely new EIS

that: purported to address all impacts; predicted a different volume of coal to be mined; was

based on a new record containing new data about flaring (e.g., the Elk Creek mine's new flare,

and Colorado's 2016 report addressing flaring, see supra at 22); and led to a new ROD,

containing different stipulations addressing methane.[18] Further, the NEPA violation the HCCA I

court identified, and that the Leasing SFEIS ostensibly addresses, was the Agencies' failure to

address the leases' climate impacts, an issue inextricably tied to West Elk's methane pollution.

## CONCLUSION

For the reasons set forth above, this Court should find unlawful and set aside the

Colorado Roadless Rule coal mine exception and the challenged lease modifications.[19]

Respectfully submitted May 3, 2018,

/s/ *Edward B. Zukoski*
  Edward B. Zukoski                    Mary Emily Splitek
  Earthjustice                         Earthjustice
  633 16th Street, Suite 1600          633 16th Street, Suite 1600
  Denver, CO 80202                     Denver, CO 80202
  (303) 623-9466                       (303) 966-9613
  Fax: (303) 623-8083                  Fax: (303) 623-8083
  tzukoski@earthjustice.org            esplitek@earthjustice.org

Attorneys for Plaintiffs High Country Conservation Advocates, et al.

---

[17] See HCCA II, 67 F. Supp. 3d at 1265 (declining to remand because "[t]his case is more like a Gordian knot that needs cutting than a simple tangle that … can [be] untie[d] with a little time").

[18] Compare FSLeasing-46987 (2012 EIS predicting 19 million tons of public and private coal total) with FSLeasingII-240 (2016 SFEIS predicting 17.6 million tons); compare FSLeasing-69925 (2012 ROD methane stipulation) with FSLeasingII-102–06 (2016 ROD stipulations); FSLeasingII-132 (MCC resubmitted applications in 2015); Op. Br. 43 (Elk Creek flare, Colorado report).

[19] Federal Defendants allege that Conservation Groups' complaint forecloses the Groups' seeking vacatur as a remedy. Fed. Br. 6 n.4. But the Groups' complaint repeatedly asks this Court to set aside the challenged decisions. Am. Compl. (ECF 39) at 3–5, 11, 37–38.

**CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2018, I filed the foregoing **PLAINTIFFS' REPLY BRIEF ON THE MERITS** and exhibits with the Court's electronic filing system, thereby generating service upon the following parties of record:

Michael Drysdale
DORSEY & WHITNEY LLP
50 South Sixth Street, Ste. 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-5652
Facsimile: (612) 340-8800
Email: drysdale.michael@dorsey.com

Scott P. Sinor
DORSEY & WHITNEY LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202
Telephone: (303) 629-3400
Facsimile: (303) 629-3450
Email: sinor.scott@dorsey.com

Attorneys for Mountain Coal Company

John S. Most, Trial Attorney
United States Department of Justice
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
Tel: (202) 616-3353
Email: john.most@usdoj.gov

Counsel for Federal Defendants

/s/ *Edward B. Zukoski*