IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 17-cv-03025-PAB

HIGH COUNTRY CONSERVATION ADVOCATES,
WILDEARTH GUARDIANS,
CENTER FOR BIOLOGICAL DIVERSITY,
SIERRA CLUB, and
WILDERNESS WORKSHOP,

       Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
U.S. DEPARTMENT OF AGRICULTURE,
DANIEL JIRÓN, in his official capacity as Acting Under Secretary of Agriculture for
Natural Resources and Environment, U.S. Department of Agriculture,
SCOTT ARMENTROUT, in his official capacity as Supervisor of the Grand Mesa,
Uncompahgre, and Gunnison National Forests,
UNITED STATES DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT, and
KATHARINE MACGREGOR, in her official capacity as Deputy Assistant Secretary,
Land and Minerals Management, U.S. Department of the Interior,

       Defendants, and

MOUNTAIN COAL COMPANY, LLC,

       Defendant-Intervenor.

---

## ORDER

---

    This matter is before the Court on plaintiffs' First Amended Complaint for

Declaratory and Injunctive Relief and Petition for Review of Agency Action [Docket No.

39] and Plaintiffs' Amended Opening Brief on the Merits [Docket No. 47].   Plaintiffs

challenge the approval of the North Fork Exception to the Colorado Roadless Rule

("CRR") by the United States Forest Service ("Forest Service") and the joint approval of

lease modifications in favor of defendant-intervenor Mountain Coal Company, LLC

("Mountain Coal") by the Forest Service and Bureau of Land Management ("BLM")

(collectively with the Forest Service and the individual defendants named in their official

capacities, the "Agencies").  Plaintiffs' claims arise under the federal Administrative

Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the National Environmental Policy

Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*  Also before the Court is the Motion of the

Institute for Policy Integrity at New York University School of Law to Participate as

*Amicus Curiae* and with Proposed *Amicus* Brief in Support of Plaintiffs [Docket No. 41].

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

## I. BACKGROUND

This lawsuit is part of an ongoing dispute over proposed exploration and coal

mining activities in and around the Sunset Roadless Area near the west flank of Mount

Gunnison in Colorado.  As explained by District Judge R. Brooke Jackson in his 2014

decision:

> The Sunset Roadless Area contains 5,800 acres of relatively
> undeveloped forest and scrub land in a part of western Colorado called
> the North Fork Valley.  Mount Gunnison and the West Elk Wilderness lie
> to the east. . . . [T]here have been human activities in the area making it
> less pristine than the nearby West Elk Wilderness Area.  But at the same
> time the area is undoubtedly wild, relatively empty, and home to diverse
> flora and fauna.
>
> Recreational opportunities are available in the area as well, . . . there are
> two trails . . . – the Sunset Trail and Trail 8152 – though they do not
> receive heavy use.  The area is more popular for dispersed recreational
> activities.

*High Country Conservation Advocates v. United States Forest Serv.*, 52 F. Supp. 3d

1174, 1183 (D. Colo. 2014) (citations and footnote omitted) ("*High Country*")

The Sunset Roadless Area is located on National Forest lands managed by the Forest Service. The BLM is, however, responsible for managing coal leases on Forest Service land. *See* 30 U.S.C. § 181 et seq. Coal leases and lease modifications are subject to a dual-agency permitting process by which the BLM must obtain the consent of the Forest Service before approving leases or lease modifications. *High Country*, 52 F. Supp. 3d at 1182-83 (citing 30 U.S.C. §§ 201(a)(3)(iii), 207(a); 43 C.F.R. §§ 3425.3(b), 3432.3(d)).

Mountain Coal currently operates the West Elk Coal Mine, an underground mine that runs below parts of the Grand Mesa, Uncompahgre, and Gunnison National Forests. R. at FSLeasingII-0000046; *see also WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1227 (D. Colo. 2011) ("*WildEarth*"). Plaintiffs, a group of environmental advocacy organizations, challenge the Agencies' approval of the North Fork Exception and modifications to Mountain Coal's lease. *See* Docket No. 1 at 17, ¶ 50. The changes allow Mountain Coal to perform exploration activities, including road construction, with a view toward expanded mining operations into the Sunset Roadless Area. *Id*. at 18, ¶ 52.

The present dispute has its roots in earlier administrative approval processes and the lawsuit between the parties that concluded with Judge Jackson's order in *High Country*. In 2012, the Forest Service approved the CRR, which "extended roadless protections to a vast amount of acreage that was previously unprotected under the national rule in exchange for various concessions from environmentalists." *High Country*, 52 F. Supp. 3d at 1184. The CRR included a provision, referred to as the

North Fork Exception, that allowed "for road construction related to coal mining on about 20,000 acres of previously protected land including the Sunset Roadless Area," the Pilot Knob Roadless Area, and the Flatirons Roadless Area.  *Id*.[1]  After the CRR was approved, the BLM approved modifications to the lease held by Mountain Coal, adding new lands for the West Elk Mine, and approved an exploration plan for the newly-leased area.  *Id*.  The environmental groups filed suit in July 2013, challenging the CRR, the lease modifications, and the exploration plan.  *Id*. at 1185.

On June 27, 2014, Judge Jackson issued his order on the merits in *High Country*.  He found that the lease modification's final environmental impact statement improperly discussed only the beneficial impacts expected to result from additional mining, but failed to consider environmental harms that would result.  *High Country*, 52 F. Supp. 3d at 1191.  Specifically, Judge Jackson found that it was arbitrary for the Forest Service to, without explanation, quantify the expected economic benefits of additional mining, but fail to quantify the expected economic harms related to the expected increase in greenhouse gas emissions.  *Id*. at 1190-91.  He noted that the draft version of the environmental impact statement had contained such a quantification based on the "social cost of carbon protocol."  *Id*.  The social cost of carbon protocol is "designed to quantify a project's contribution to costs associated with global climate change [and] was created with the input of several departments, public comments, and

_____

[1] Although the *High Country* decision focuses on the Sunset Roadless Area, the North Fork Exception in that case also encompassed the Pilot Knob Roadless Area and the Flatirons Roadless Area.  *See* Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado, 77 Fed. Reg. 39576, 39578 (July 3, 2012); R. at CRR-0160284, CRR-0033120.

technical models." *Id*. at 1190. It was "expressly designed to assist agencies in cost-benefit analyses associated with rulemakings, but the EPA has expressed support for its use in other contexts." *Id*.; *see also* R. at FSLeasingII-031713-17 (EPA, EPA Fact Sheet, Social Cost of Carbon (Dec. 2016)). By the Forest Service quantifying benefits, but failing to quantify harms, Judge Jackson found that "[i]n effect the agency prepared half of a cost-benefit analysis, incorrectly claimed that it was impossible to quantify the costs, and then relied on the anticipated benefits to approve the project." *High Country*, 52 F. Supp. 3d at 1191. Judge Jackson similarly found that the CRR's final environmental impact statement ("CRR FEIS") improperly failed to disclose the expected greenhouse gas emissions from the North Fork Exception allowing for mining operations, while at the same time basing approval on projected benefits. *Id*. at 1195 ("It is arbitrary to offer detailed projections of a project's upside while omitting a feasible projection of the project's costs." (citations omitted)). Consistent with these findings, the court enjoined Mountain Coal from moving ahead with the exploration plan and ordered briefing on an appropriate remedy. *Id*. at 1201.

On September 11, 2014, with the benefit of the parties' briefing on the appropriate remedy, Judge Jackson vacated the approvals of the lease modifications and the exploration plans. *High Country*, No. 13-cv-01723, Docket No. 101 at 7. With respect to the CRR, Judge Jackson severed the North Fork Exception from the remainder of the CRR and vacated the North Fork Exception. *Id*. Judge Jackson did not remand any issues for reconsideration. *High Country*, No. 13-cv-01723, Docket No. 102 at 2.

After the *High Country* court entered judgment for plaintiffs, Mountain Coal renewed its mine expansion applications.  R. at FSLeasingII-0000132 ("Applications for lease modification were resubmitted to BLM on January 30, 2015 and sent to the Forest Service for consent to lease.").  It is the regulatory actions taken by the Forest Service and BLM in relation to these renewed applications that are at issue in this proceeding. The Forest Service initiated a rulemaking to reimplement the North Fork Exception with the purpose of "provid[ing] management direction for conserving about 4.2 million acres of [Colorado roadless areas] while addressing the State's interest in not foreclosing opportunities for exploration and development of coal resources in the North Fork Coal Mining Area."  R. at CRR2-0000011.  The Forest Service also reaffirmed that the new rulemaking was meant to accomplish the purposes of the 2012 CRR rulemaking.  *Id*.[2]

_____

[2] The following reasons were restated:

Roadless areas are important because they are, among other things, sources of drinking water, important fish and wildlife habitat, semi-primitive or primitive recreation areas that include both motorized and non-motorized recreation opportunities, and naturally appearing landscapes.  A need exists to provide for the conservation and management of roadless area characteristics.

The Department [of Agriculture], the Forest Service, and the State of Colorado recognize that tree cutting, sale, or removal and road construction/reconstruction have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area characteristics.  Therefore, there is a need to generally prohibit these activities in roadless areas.  Some have argued that linear construction zones (LCZs) also need to be restricted.

A need exists to accommodate State-specific situations and concerns in Colorado's roadless areas.  These include:

-reducing the risk of wildfire to communities and municipal water supply systems,

In considering whether to reimplement the North Fork Exception, the Forest Service prepared a draft supplemental environmental impact statement and then a supplemental final environmental impact statement (the "Exception SFEIS"). *See* R. at CRR2-0000001. As part of a revised economic analysis, the Exception SFEIS used the social cost of carbon protocol to determine the expected harm from the amount of carbon predicted to be mined in the North Fork Area. R. at CRR2-0000234-267. On December 19, 2016, the Forest Service readopted the North Fork Exception by issuing a Record of Decision. Roadless Area Conservation; National Forest System Lands in Colorado, 81 Fed. Reg. 91811 (Dec. 19, 2016).

In April 2017, the BLM, along with Forest Service and other participating agencies, issued a supplemental environmental impact statement related to the lease modifications (the "Leasing SFEIS") with the purposes to "facilitate recovery of federal coal resources in an environmentally sound manner" and "ensure that compliant and super-compliant coal reserves are recovered and not bypassed." R. at FSLeasingII-0000135. The Leasing SFEIS disclosed the anticipated greenhouse gas

_____

> -facilitating exploration and development of coal resources in the North Fork coal mining area,
>
> -permitting construction and maintenance of water conveyance structures,
>
> -restricting LCZs, while permitting access to current and future electrical power lines, and
>
> -accommodating existing permitted or allocated ski areas.

There is a need to ensure that CRAs are accurately mapped.

R. at CRR2-0000011.

emissions from a mine expansion, but did not use the social cost of carbon protocol to quantify expected environmental harms. R. at FSLeasingII-0000241. On December 11, 2017, the Forest Service consented to the lease modifications. R. at FSLeasingII-0000023. On December 15, 2017, the Department of the Interior approved the lease modifications. R. at BLM000017.

On December 15, 2017, plaintiffs filed their complaint in this action. Docket No. 1. Three days later, plaintiffs moved for a preliminary injunction and temporary restraining order ("TRO"). Docket No. 8. On December 21, 2017, the Court held a hearing on plaintiffs' motion for a TRO. Docket No. 26. The Court denied plaintiffs' request for a TRO and set a preliminary injunction hearing. *Id*. The Court later vacated the preliminary injunction hearing on plaintiffs' motion and set an expedited merits briefing schedule. *See* Docket No. 28 at 2; Docket No. 32. On March 27, 2018, the Institute for Policy Integrity at New York University School of Law ("Institute") filed a motion seeking to file a brief as *amicus curiae* in support of plaintiffs, which included a proposed brief. Docket No. 41.

## II. AMICUS MOTION

The Institute requests permission to file an *amicus* brief in support of plaintiffs. Docket No. 41. The Agencies and Mountain Coal (collectively, "defendants") oppose. They argue that the Institute's motion is untimely, that the Institute is not a disinterested party because it submitted comments during the administrative proceedings, and that plaintiffs are represented by competent counsel who address the same issues in plaintiffs' briefing. *See* Docket No. 53 at 6-12; Docket No. 54 at 2-4.

Courts have broad discretion in determining whether to allow participation by *amicus curiae*. *WildEarth Guardians v. Lane*, 2012 WL 10028647, at *1 (D.N.M. June 20, 2012) (collecting cases). In determining whether to allow participation, courts "consider whether the *amicus* briefs provide 'unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Id*. at *2 (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir.1997)); *see also Ass'n of Am. Sch. Paper Suppliers v. United States*, 683 F. Supp. 2d 1326, 1327 (Ct. Int'l Trade 2010) (citations omitted) (discussing other factors). The Institute argues that it has "expertise generally in economic analysis—and particularly on the social cost of greenhouse gas metrics and the standards for federal cost-benefit analysis." Docket No. 41 at 3. In this vein, the proposed *amicus* brief discusses how economic measures can aid public understanding of abstract harms, *id*. at 5, and argues that the challenged regulatory actions use arbitrary economic analysis and terminology. *Id*. at 10. Defendants and Mountain Coal request further briefing to respond, Docket No. 53 at 12; Docket No. 54 at 6, but identify nothing that they would provide in response that is not already in the record or available in reported legal decisions. Docket No. 53 at 8-10; Docket No. 54 at 5 (citing CRR2-0105119, 105127-132 (Mountain Coal's record comments) and *EarthReports, Inc. v. Federal Energy Regulatory Comm'n*, 828 F.3d 949, 956 (D.C. Cir. 2016)). Indeed, they argue that the Institute's arguments are "merely duplicative" of plaintiffs' arguments. Docket No. 53 at 4; *see also* Docket No. 54 at 3-4.

The Court finds that the Institute's participation as *amicus curiae* is warranted

and will grant its motion.  Although the Institute addresses the same issues as the parties, the Court finds its unique perspective helpful in understanding and analyzing the issues presented.  *See Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1143 n.7 (10th Cir. 2010); *see also Vigil v. Am. Tel. & Tel. Co.*, No. C-1476, 1969 WL 118, at *1 (D. Colo. Sept. 9, 1969); *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991).  The Court further finds further briefing is unnecessary because the Institute's brief is limited to the same issues addressed by the parties, its brief was filed weeks before defendants' briefs, and defendants were afforded more combined pages than plaintiffs and the Institute.  *See Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 976 (E.D. Wash. 1999).

## III.  STANDING

The party seeking redress bears the burden of establishing standing.  *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  To carry this burden, plaintiffs must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  *Id.* at 543 (internal quotation marks and alteration marks omitted); *Lujan*, 504 U.S. at 560-61.  As organizations with members, plaintiffs can establish standing either in their own right or on behalf of their members.  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

In conjunction with their merits brief, plaintiffs filed updated declarations from their members that addressed events occurring after the denial of plaintiffs' TRO

motion.  *See* Docket Nos. 47-1, 47-2, 47-7, 47-8.  Mountain Coal challenges the

standing of plaintiffs, arguing that plaintiffs' members are unlikely to visit the Sunset

Roadless Area in the future because of the road construction that occurred after the

Court denied the TRO.  Docket No. 52 at 10.  Mountain Coal argues that the updated

declarations of plaintiffs' members that they would be deterred from returning to the

Sunset Roadless Area by road construction are "not credible" because either "(1) the

TRO Declarants' December testimony was exaggerated, to accentuate the perception

of harm and improve their chances of obtaining injunctive relief; or (2) their updated

testimony is misleading, promising future visits where none are in fact likely."  *Id*. at 13

(emphasis omitted).  However, contrary to Mountain Coal's characterization of them,

the declarations do not suggest that plaintiffs' members only visit undisturbed

wilderness or that the limited damage that has occurred thus far would rule out future

visits to the areas at issue.  *See, e.g.*, Docket No. 47-1 at 26, ¶ 26 ("I intend to return to

hike, view wildlife, and enjoy the natural and undeveloped nature of the area in June of

2018, if not earlier. . . . [R]oad construction in this area . . . will irreversibly alter the

natural and undeveloped character of the area and irreparably diminish my enjoyment

of future recreation."); Docket No. 47-2 at 18-19, ¶ 39 ("My favorite time of year to visit

is in the fall. . . . I hope to have this experience this coming year and for years to

come.").  The Court finds the declarations establish potential harm to plaintiffs'

members' aesthetic and recreational interests, which is sufficient to confer standing on

plaintiffs.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While

generalized harm to the forest or the environment will not alone support standing, if that

harm in fact affects the recreational or even the mere esthetic interests of the plaintiff,

that will suffice." (citing *Morton*, 405 U.S. at 734-36)); Docket No. 47-7 at 18 ("I will be

unable to make future trips, or have less reason to do so, should the bulldozing, pad

construction, drilling, vehicle use, noise, dust, and increased human presence

associated with this coal lease expansion and development . . . occur.").

## IV.  ADMINISTRATIVE APPEAL

### A.   Waiver and Res Judicata

As an initial matter, the Court addresses defendants' arguments that plaintiffs

waived, or are barred from raising, arguments that were not raised during the

administrative proceedings before the decision in *High Country*.  In particular,

defendants argue that plaintiffs cannot raise the Pilot Knob alternative, the lack of

baseline environmental information, and the methane flaring alternative.  *See* Docket

No. 51 at 13-16, 18-19, 32-33.

Defendants' preclusion and waiver arguments are based on the argument that the

*High Country* court "remanded" issues to the Agencies for consideration.  *See, e.g.*,

Docket No. 51 at 18 ("Plaintiffs, moreover, cannot elude claim preclusion by directing

their baseline arguments at the Exception SFEIS, because baseline information was not

among the deficiencies the [*High Country*] Court instructed the USDA to address on

remand."); Docket No. 52 at 15 ("Fundamentally, the Pilot Knob, Baseline Data, and

Methane Flaring claims are attempts to inject new arguments or relitigate old issues that

are well beyond the scope of the supplemental FEIS ordered in the [*High Country*]

remand and are thus waived.").  However, no such remand occurred.  Defendants did

argue in *High Country* that vacatur was inappropriate and that the Agencies should be

allowed to supplement their findings through a continuation of the administrative procedure. *High Country*, No. 13-cv-01723, Docket Nos. 97 at 1-2, 98 at 3 ("Vacatur would require . . . starting the leasing process from scratch."). But the court rejected these arguments, and it vacated the Forest Service and BLM's administrative actions as unlawful. *High Country*, No. 13-cv-01723, Docket Nos. 101 at 7, 102 at 2. The Forest Service and BLM later initiated *new* administrative approval processes based on a renewed application by Mountain Coal. R. at CRR2-0000013-14; R. at FSLeasingII-0000132. In its new rulemaking, the Forest Service considered a new alternative to the North Fork Exception that it had not considered during the 2012 rulemaking process. *Compare* R. at CRR-0153301 *with* R. at CRR2-0000012. Defendants provide no basis for barring plaintiffs from proposing new alternatives where the agency itself reopened the alternatives analysis. The cases that defendants cite involve remand or instances where the Court ordered specific analysis, which are inapposite here.[3] The newly issued SFEIS and lease modifications were "supplemental" administrative actions only in the sense that they incorporated by reference substantial information from earlier, vacated administrative actions. *See, e.g.*, R. at CRR2-0000014 (explaining that the Exception SFEIS addressed several new issues, but incorporated by reference the earlier record because the "Colorado Roadless Rule interdisciplinary team determined that the majority of the analyses in the 2012 FEIS did not warrant

---

[3] *See United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996) (remand to address discrete error); *Avello v. S.E.C.*, 454 F.3d 619, 627 (7th Cir. 2006) (agency voluntarily remanded the case to address specific errors); *West Virginia v. EPA*, 362 F.3d 861, 869, 872 (D.C. Cir. 2004) (remand); *South Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 2012 WL 13780, at *2 (D. Nev. Jan. 4, 2012) (court ordered agency to address specific issues).

supplementation due to changed circumstances and/or new information"). In such circumstances, plaintiffs are not barred by res judicata from proposing new alternatives or considered to have waived arguments not raised in prior administrative proceedings. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) ("[T]he fact that the two suits involve challenges to very similar courses of conduct does not matter; a prior judgment 'cannot be given the effect of extinguishing claims which did not even then exist.'" (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955))). Defendants do not contest that plaintiffs raised the arguments that they seek to raise at an appropriate stage of the new administrative proceedings. Accordingly, the Court rejects defendants' res judicata and waiver arguments.

### B. Standard of Review

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, the Court must determine whether an agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of this review is narrow. *See Colo. Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *New Mexico ex rel. Richardson v. Bureau of Land*

*Management*, 565 F.3d 683, 704 (10th Cir. 2009) (citation omitted).  When reviewing an agency's factual determinations, the Court "ask[s] only whether the agency took a 'hard look' at information relevant to the decision."  *Id.*

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). An agency's decision, therefore, is arbitrary if not supported by "substantial evidence." *Id.*  "Evidence is substantial in the APA sense if it is 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact.'"  *Id.* (citation omitted).

A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action.  *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008).  The deference given to an agency action "is especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise."  *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

### C.  National Environmental Policy Act

NEPA declares the federal government's policy to "use all practicable means and measures, including financial and technical assistance . . . to create and maintain conditions under which man and nature can exist in productive harmony."  42 U.S.C. § 4331(a).  To that end, NEPA imposes a requirement on federal entities to take a "hard look" at the environmental impact of a proposed action.  *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA was intended to ensure that agencies "consider environmentally significant aspects of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns."  *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002).

Before an agency may take a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an in-depth environmental impact statement ("EIS").  42 U.S.C. § 4332(C); *see also Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006).[4]  Agencies must begin the NEPA evaluation process as early as possible so that the EIS serves to ensure incorporation of environmental values into the decisionmaking process, instead of rationalizing it after the fact, and to avoid downstream delays.  40 C.F.R. §§ 1501.2, 1502.5.  An EIS is an "action-forcing" device with two primary purposes: (1) to ensure that the decisionmaker "will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) to make information available to the public, which "may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson*, 490 U.S. at 349.  An EIS must address the environmental impact of the proposed action; adverse effects that cannot be avoided; mitigation

_____

[4] If a proposed federal action will not have a "significant" environmental impact, an agency may satisfy NEPA by preparing an environmental assessment, which is a "concise public document" that provides "sufficient evidence and analysis" for the agency to determine whether it needs to prepare an EIS or, instead, can issue a finding of no significant impact ("FONSI") for the action in question.  40 C.F.R. § 1508.9(a).  An environmental assessment need only include "brief discussions" of the need for the proposal, alternatives, and environmental impacts of both the proposed action and its alternatives.  40 C.F.R. § 1508.9(b).

measures; alternatives to the proposed action, including a no-action alternative; direct, indirect, and cumulative impacts of the proposed action; and any "irreversible and irretrievable commitments of resources" entailed in implementing the proposed action. 42 U.S.C. § 4332; *see also* 40 C.F.R. § 1508.25; 40 C.F.R. § 1502.14 (the discussion of alternatives "is the heart of the environmental impact statement" and it "should present the environmental impacts of the proposal and the alternatives," including the "alternative of no action," and the agency must identify its "preferred alternative").

Although NEPA imposes procedural requirements on federal agencies, NEPA does not dictate the substantive results of an agency's analysis, and "[s]o long as the record demonstrates that the agencies in question followed the NEPA procedures, which require agencies to take a 'hard look' at the environmental consequences of the proposed action, the court will not second-guess the wisdom of the ultimate decision." *Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Robertson*, 490 U.S. at 350).

### D. Failure to Consider Alternatives

Under NEPA, agencies are required to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a). As part of this analysis, an agency must "identify and analyze its preferred alternative, as well as a null or 'no action' alternative that would occur if the agency elected to maintain the current state of affairs unchanged." *Colorado Envtl. Coal. v. Salazar*, 875 F. Supp. 2d 1233, 1245 (D. Colo. 2012) (citing 40 C.F.R. § 1502.14). An agency is not required to consider an unlimited number of alternatives and has broad

discretion in defining the goals of the project. *See Colorado Envtl. Coal.*, 875 F. Supp. 2d at 1245 ("[T]he phrase 'all other reasonable alternatives' is not entirely open-ended. To define the boundaries of the range of alternatives that must be considered, the agency must first define the objectives of the proposed action, a task in which the agency enjoys considerable discretion.") (citation omitted). An agency "may also reject alternatives that are not 'significantly distinguishable from the alternatives already considered' or under consideration." *Id.* (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 708-09). When assessing an agency consideration of alternatives, the Court must apply a "rule of reason." *New Mexico ex rel. Richardson*, 565 F.3d at 709.

> The reasonableness of the alternatives considered is measured against two guideposts. First, when considering agency actions taken pursuant to a statute, an alternative is reasonable only if it falls within the agency's statutory mandate. Second, reasonableness is judged with reference to an agency's objectives for a particular project.

*Id.* (citations omitted). Agencies are only required to "'briefly discuss'" the reasons that possible options were eliminated from detailed study as plan alternatives. *Utahns for Better Transp.*, 305 F.3d at 1166 (quoting 40 C.F.R. § 1502.14(a)).

Plaintiffs argue that defendants failed to consider reasonable alternatives to the North Fork Exception and lease modifications. Regarding the exception, plaintiffs argue that the Forest Service should have considered an alternative protecting the Pilot Knob Roadless Area. Docket No. 47 at 10-14. With respect to the lease modifications, plaintiffs argue that the BLM should have considered an alternative that required Mountain Coal to flare methane vented from the mine. *Id.* at 39-44. Plaintiffs argue that the Agencies' bases for rejecting these alternatives were impermissible under NEPA and

18

should be rejected.

## 1. *Pilot Knob Alternative*

In its rulemaking, the Forest Service considered three alternatives in detail:
Alternative A, which was the required no action alternative, and two action alternatives –
Alternative B, the adopted North Fork Exception, and Alternative C, which left roadless
protection in place for those portions of the three roadless areas previously found to be
wilderness capable.[5]  R. at CRR2-0000020-24.  Plaintiffs proposed an additional
alternative, referred to as Pilot Knob Alternative, that would maintain the Pilot Knob
Roadless Area as subject to the CRR and limit the exception allowing road construction
proposals to the Sunset and Flatirons Roadless Areas.  R. at CRR2-0105826.  The Pilot
Knob Roadless Area lacks any active mining operations, is the smallest of the three
roadless areas subject to the North Fork Exception, and is expected to contain the least
coal.  *Id*.  Under the Pilot Knob Alternative, approximately 128 of the 172 million tons of
coal expected to be found in the North Fork Exception would be in areas subject to
mining-related road construction.  R. at CRR2-0105827.  This is more than the 95 million
tons of coal expected to be found in the areas unprotected under Alternative C, which
protected a portion of all three roadless areas and was considered in detail by the Forest
Service.  *Id*.  In their administrative comments, plaintiffs claimed that the Pilot Knob area
is "geographically and ecologically distinct from the other roadless areas."  *Id*.

---

[5] The additional areas protected under Alternative C were identified by the Forest
Service as "wilderness capable" in a 2007 study because they "contain[] the basic
characteristics that would make [them] suitable for wilderness," including being free
from disturbance, allowing for adventure, and being manageable as wilderness areas.
R. at CRR2-0000024.

Specifically, plaintiffs stated that Pilot Knob is "generally drier and typified by less forest and more grasslands and more areas dominated by shrubs" than the other two roadless areas and has the "only winter range for deer and bald eagles found in the North Fork Coal Mining Area, and the only severe winter range for elk in the area." R. at CRR2-0105831.

The Forest Service declined to provide a detailed analysis of the Pilot Knob Alternative, stating that it

> was dismissed from detailed analysis because the Colorado Roadless Rule is considering access to coal resources within the North Coal Mining Area over the long-term based on where recoverable coal resources might occur. The Rule preserves the option of future coal exploration and development by allowing temporary road construction for coal exploration and coal-related surface activities. One of the State-specific concerns is the stability of local economies in the North Fork Valley and recognition of the contribution that the coal industry provides to those communities. Preserving coal exploration and development opportunities in the area is a means of providing community stability.

R. at CRR2-0000029. The Forest Service also rejected plaintiffs' wildlife-related concerns stating, in part, that such concerns "will be addressed and mitigated as appropriate in future NEPA evaluations, forest plan consistency reviews, and Forest Service decisions." R. at CRR2-0000327.

Plaintiffs argue that the Forest Service violated NEPA because the Pilot Knob Alternative was a reasonable alternative meeting the purpose and need of the rulemaking that is significantly distinguishable from the two action alternatives that were considered in detail. Docket No. 47. The Agencies respond that the Pilot Knob Alternative "would have foreclosed long-term opportunities" such as reopening the currently-idled mine in the area and was similar to Alternative C insofar as it increased

the protected acreage.  Docket No. 51 at 12, 17.[6]  Mountain Coal argues that the Pilot

Knob alternative is not significantly distinguishable from Alternative C and that the

adopted North Fork Exception does not itself allow road construction in the Pilot Knob

area without further approvals.  Docket No. 52 at 16-17.

The Agencies' claim that the Pilot Knob alternative is "impractical and ineffective

and, therefore, not reasonable" because it forecloses long-term opportunities for coal

mining is hard to reconcile with Alternative C.  Docket No. 51 at 16.  Under NEPA,

federal agencies are required to "study, develop, and describe *appropriate* alternatives

to recommended courses of action in any proposal which involves unresolved conflicts

concerning alternative uses of available resources."  42 U.S.C. § 4332(E) (emphasis

added).  Alternative C would foreclose mining-related road construction in a larger area

and one expected to contain more coal deposits than the Pilot Knob Roadless Area.

Given that the Forest Service proposed Alternative C as an appropriate, but not

preferred, alternative it is unclear why the Forest Service dismissed the Pilot Knob

Alternative as unreasonable.

The Court, however, finds that this apparent contradiction does not demonstrate

that the Forest Service violated NEPA or acted arbitrarily.  The additional areas that

would have been protected under Alternative C are all within the Flatirons and Sunset

Roadless Areas, not in the Pilot Knob Roadless Area.  R. at CRR2-0000024.  Both

---

[6] The Agencies also argue that road construction is already allowed in the Pilot
Knob area for other purposes, but this was not a stated basis for the Forest Service's
decision and, therefore, cannot provide a basis to affirm that decision.  *New Mexico ex
rel. Richardson*, 565 F.3d at 704 ("In considering whether the agency took a 'hard look,'
we consider only the agency's reasoning at the time of decisionmaking, excluding
post-hoc rationalization concocted by counsel in briefs or argument.").

action alternatives contemplated opening the same section of the Pilot Knob area to mining-related road construction, namely, the area where the idled Elk Creek Mine is located. *Compare* R. at CRR2-0000023 *with* CRR2-0000025. The record indicates that the Elk Creek Mine was idled "due to mining difficulties and underground safety issues," but that it still contains recoverable coal. R. at CRR2-0000036. With this context, the Forest Service's justification for declining to give detailed consideration to the Pilot Knob Alternative is reasonable. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1244 (10th Cir. 2011) ("NEPA does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." (quoting *Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1030)). The existence of the Elk Creek Mine in the Pilot Knob Area represents a distinguishing coal exploration and development possibility important to the rulemaking's goal of "not foreclosing opportunities for exploration and development of coal resources in the North Fork Coal Mining Area," R. at CRR2-0000011, and supports the Forest Service's rejection of the Pilot Knob Alternative on the basis that it would be contrary to Colorado's concerns about the "stability of local economies in the North Fork Valley and recognition of the contribution that the coal industry provides to those communities." R. at CRR2-0000029; *see also City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999) ("[A]n alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)). Plaintiffs do not

ask the Court to review whether the goals of the rulemaking themselves were reasonable. *See* Docket No. 47 at 11; *cf. City of Alexandria*, 198 F.3d at 867 ("We engage in both of these inquiries—whether an agency's objectives are reasonable, and whether a particular alternative is reasonable in light of these objectives—with considerable deference to the agency's expertise and policy-making role.") (citation omitted). The Court will not second-guess the Forest Service's determination that the Pilot Knob Alternative would foreclose long-term opportunities in a way inconsistent with the rulemaking's goals. *See Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1176 (10th Cir. 1999) (upholding an agency's decision to dismiss from consideration certain opportunities that did not advance the objectives of the project).[7]

### 2. *Methane Flaring Alternative*

Methane and coal exist together in underground coal deposits and, as a result, methane is released during coal mining. For the safety of mine workers, regulations require that methane be kept below certain levels, which is generally accomplished by diluting the gas and venting it into the atmosphere. R. at FSLeasingII-0000183. Methane flaring is a process by which methane that would otherwise vent from a coal deposit is captured and burned. *See* R. at FSLeasingII-0000188. Because the combustion products (mostly carbon dioxide and water) are less potent greenhouse gases than methane, this process reduces the greenhouse gas impact of accessing buried coal. *Id*. But burning combustible gas near coal deposits presents safety

---

[7] Because the Court finds that the Forest Service provided a valid reason for declining to consider the Pilot Knob Alternative in detail, the Court does not reach the issue of whether the Pilot Knob Alternative is significantly distinguishable from the two action alternatives (Alternative B and Alternative C).

concerns.  Any plan to use methane flaring "would have to be proposed to and approved by the Mine Safety and Health Administration ("MSHA"), which has the regulatory authority to approve proposed flaring systems intended for use at coal mines in the U.S." R. at FSLeasingII-0000189.

During the North Fork Exception rulemaking, plaintiffs argued that the Forest Service should "analyze in full . . . at least one action alternative that significantly reduces the climate change impacts of methane emissions caused by mining [by requiring mines to] use best available technology to capture and/or combust . . . methane to be emitted from the mine, including from methane drainage wells."  R. at CRR2-0105833.  In the Exception SFEIS, the Forest Service declined to consider in detail methane flaring as an alternative because "methane flaring is best considered at the leasing stage when there is more information on the specific minerals to be developed and the lands that would be impacted by a flaring operation."  R. at CRR2-0000295.

At the leasing stage, the Agencies did not consider flaring as an alternative, but did discuss methane flaring as a potential mitigation measure.  FSLeasingII-0000182-0000186.  The lease modifications, however, also put off a decision on whether to require methane flaring to a later point.  The Leasing SFEIS states that methane flaring was not considered as an alternative because there are no legal limits on methane emissions and "it would be arbitrary to mandate its control when effectiveness of the mitigation is only measured in tons of $CO_2e$[8] and not by effects on either surface or

_____

[8] "$CO_2e$" refers to carbon dioxide equivalent global warming potential.  *See, e.g,* R. at FSLeasingII-0000188.

non-mineral resources." R. at FSLeasingII-0001100-1101. The report noted that expected greenhouse gas emissions had been disclosed and stated that "NEPA does not require us to mitigate all impacts (particularly in an EIS) or to include anything beyond 'appropriate mitigation measures' (40 CFR 1502.14(f)), which in this case are lease stipulations that we can ensure can be implemented at this stage of the process." R. at FSLeasingII-0001100. The Forest Service's record of decision states that methane flaring was not considered in detail "because it, like all other methane mitigation measures, requires detailed engineering and economic considerations that would occur later in the process." R. at FSLeasingII-0000079. The Agencies also noted that Section 2.6 of the lease stipulations "require additional analysis" of the feasibility of methane use or capture. R. at FSLeasingII-0001100. More specifically, the modified leases require periodic reporting on "changing technical and economic parameters that can either enable or create barriers to the implementation or adoption of a particular methane control strategy." R. at FSLeasingII-0000185.

Plaintiffs argue that the Agencies are impermissibly delaying making a decision on methane flaring and that requiring methane flaring represented a reasonable alternative to the proposed action alternatives for the lease modifications. Docket No. 47 at 39. Plaintiffs note that methane flares have been used safely, both abroad and at the idle Elk Creek Mine. *Id*. at 40-44. Plaintiffs argue that the current circumstances are distinguishable from *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1239 (D. Colo. 2011), where another judge in this district affirmed the Forest Service's decision to rule out methane flaring and capture as infeasible at the same mine, because the intervening years have provided "additional evidence . . . that flaring

25

operations are safe" and plaintiffs provided a report showing that methane flaring would be economically feasible.  Docket No. 47 at 44.[9]

Defendants respond that methane flaring was properly considered along with other mitigation measures and that the lease modifications provide for an appropriate multi-stage analysis of whether methane flaring is appropriate.  Docket No. 51 at 33-34. Defendants argue that, through the periodic reports to the BLM required by the lease modifications, Mountain Coal will be required to implement methane capture or flaring when it is economically feasible to do so.  *Id*. at 35.[10]

_____

[9] Additionally, plaintiffs argue, Docket No. 47 at 42-43, that the EPA disagreed with the Forest Service's "characterization of the state of knowledge" with respect to the design criteria for a methane mitigation system.  R. at CRR2-0103909.  The EPA stated that the existing mines in the North Fork area "deploy gas drainage systems to supplement their ventilation fans" and that the EPA Coalbed Methane Outreach Program has "provided funding for pre-feasibility studies [of methane mitigation] at the West Elk mine."  *Id*.  The EPA also "recommend[ed]" that the "SFEIS provide that information and clarify that disturbances necessary to collect and combust or use methane vented from the mines would be allowable."  R. at CRR2-0103904.  The Forest Service's rationale to consider such determinations premature, discussed below, applies equally to these comments.  *See* R. at CRR2-0000295 ("[M]aking flaring a regulatory requirement for coal-mining operations in the North Fork Coal Mining Area could be problematic because the Mine Safety and Health Administration could ultimately decide not to allow flaring if it determined that it jeopardizes the safety of the miners. . . . This could result in the coal mining company being required to flare by two agencies but not allowed to flare by another agency charged with miner safety, which would be inappropriate from the perspective of agency-to-agency coordination.").  Notwithstanding the Forest Service's knowledge about the mine's design and operation, it was reasonable for the Forest Service to find that imposing a requirement of methane flaring was premature in the absence of a decision from the MSHA.

[10] Mountain Coal generally echoes the Agencies' arguments concerning the methane flaring alternative.  Mountain Coal argues that the expert report filed by plaintiffs on the economic feasibility of methane flaring was untimely filed after the Leasing SFEIS was published.  Docket No. 52 at 34.  Because the Forest Service considered the report in its record of decision, R. at FSLeasingII-0000079, the Court disagrees and considered the report.  *See Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198, 1210 (D. Colo. 2009) (citing *Forest Guardians v. U.S.*

In their reply, plaintiffs argue that defendants failed to address whether methane flaring should have been considered as an alternative and, therefore, that defendants have conceded that mandatory methane flaring "meets the project's purpose." Docket No. 55 at 22.

Whether methane flaring is considered as an alternative or a mitigation measure appears to be of little moment here. In considering methane flaring as an alternative, instead of a mitigation measure, the Agencies would not have avoided the dilemmas that they encountered during the lease modification process, namely, that a different agency, the MSHA, is responsible for mine safety, MSHA would need to approve any proposed flaring system, MSHA has never approved a flaring system for an active coal mine, and MSHA has not received any proposal for a flaring system at the West Elk Mine. R. at FSLeasingII-0000189. Plaintiffs do not dispute that Mountain Coal needs to design the proposed mine ventilation system in order to propose a ventilation system to the MSHA and that such a design is dependent on the location of coal to be mined, which Mountain Coal has not yet explored, but is currently doing pursuant to the lease. *See* Docket No. 55 at 23. Moreover, even without detailed consideration of a methane flaring alternative, the Agencies' task under NEPA included consideration of mitigation of environmental impacts, 40 C.F.R. § 1502.14(f), and the project's purpose included the goal to recover coal in an environmentally sound manner. *See Citizens' Comm. to Save Our Canyons*, 297 F.3d at 1031 (affirming, based on its consideration of relevant impacts, the Forest

_____

*Forest Serv.*, 579 F.3d 1114, 1120-21 (10th Cir. 2009)); *Native Ecosystems Council & All. for the Wild Rockies v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209, 1223 (D. Idaho 2012).

Service's refusal to study proposed options where project's objectives included "balancing environmental interests" against "improv[ing] the recreational use in the area"). The renewed lease modification administrative process included substantial information about methane mitigation alternatives, including consideration of both a report on the economic viability of methane flaring by Mountain Coal, which forms Appendix A of the Leasing SFEIS, and the report presented by plaintiffs that addressed new developments. R. at FSLeasingII-0000079; FSLeasingII-0000447-664. In line with the project's purpose, the Leasing SFEIS and record of decision considered the environmental impact of methane venting and the modified lease terms require further study of this issue.

The determination whether a particular site-specific analysis can wait until a later decisionmaking stage is a "fact-specific inquiry" that is "tied to the existing environmental circumstances, not to the formalities of agency procedures." *See New Mexico ex rel. Richardson*, 565 F.3d at 718. The Court finds that the Agencies' determination that, even if methane flaring can be shown to be economically feasible, detailed consideration of whether methane flaring should be used in the West Elk Mine would be more appropriate at a later date because it "requires detailed engineering and economic considerations" available at later stages in the process does not constitute a NEPA violation. R. at FSLeasingII-0000079. The Court finds that the discussion in the Leasing SFEIS is sufficient to satisfy the Agencies' obligation to "briefly discuss" why the option was eliminated from detailed consideration as an alternative. 40 C.F.R. § 1502.14(a). While methane flaring is consistent with the lease modifications' goal of environmentally sound coal removal, as the Agencies noted, the same may be true of other methods,

28

and it was reasonable for the Agencies to conclude that focusing on the economic feasibility of one particular method at this stage is unwarranted because the practical ability to design and receive MSHA approval for such a system remains speculative and such focus could ultimately "preclude the use of emerging technology and more effective methods."  R. at FSLeasingII-0000079; *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 977-78 (9th Cir. 2006) (finding that a challenge to the EIS lacked merit because the environmental groups would be "able to raise more focused criticisms of site analysis at the exploration and permit stages of the leasing program.").  Plaintiffs have not shown that the Agencies' decision to decline to consider mandatory methane flaring as an alternative was arbitrary, capricious, or an abuse of discretion.

### E.   Failure to Disclose and Consider Information

Courts apply a "rule of reason standard (essentially an abuse of discretion standard) in deciding whether claimed deficiencies in a [SFEIS] are merely flyspecks, or are significant enough to defeat the goals of informed decisionmaking and informed public comment."  *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004) (citing *Utahns for Better Transp.*, 305 F.3d at 1163).

### 1.  *Baseline Environmental Data*

Plaintiffs argue that the Forest Service violated NEPA by failing to disclose and consider the baseline environmental conditions in the three roadless areas subject to the North Fork Exception necessary to assess the environmental impacts of each alternative.  Docket No. 47 at 14-15.  Plaintiffs claim that the "Exception SFEIS provides virtually no data about the resources – including vegetation, watersheds, surface and

ground water quality, hydrology, visual resources, topography, and recreational resources – across the roadless areas that would be harmed" by the construction of surface roads and pads to allow for mining. *Id*. at 16. Plaintiff argues that, by failing to provide such baseline environmental data, defendants failed to "describe the environment of the area(s) to be affected" by the North Fork Exception as required by 40 C.F.R. § 1502.15. Docket No. 47 at 14. Plaintiffs emphasize that the Exception SFEIS addresses a much smaller area than the 2012 CRR FEIS, but nonetheless does not provide detail specific to the three areas subject to the Exception. *Id*. at 18.

Defendants respond that the Agencies developed and disclosed relevant baseline environmental information concerning the roadless areas during the earlier CRR rulemaking, "particularly with respect to big game habitat and wetlands." Docket No. 51 at 20. With regard to plaintiffs' argument that the roadless areas vary, defendants argue that plaintiffs "have failed to explain or demonstrate with any supporting authority how any differences in habitat across the Pilot Knob, Sunset, and Flatirons roadless areas, whether major or minor, would somehow increase impacts to this resource so as to alter the agency's analysis in any meaningful way." Docket No. 51 at 21.

The 2012 CRR FEIS contains a large amount of general information about the environments of the areas subject to the CRR as well as information about the ranges and critical habitat of sensitive, threatened, and endangered species that is specific to each of the 363 separate roadless areas. R. at CRR-0153489-153501; *see also* CRR-0077060-77110 (underlying data on terrestrial species habitat). The CRR FEIS also contains a description of the expected effects of road construction on such environments, R. at CRR-0153503-153505, and expected environmental effects under

the preferred alternative, which included the North Fork Exception.  R. at CRR-0153507-13.  This information is incorporated by reference into the Exception SFEIS.  R. at CRR2-0000014.  The Exception SFEIS provided supplemental environmental information specific to the three roadless areas that is focused on the habitat of sensitive, threatened, and endangered species in addition to aquatic animals.  R. at CRR2-0000065-77, 84-87.  The Exception SFEIS also distinguishes the environmental characteristics of the three roadless areas with respect to the "wilderness capable" areas that would have been excluded from the exception under Alternative C and concludes that Alternative C would "reduc[e] future concerns" related to sensitive fish by removing their habitat from the Exception area.  R. at CRR2-0000088.  Plaintiffs do not challenge the fact that the information in the 2012 CRR FEIS or the supplementary information accurately reflects current environmental conditions in roadless areas subject to the North Fork Exception.  S*ee* Docket No. 47 at 14-18.

Although plaintiffs are correct that the Agencies bear the burden to gather and analyze baseline information required by NEPA, Docket No. 55 at 11 (citing *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)), the burden to show that the Agencies improperly failed to do so rests with plaintiffs.  *See Citizens' Comm. to Save Our Canyons*, 513 F.3d at 1176.  The Court finds that plaintiffs have not shown that the Forest Service failed to "sharply defin[e] the [environmental] issues and provid[e] a clear basis for choice among options" in violation of NEPA because the Exception SFEIS did not contain a detailed discussion of environmental differences among the three roadless areas.  *Id*. at 1179 (quoting 40 C.F.R. § 1502.14); *Dubois v.*

*U.S. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996) (an EIS must "provide decisionmakers with sufficiently detailed information to aid in determining whether to proceed with the action in light of its environmental consequences." (quoting *Northwest Resource Info. Ctr., Inc. v. National Marine Fisheries Serv.*, 56 F.3d 1060, 1064 (9th Cir. 1995))). The incorporated 2012 CRR FEIS contains sufficiently detailed information about the baseline environmental conditions for public participation and analysis of environmental impacts by including both general information about the environment as it applies to common species and specific information about the habitats of less-common species. Additionally, the 2012 CRR FEIS and Exception SFEIS together provide sufficient information about wetlands and other environments within the three roadless areas as they apply to aquatic species. Thus, while some of the information in the record is general information about habitats that cover large areas, the Agencies also provided sufficiently specific information about the expected environmental impacts on the habitats existing in the North Fork Exception. Plaintiffs fail to show that the additional information about the North Fork Exception was necessary to determine foreseeable environmental impacts. *Cf. Utahns for Better Transp.*, 305 F.3d at 1176 ("Even as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and merit inclusion, the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992))). On this record, the Court cannot conclude that the lack of an additional specific discussion of differences between the environmental conditions in the three roadless areas renders the Exception

SFEIS inadequate. *See All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1446 (10th Cir. 1992) (holding an EIS's discussion of cultural resources sufficient where it "condensed the available information" and a discussion of endangered species did not make the EIS inadequate, even though it omitted specific information about two such species).

### 2. *Greenhouse Gas Emissions*

Consistent with governing regulations, the Agencies' analyses of climate change impacts during the administrative proceedings incorporated prior work. By regulation, "[a]gencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action." 40 C.F.R. § 1502.21. The Exception SFEIS contains an extensive economic analysis of the expected global warming consequences of coal mining in the North Fork Exception that includes application of the social cost of carbon protocol to disclose the predicted economic value of environmental harms. R. at CRR2-0000234-267. The Leasing SFEIS, in turn, discloses the expected greenhouse gas emissions for mining specific to the lease modifications. But the leasing SFEIS does not provide additional project-specific information about climate change. R. at FSLeasingII-0000147.

Plaintiffs challenge the Agencies' disclosure of the environmental impacts of climate change with respect to both the North Fork Exception and the lease modifications. With respect to the North Fork Exception, plaintiffs argue that the Forest Service's calculations regarding increased pollution fail to account for increased demand for electricity resulting from additional coal supplies lowering electricity prices. Docket

No. 47 at 21.  With respect to the lease modifications, plaintiffs argue that the Leasing SFEIS should have included further discussion of the expected climate change-related environmental impacts of the lease modification, including application of the social cost of carbon protocol.

### a.  Increased Demand for Electricity

Plaintiffs make a straightforward supply and demand argument that an increased supply of coal will reduce the cost of coal generally.  Docket No. 47 at 20.  And, because coal is burned to create electricity, cheaper coal will result in cheaper electricity, leading, in turn, to an increased demand for electricity.  *Id*. at 21.  Plaintiffs note that the Forest Service predicted a decrease in electricity prices as a result of the project, R. at CRR2-0000108, and considered a corresponding increase in electricity demand a possibility.  Docket No. 47 at 22-23.  The Forest Service stated in the Exception SFEIS that "a number of chain reactions may occur" in response to an increase in coal mining "such as . . . [a]n increase in total electricity production, reflecting the net effect of increased availability of coal fuel inputs for power generation."  R. at CRR2-0000251.  Because the additional electricity produced to meet such demand would, at least in part, be generated by burning fossil fuels other than coal mined from the North Fork Exception, plaintiffs claim that allowing coal mining would result in greenhouse gas emissions exceeding those that would directly result from mining and burning the recoverable North Fork coal.  Docket No. 47 at 22.  Plaintiffs support this analysis with two reports authored by economist Thomas Michael Power, scientist Donovan S. Power, and data analyst Joel M. Brown.  R. at CRR2-0155897-947;

R. at CRR2-0164322-41.[11]

The Agencies respond that, "[i]n time, [plaintiffs'] conclusions may or may not prove true (despite Plaintiffs' certainty), but in 2016 they were unquestionably speculative and thus not useful to decision makers or the public."  Docket No. 51 at 23. The Agencies note that the Exception SFEIS disclosed the assumptions underlying the analysis, including a steadily increasing demand for electricity and that electricity generation across all fuel sources would remain constant, and also identified many other factors that could affect demand for electricity and related greenhouse gas emissions. *Id*. at 24 (citing R. at CRR2-0000016).  With respect to the variables that can influence demand for electricity, the Exception SFEIS explained:

> Change in consumption of fuels by power generating facilities in response to changes in fuel prices varies by supply region (e.g., natural gas-coal elasticity ranges from 0.05 to 0.38; -0.14 to -0.22 for coal's own price elasticity), as expected given differing market, technology, policy, and demand conditions across regions (see Appendix C).  However, consumption of coal is generally, relatively unresponsive to prices (inelastic).

R. at CRR2-0000117.  In responding to plaintiffs' comments about increases in demand for electricity, the Forest Service stated, in part:

> There is no clear evidence to support the suggestion that making available a pre-determined quantity of coal would lower coal prices enough to cause an increase in electric demand in a decision of this magnitude.  While it is true that under the law of demand 'a decrease in the own price of a normal good will cause quantity demanded to increase'; the responsiveness of how quantity demanded changes relative to a change in price is more nuanced (own-price elasticity) and depends upon numerous factors such as the availability of substitutes, length of adjustment period and the budget share spent on the good.  In the case of

---

[11] The reports also criticized the Forest Service's social cost of carbon analysis for other reasons, but plaintiffs do not raise those issues on appeal.

electric power generation, the consumption of coal is generally, relatively unresponsive to prices (inelastic).

* * *

There is also a lack of data supporting the phenomena where retail electric rates would decrease enough to cause a noticeable change in electric demand due to changes in fuel prices, in response to shifts in fuel supply of the magnitude modeled in this action. In this present case, evidence has not been presented to support the claim that electricity demand would change with the addition or subtraction of projected amounts of North Fork coal from the fuel supply. The assumption that [the] IPM [method used] does not incorporate the basic economic principle of price elasticity of demand is mistaken. In actuality, IPM does not hard-wire coal demand or coal plant dispatch; rather, the demand for coal is allowed to be determined in a competitive environment with other generating resources.

R. at CRR2-0000342. The Exception SFEIS also included an appendix, Appendix C, discussing the economic analysis underlying the Forest Service's conclusions. R. at CRR2-0000233-67. Based on these disclosures, the Agencies argue that the "record reflects that the agency examined the issue [of electricity demand] in considerable detail, acknowledged the possibility of price variation, dependent of course on a number of factors difficult to predict, and ultimately disagreed with Dr. Power's conclusions." Docket No. 51 at 25-26.

Under NEPA, the Agencies need only disclose effects of a project that are "reasonably foreseeable." 40 C.F.R. § 1508.8; *see also Lee v. U.S. Air Force*, 354 F.3d 1229, 1241 (10th Cir. 2004) (discussing 40 C.F.R. § 1502.22, which applies when there is "incomplete or unavailable information" about potential impacts). In *WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1236 (10th Cir. 2017), the Tenth Circuit rejected a claim by the BLM that coal could be perfectly substituted for other fuels, concluding that the "perfect substitution assumption [is] arbitrary and capricious because the assumption itself is irrational (i.e., contrary to basic

36

supply and demand principles)." The court noted that the "perfect substitution assumption was key to the [BLM's] ultimate decision" and, based on this assumption, the agency "underestimate[d] the effect on climate change." *Id*. at 1236-37.

The Court finds that *WildEarth Guardians* is distinguishable. The Forest Service provided significant evidence and analysis showing that the basic supply and demand relationship asserted by plaintiffs is questionable because of other factors that bear on the relationship between coal availability and electricity demand. In particular, with respect to future demand for coal to produce energy, the Exception SFEIS notes that numerous factors affect whether other energy sources can substitute for coal and that power plants operate subject to numerous technological and regulatory limitations that determine whether coal generally, or coal of the particular type recoverable in the North Fork area, can be substituted for other fuels, regardless of its price. R. at CRR2-0000250. Likewise, with respect to electricity consumption, the Exception SFEIS discusses how numerous factors other than fuel price influence the cost of and demand for electricity. R. at CRR2-0000342. In light of these disclosures, the Court is unpersuaded by plaintiffs' argument that the Agencies failed to take a hard look at climate impacts because the Agencies disagreed that one factor in a complex analysis, an increased supply of a particular type of coal, would lead to additional climate impacts through a mechanism, namely, the fluctuating demand for electricity, that is itself subject to various disclosed factors. Unlike in *WildEarth Guardians*, the Court finds no basis to conclude that the Forest Service "[f]ail[ed] to disclose the data critical to the key distinction between two alternatives" leading to "an uninformed agency decision" that "did not adequately disclose the [Forest Service's] rationale to the public." *WildEarth*

*Guardians*, 870 F.3d at 1237.  Rather, the Forest Service extensively disclosed the basis for its analysis and the Court will not overturn its reasoned decision that the chain reaction plaintiffs claim will occur is speculative, rather than reasonably foreseeable. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) ("It is not our task to determine what decision we, as Commissioners, would have reached. Our only task is to determine whether the Commission has considered the relevant factors and articulated a rational connection between the facts found and the choice made.").

**b.  Repeal of the Clean Power Plan**

Plaintiffs argue that, in approving the lease modifications, the Agencies could not rely on the social cost of carbon analysis in the Exception SFEIS because of changes to the expected regulations that will govern the use of coal to produce electricity in the future.  Docket No. 47 at 24-25.  Specifically, plaintiffs claim that the Exception SFEIS's estimates of carbon emissions and the social cost of those emissions were outdated and required revision in light of the intervening Administration announcement that it planned to repeal the Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, commonly referred to as the "Clean Power Plan."  *Id*. at 35.  The Clean Power Plan was adopted by the EPA on October 23, 2015.  80 Fed. Reg. 64,662.  It placed annual limits on carbon dioxide emissions from existing power plants, which restricted the amount of coal that could be burned by such power plants in future years.  *Id*.; *see also In re Murray Energy Corp. v. EPA*, 788 F.3d 330, 334 (D.C. Cir. 2015).  The Clean Power Plan was promptly challenged in federal court and, on

February 9, 2016, the Supreme Court stayed the program's implementation pending review. *W. Virginia v. EPA*, 136 S. Ct. 1000 (2016). On April 4, 2017, the EPA announced rulemaking that may repeal the Clean Power Plan. 82 Fed. Reg. 16,329; *see also* 82 Fed. Reg. at 48,038. The Forest Service adopted the North Fork Exception before the EPA's announcement, but the lease modifications were finalized after the EPA proposed repealing the Clean Power Plan.

As the Agencies note, the *High Country* decision did not mandate that the Agencies apply the social cost of carbon protocol in their decisions; the court merely found arbitrary the Agencies' failure to do so without explanation. *See High Country*, 52 F. Supp. 3d at 1193 ("[T]he agencies might have justifiable reasons for not using (or assigning minimal weight to) the social cost of carbon protocol to quantify the cost of [greenhouse gas] emissions from the Lease Modifications. Unfortunately, they did not provide those reasons in the FEIS, and their post-hoc attempts to justify their actions, even if the Court were permitted to consider them, are unpersuasive."). The lease modifications address a section of the area subject to the North Fork Exception and incorporate the Exception SFEIS, relying in part on its analysis. The Leasing SFEIS discloses the amount of greenhouse gases expected to be emitted under each of the lease modification alternatives considered. R. at FSLeasingII-0000195; *see also* FSLeasingII-0000227 (discussing greenhouse gases and disclosing emissions from wildfires and mobile sources); R. at FSLeasingII-0000240. Plaintiffs do not argue that the expected climate impacts of the lease modifications are anything other than an amount proportionate to the percentage of coal subject to the North Fork Exception that is leased. Thus, the social cost of carbon information provided in the Exception SFEIS

is informative of the climate impacts expected to occur under the lease modifications. The Forest Service's record of decision approving the lease modifications notes that the Exception SFEIS's discussion of greenhouse gas harms informed its decision on the harms of the lease modifications, but concluded that further analysis of the issue was not necessary because the "public [has] been informed by the analysis done to date."  R. at FSLeasingII-0000060; *see also* BLM000004 (BLM record of decision for lease modifications noting the new administrative proceedings "address[ed] Court-identified deficiencies and incorporate[d] new information and policies since 2012").  Additionally, the Forest Service explained that it did not need further "project-level" analysis to understand the relevant impacts.  R. at FSLeasingII-0000061.

In light of the social cost of carbon analysis in the Exception SFEIS addressing the same areas, the Court finds that the omission of a social cost of carbon analysis from the leasing SFEIS was not an abuse of discretion.  While such a project-specific analysis could be helpful, the Agencies' reasoned decision that it was unnecessary to provide a project-level analysis with revisions specific to the potential repeal of the Clean Power Plan does not constitute an omission "significant enough to defeat the goals of informed decisionmaking and informed public comment."  *Lee*, 354 F.3d at 1237 (citing *Utahns for Better Transp.*, 305 F.3d at 1163).  At best, plaintiffs' argument suggests that the repeal of the Clean Power Plan would lead to burning more coal for power generation because less fuels with lower expected greenhouse gas impacts would be substituted for coal.  *See, e.g.*, FSLeasingII-0036293.  As discussed above, however, the Agencies disclosed and discussed numerous technological, regulatory, and other factors in the Exception SFEIS that influence whether other fuels can be substituted for

a particular type of coal, regardless of whether one particular regulation is in effect. Therefore, applying the "rule of reason standard" as it must, the Court finds that the omission of a social cost of carbon analysis addressing the likely repeal of the Clean Power Plan from the Leasing SFEIS does not amount to a deficiency significant enough to warrant reversal. *Lee*, 354 F.3d at 1237; *Dombeck*, 185 F.3d at 1172 ("Our objective is not to 'fly speck' the environmental impact statement, but rather, to make a 'pragmatic judgment whether the [environmental impact statement]'s form, content and preparation foster both informed decision-making and informed public participation.'" (quoting *Oregon Envtl. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)).

## V. CONCLUSION

For the above-stated reasons, it is

**ORDERED** that the Motion of the Institute for Policy Integrity at New York University School of Law to Participate as *Amicus Curiae* and with Proposed *Amicus* Brief in Support of Plaintiffs [Docket No. 41] is **GRANTED**. It is further

**ORDERED** that the Agencies' decisions are **AFFIRMED**, judgment shall enter in favor of defendants, and this case shall be closed in its entirety.

DATED August 10, 2018.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge